No. 24-60084

# United States Court of Appeals for the Fifth Circuit

DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE;
HEALTHY GULF; ALLIANCE FOR AFFORDABLE ENERGY,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN,

*Respondents*.

On Petition for Review of a Final Action
of the U.S. Environmental Protection Agency
No. EPA-HQ-OW-2023-0073

## OPENING BRIEF OF PETITIONERS

James Yskamp (PA319444)
EARTHJUSTICE
25000 Euclid Ave, Suite 305
Euclid, OH 44117
(570) 404-0237
jyskamp@earthjustice.org

Claire Taigman (IL6341853)
EARTHJUSTICE
311 S. Wacker Dr., Ste. 1400
Chicago, IL 60640
(312) 500-2190
ctaigman@earthjustice.org

Elizabeth Livingston de Calderon (LA31443)
EARTHJUSTICE
900 Camp Street, Unit 303
New Orleans, LA 70130
(504) 910-1712
ecalderon@earthjustice.org

*Counsel for Petitioners Deep South Center for
Environmental Justice, Healthy Gulf, and
Alliance for Affordable Energy*

## CERTIFICATE OF INTERESTED PARTIES

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case.

These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

**Petitioners:**

1. Alliance for Affordable Energy
2. Deep South Center for Environmental Justice
3. Healthy Gulf

**Counsel for Petitioners:**

1. Elizabeth Livingston de Calderon, Earthjustice
2. Claire Taigman, Earthjustice
3. James Yskamp, Earthjustice

**Respondents:**

1. Michael Regan
2. United States Environmental Protection Agency

**Counsel for Respondents:**

1. Tsuki Hoshijima, U.S. Department of Justice, Environment & Natural Resources Division
2. Jeffrey Prieto, Environmental Protection Agency, Office of General Counsel

**Intervenors:**

1. American Petroleum Institute
2. State of Louisiana
3. Louisiana Department of Energy and Natural Resources

**Counsel for Intervenor American Petroleum Institute:**

1.    James Michael Auslander, Beveridge & Diamond, P.C.

**Counsel for Intervenors State of Louisiana and Louisiana Department of Energy and Natural Resources:**

1.    Jorge Benjamin Aguinaga, Louisiana Department of Justice
2.    Kelsey LeeAnn Smith, Louisiana Department of Justice, Office of the Attorney General

June 12, 2024                    */s/ James Yskamp*
                                 James Yskamp (PA319444)
                                 EARTHJUSTICE
                                 25000 Euclid Ave, Suite 305
                                 Euclid, OH 44117
                                 (570) 404-0237
                                 jyskamp@earthjustice.org

                                 *Counsel for Petitioners*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners respectfully request oral argument.  *See* Fed. R. App. P. 34(a), (f); 5th Cir. R. 28.2.3.  This case involves important legal issues and a complex and voluminous administrative record.  Oral argument would substantially aid the Court in its resolution of the case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES .............................................. i

STATEMENT REGARDING ORAL ARGUMENT ................................... iii

TABLE OF CONTENTS ..................................................................... iv

TABLE OF AUTHORITIES ........................................................ vii

INTRODUCTION ............................................................................ 1

STATEMENT OF JURISDICTION ............................................... 2

STATEMENT OF THE ISSUES ................................................... 3

STATEMENT OF THE CASE ..................................................... 3

    A.  Carbon Sequestration Through Underground Injection Wells
        and Its Risks. ................................................................. 3

    B.  The Safe Drinking Water Act and UIC Class VI Well
        Regulations Seek to Address Risks to USDWs Imposed by
        Carbon Dioxide Sequestration. .................................... 7

    C.  Louisiana's Class VI UIC Well Primacy Application Includes
        a Liability Release and Fails to Demonstrate the Expertise
        Required to Administer the Program. ......................... 11

    D.  EPA's Approval of Louisiana's Class VI Primacy Application
        and Adoption of Louisiana's Laws Under the Safe Drinking
        Water Act. .................................................................. 14

SUMMARY OF THE ARGUMENT ........................................... 15

STANDARD OF REVIEW ...................................................... 19

ARGUMENT ........................................................................... 20

    I.   The Community Groups Have Standing. ................................. 20

        A. Associational Standing. ......................................... 20

        B.  Organizational Standing. ....................................... 25

    II.  EPA's Approval Exceeded Its Authority and Violated the
        Act. ................................................................................ 27

    III.  Louisiana's Program Is Less Stringent Than Federal
        Regulations. ................................................................... 31

    IV. EPA Failed to Offer a Satisfactory Explanation for Its
        Approval. ...................................................................... 41

A. EPA Failed to Explain Why It Did Not Consider Post-Site Closure Liabilities in Its Stringency Evaluation. ..................... 42

B. EPA Lacked the Basis to Conclude that Louisiana Has the Expertise to Implement the Class VI Program. ...................... 45

CONCLUSION ............................................................................ 49

CERTIFICATE OF SERVICE .................................................... 50

CERTIFICATE OF COMPLIANCE ........................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Calumet Shreveport Ref., L.L.C. v. EPA,*
    86 F.4th 1121 (5th Cir. 2023) ............................................................46, 47

*Center for Biological Diversity v. Regan*
    2024 WL 1602457 (D.D.C. Apr. 12, 2024) .............................................. 30

*Concerned Pastors for Soc. Action v. Khouri,*
    194 F. Supp. 3d 589 (E.D. Mich. 2016) ................................................... 38

*Michigan v. EPA,*
    268 F.3d 1075 (D.C. Cir. 2001) ........................................................16, 27

*Gulf States Mfrs., Inc. v. N. L. R. B.,*
    579 F.2d 1298 (5th Cir. 1978) ................................................................. 19

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ................................................................................ 20

*Legal Env't Assistance Found., Inc. v. EPA,*
    118 F.3d 1467 (11th Cir. 1997) ..........................................................19, 32

*Mattoon v. City of Pittsfield,*
    980 F.2d 1 (1st Cir. 1992) ....................................................................... 10

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ................................................................... 19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................... 41, 44, 47

*Ohio River Valley Env't Coal. v. Kempthorne,*
    473 F.3d 94 (4th Cir. 2006) ........................................................ 18, 42, 44

*Phillips Petroleum Co. v. EPA,*
    803 F.2d 545 (10th Cir. 1986) .................................................................. 8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ............................................................... 28

*Sierra Club v. Chesapeake Operating, LLC*,
248 F. Supp. 3d 1194 (W.D. Okla. 2017) ................................... 7

*Sierra Club v. Louisiana Dep't of Env't Quality*,
100 F.4th 555 (5th Cir. 2024) ................................................. 31

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ............................................41, 44

*Texas State LULAC v. Elfant*,
52 F.4th 248 (5th Cir. 2022) ................................................... 27

*Louisiana v. U.S. Dep't of Energy*,
90 F.4th 461 (5th Cir. 2024) ............................................19, 20

*United States v. King*,
660 F.3d 1071 (9th Cir. 2011)................................................. 31

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) ................................................... 20

**Federal Statutes**

5 U.S.C. § 706 ............................................................................... 19

33 U.S.C. § 1319 ....................................................................13, 39

42 U.S.C. § 300h ...................................................................*passim*

42 U.S.C. §300h-1 .................................................................*passim*

42 U.S.C. § 300h-2 ......................................................... 16, 28, 39

42 U.S.C. § 300i ........................................................................... 40

42 U.S.C. § 300j-7 ...................................................................... 2, 3

42 U.S.C. § 300j-8 ......................................................................... 12

42 U.S.C. § 6901 ......................................................................... 30

42 U.S.C. § 6928 ............................................................................13, 39

42 U.S.C. § 6972 ............................................................................13, 39

42 U.S.C. § 9601 ............................................................................... 30

42 U.S.C. § 9609 ............................................................................13, 39

42 U.S.C. § 9613 ............................................................................13, 39

Administrative Procedure Act,
     5 U.S.C. § 551 et. seq. ........................................................*passim*

Clean Air Act of 1970,
     42 U.S.C. § 7401 et seq ............................................... 29, 30, 38

Clean Water Act of 1972,
     33 U.S.C. § 1251 et. seq. ......................................... 13, 39, 43

Comprehensive Environmental Responsem Comensation, &
     Liability Act,
     42 U.S.C. § 9601 et seq. ...................................................*passim*

Endangered Species Act of 1973,
     16 U.S.C. § 1531 et seq ................................................... 30

Resource Conservation and Recovery Act,
     42 U.S.C. § 6901 et seq. ...................................................*passim*

Safe Drinking Water Act,
     42 U.S.C. § 300f et seq. ...................................................*passim*

Surface Mining Control and Reclamation Act of 1977,
     30 U.S.C. § 1201 et. seq ........................................................ 43

**State Statutes**

La. Rev. Stat. § 30:1109 .....................................................*passim*

**Regulations**

40 C.F.R. § 144.12 .........................................................13, 37

40 C.F.R. § 144.6 ........................................................... 4, 8

40 C.F.R. § 145.11 ........................................................ 10, 17, 32

40 C.F.R. § 145.13 ........................................................ 13, 17, 37

40 C.F.R. § 145.23 ........................................................ 10, 13, 45

40 C.F.R. § 146.82 .............................................................. 8, 9

40 C.F.R. § 146.93 ...........................................................*passim*

40 C.F.R. § 147.950 ............................................................... 31

La. Admin. Code tit. 43, pt. XVII, § 3633 ......................... 34, 35, 36

## Federal Register Notices

60 Fed. Reg. 54990 ................................................................ 38

60 Fed. Reg. 55000 ................................................................ 38

75 Fed. Reg. 77230 .................................................................. 5

75 Fed. Reg. 77234 .................................................................. 5

75 Fed. Reg. 77260 ............................................................29, 30

75 Fed. Reg. 77272 ..........................................................*passim*

76 Fed. Reg. 56982 .................................................................. 4

89 Fed. Reg. 703 ......................................................... 11, 14, 15

89 Fed. Reg. 704 ......................................................... 11, 14, 15

89 Fed. Reg. 711 ................................................................... 15

## Other Authorities

EPA, *Class VI Wells Permitted by EPA*, https://www.epa.gov/uic/class-
   vi-wells-permitted-epa (Apr. 11, 2024) ....................................... 7

EPA, *Rulemaking Docket: Louisiana Underground Injection Control
   Program; Class VI Primacy*,
   https://www.regulations.gov/docket/EPA-HQ-OW-2023-0073
   (last visited June 10, 2024) ...................................................... 15

**INTRODUCTION**

The U.S. Environmental Protection Agency ("EPA") failed to comply with the law when it handed over authority to Louisiana to regulate the high-risk practice of sequestering vast amounts of carbon dioxide ("$CO_2$") underground through injection wells. EPA's decision to grant Louisiana primacy over the "Class VI" well program violated the Safe Drinking Water Act (or the "Act") and its regulations because Louisiana's program *1)* releases post-site closure liability under the Safe Drinking Water Act requirements and other federal environmental statutes, *2)* is less stringent than EPA's regulatory requirements and, *3)* fails to demonstrate the state has the staff and expertise necessary to implement the permitting program. Further, EPA violated the Administrative Procedure Act by failing to sufficiently explain its approval in light of those statutory and regulatory failures and the state's past failures regulating less complicated wells. EPA's unlawful decision leaves Louisianans who live, work, or recreate near Class VI wells at risk for their health and potentially without any responsible owner or operator to hold accountable.

EPA's violation allows potentially catastrophic harms to drinking water and health. Carbon dioxide storage is a uniquely challenging technology and, because long-term efficacy of the practice is uncertain, long-term liability is critical. EPA itself has permitted eight Class VI wells since 2015 in the United

States, only four of which have injected $CO_2$.  And it has granted Class VI primacy to only two other states, neither of which faces Louisiana's geological vulnerabilities or its massive proposed $CO_2$ storage facility buildout.  Primacy gives Louisiana authority over more than 50 Class VI well permit applications to process for more than 20 fossil fuel-related projects despite the state's acknowledged lack of expertise and documented failure to monitor and enforce a less complicated well program.  With its approval, EPA unlawfully adopted Louisiana's liability waiver into federal law and handed over authority without the required showing that Louisiana has the staff and expertise to safely run the program. This Court should reverse EPA's decision.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 42 U.S.C. § 300j-7(a)(2), which authorizes review of a final action of the EPA Administrator—aside from those establishing national primary drinking water regulations—in the circuit where a petitioner resides or transacts business directly affected by the action. The petition seeks review of a final EPA action that granted Louisiana primary enforcement authority over a Safe Drinking Water Act underground injection control program in that state.  Petitioners timely filed their petition on February 20, 2024, within the 45-day period after EPA's January 5, 2024, final action, as

provided under 42 U.S.C. § 300j-7(a). Petitioners are organizations based in Louisiana, and EPA's action adversely affects Petitioners and their members.

## STATEMENT OF THE ISSUES

1. Whether EPA violated the Safe Drinking Water Act when it approved Louisiana's Application even though Louisiana's program waives post-site closure liability under the Act and other federal laws.

2. Whether EPA violated its own regulations by approving Louisiana's Application even though Louisiana's program is less stringent than EPA's.

3. Whether EPA violated the Administrative Procedure Act by failing to sufficiently explain its approval of the liability waiver in Louisiana's program.

4. Whether EPA violated the Administrative Procedure Act by failing to sufficiently explain why it found that Louisiana has staffing and expertise necessary to implement the Class VI UIC Well program though its own guidance and the record show the opposite.

## STATEMENT OF THE CASE

### A. Carbon Sequestration Through Underground Injection Wells and Its Risks.

Underground injection control ("UIC") wells are used to dispose of waste, typically by injecting fluid underground into porous geologic formations, from shallow sands to deeper formations. *See* Excerpt 3 at 2 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 2). EPA's six UIC well programs are classified

based on the type of waste they store, such as hazardous wastewater (Class I) and oil and gas wastewater (Class II). *See* 40 C.F.R. § 144.6.

Class VI UIC wells are used for long-term storage, *i.e.* "geological sequestration," of carbon dioxide through deep subsurface injection. *Id.* at § 144.6(f); s*ee* Announcement of Federal Underground Injection Control (UIC) Class VI Program for Carbon Dioxide ($CO_2$), 76 Fed. Reg. 56982 (Sept. 15, 2011). This process involves capturing $CO_2$ from an emissions source, transporting it to a well site, and then injecting it in a delicate state of temperature and pressure, known as a "supercritical" state, through a Class VI well entry into deep geologic formation reservoirs. Excerpt 3 at 2-3.

The use of Class VI wells for sequestration of carbon dioxide is relatively new. The first Class VI well began injecting carbon dioxide in 2017 in Illinois, and today there are only four Class VI wells in operation across the country. Critically, "no Class VI wells have completed a full permit lifecycle (*i.e.*, through the injection phase and [post-injection site care] phase to site closure)." Excerpt 2 at 22 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex.1.).

Although the efficacy of long-term storage of $CO_2$ is uncertain still, the risks it poses are clear, particularly those to drinking water. First is the risk from $CO_2$'s mobility and potential to escape the well. Supercritical $CO_2$ is "highly buoyant compared to displaced formational fluids and has a greater potential to

4

migrate vertically in the subsurface and endanger shallower formations (including drinking water sources) than that of denser waste types common to" other injection well disposal practices.  Excerpt 4 at 5 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex 6).  Impurities that may be present in the injected $CO_2$ stream exacerbate the dangers from migration.  Federal Requirements Under the Underground Injection Control (UIC) Program for Carbon Dioxide ($CO_2$), 75 Fed. Reg. 77230, 77234 (Dec. 10, 2010) (to be codified at 40 CFR Parts 124, 144, 145, 146, and 147).

Second is the risk from $CO_2$'s corrosivity.  Injected $CO_2$ is corrosive in the presence of water, where it "could cause leaching and mobilization of … contaminants from geologic formations into groundwater (e.g., arsenic, lead, and organic compounds)."  *Id.* at 77235.  $CO_2$'s corrosivity can also compromise the steel and cement in well components, while its buoyant nature "could enable it to migrate up a compromised wellbore."  *Id.* at 77261.  EPA's decision noted that "large $CO_2$ injection volumes anticipated at G[eologic] S[equestration] projects" and the various hazards and concerns related to $CO_2$ injection make "tailored requirements … necessary to manage the unique nature of $CO_2$ injection" and storage.  *Id.* at 77233.

The few studies on $CO_2$ injection wells confirm the seriousness of these risks.  A 2023 study of the two projects most cited for successful carbon

sequestration, both in Norway, noted the risks of the practice of carbon sequestration "given the very limited practical, long-term experience of permanently keeping $CO_2$ in the ground." Excerpt 5 at 5 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 13). Even in these examples, "the security and stability" of the confining geology proved difficult to predict. *Id.* at 6. Just three years into one site's operation, $CO_2$ had risen from the injection formation to a previously unidentified shallow layer of the formation. *Id.* at 6. The other site "demonstrated acute signs of rejecting the $CO_2$" just 18 months into injection operations. *Id.* The study concludes that CCS project risks demand intense, constant, and on-going long-term oversight:

> [The] projects demonstrate . . . that each CCS project has unique geology; that geologic storage performance for each site can change over time; and that a high-quality monitoring and engineering response is a constant, ongoing requirement. Every proposed project needs to budget and equip itself for contingencies both during and long after operations have ceased.

*Id.*

The risks of $CO_2$ migration are especially high in Louisiana due to Louisiana's naturally fractured geology. *See, e.g.,* Excerpt 8 at 11 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 14). These faults and fractures could allow $CO_2$ to migrate into aquifers. *See* Excerpt 7 at 14 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 26). A 2018 study noted "that faults are part of geological settings in southern Louisiana" and called for "quantifying

potential fault-related leakage" to better determine potential carbon sequestration risks.  Excerpt 8 at 11.

Similarly, Louisiana's hundreds of thousands of existing oil and gas wells, particularly those that are old, unplugged, or improperly plugged, make Class VI injection risky because these wells can serve as a conduit for $CO_2$ to flow to the surface or interact with groundwater.  Excerpt 7 at 11.  Many of those wells were drilled before records were required and are in still unknown locations, complicating siting decisions.  *Id.*

Despite these risks, large portions of Louisiana are planned for mass $CO_2$ disposal in the near future.  *See* Excerpt 6 at 10-12 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 7).  At least 55 Class VI well permit applications are pending in Louisiana for at least 22 different facilities.[1]  This is far greater than the number of Class VI wells proposed in any other state and almost five times the number in operation across the nation.

## B. The Safe Drinking Water Act and UIC Class VI Well Regulations Seek to Address Risks to USDWs Imposed by Carbon Dioxide Sequestration.

Congress enacted the Safe Drinking Water Act to "insure the quality of publicly supplied drinking water." *Sierra Club v. Chesapeake Operating, LLC*, 248

---

[1] EPA, *Class VI Wells Permitted by EPA*, https://www.epa.gov/uic/class-vi-wells-permitted-epa (Apr. 11, 2024).

F. Supp. 3d 1194, 1199–200 (W.D. Okla. 2017). To that end, "'. . . water supply systems serving the public meet minimum *national* standards for protection of *public* health' . . ." *Phillips Petroleum Co. v. U.S. EPA*, 803 F.2d 545, 555 (10th Cir. 1986) (quoting H.R. Rep. No. 93-1185 (1974)) (emphases in original). The UIC well program is a key component of the Act. 42 U.S.C. § 300h *et seq*. Congress and EPA designed the UIC program to prevent fluids or waste injected underground from contaminating Underground Sources of Drinking Water (USDWs). The Safe Drinking Water Act regulates six types of UIC injection wells, delineated as Classes I-VI. 40 C.F.R. § 144.6.

By default, EPA has sole authority to issue injection well permits, based upon which it established minimum regulations for Class VI wells. *See* 42 U.S.C. § 300h-1(c) (requiring EPA to prescribe a plan for states without primary enforcement authority); 40 C.F.R. §§ 146.81–146.95. These regulations require, among other things, emergency response plans and risk analysis for injection that may cause endangerment to USDWs, as well as complex modeling of the proposed injection site to determine where USDWs may be endangered based on site-specific data. *See id*. at §§ 146.82(c), 146.94.

Perhaps the most unique and extensive requirements in the Class VI program are its post-injection site care rules, which mandate a "post-injection site care" period after injection has ceased and before site closure is authorized.

*See id*. at § 146.93(a–c). Procedurally, once the project ceases injection, the owner or operator either submits an amended post-injection and site closure plan or demonstrates that it needs no amendment from the plans it submitted with its application. *See id*. at § 146.93(a)(3). The owner or operator then implements the site care plan and performs monitoring requirements for carbon dioxide storage plume and pressure. *See id*. at § 146.93(a–c). After the time frame established in the site plan or as amended, the owner or operator makes a "demonstration" based on a number of considerations, that the facility does not pose any danger to underground sources of drinking water. *See id*. Following that demonstration, the owner or operator notifies the Director, at least 120 days before site closure, of its intent to close the site. *Id*. at § 146.93(d). Once the Director authorizes site closure, the owner or operator plugs all the monitoring wells "in a manner which will not allow movement of injection or formation fluids that endangers a USDW." *Id*. at § 146.93(e). The owner or operator must then submit a site closure report, which it retains for ten years. *See id*. at § 146.93(f). The owner or operator must "record a notation on the deed to the facility property or any other document that is normally examined during title search that will in perpetuity provide any potential purchaser of the property" with specific information regarding the sequestration activities at the site. *See id*. at § 146.93(g). The owner or operator retains the site closure records collected

during the post-injection site care period for 10 years, after which time it delivers those records to the Director.  *Id*. at § 146.93(h).

In promulgating its regulations, EPA outlined a range of post-site closure and continuing liability under the Safe Drinking Water Act, and specifically acknowledged continuing liability under other federal environmental statutes, as well as "tort and other remedies."  75 Fed. Reg. at 77272.

While EPA has default authority over the UIC well program, Congress authorized EPA to approve or disapprove primary enforcement responsibility when a state submits a program that "contains a showing satisfactory to the Administrator that the State … will implement, an underground injection control program which meets the requirements" set forth in the Safe Drinking Water Act and EPA's regulations.  *See* 42 U.S.C. § 300h-1(b)(1).  This showing requires, among other things, a description of the agency staff that will carry out the program, including the number of employees, their occupations, and their general duties.  40 C.F.R. § 145.23(b)(1).  A state also must adopt laws and regulations "at least as stringent as" the federal regulations. *See* 40 C.F.R. § 145.11(b)(1); *Mattoon v. City of Pittsfield*, 980 F.2d 1, 5–6 (1st Cir. 1992) (explaining primary enforcement authority under the Safe Drinking Water Act). In sum, EPA must determine that a state has the capacity and regulatory

structure to carry out the program in a manner that is at least as protective as required by federal law.

### C. Louisiana's Class VI UIC Well Primacy Application Includes a Liability Release and Fails to Demonstrate the Expertise Required to Administer the Program.

The State of Louisiana applied to EPA to amend its existing UIC program to include primary enforcement authority over Class VI carbon sequestration wells in 2021 (the "Application" or "Primacy Application"). State of Louisiana Underground Injection Control Program; Class VI Primacy, 89 Fed. Reg. 703, 704 (Jan. 5, 2024) (to be codified at 40 C.F.R. § 147.950). Within its Class VI statutes and regulations, Louisiana included a statute titled, "Cessation of storage operations; limited liability release" (the "liability waiver" or "liability release"). La. Rev. Stat. § 30:1109. While Louisiana's Class VI regulations appear to adhere to the post-injection site care and site closure requirements set forth in the federal regulations, the state's governing statute cancels some of those requirements by releasing post-closure obligations and liabilities for well owners, operators, and $CO_2$ generators:

> Upon the issuance of the certificate of completion of injection operations, the storage operator, all generators of any injected carbon dioxide, all owners of carbon dioxide stored in the storage facility, and all owners otherwise having any interest in the storage facility **shall be released from any and all future duties or obligations under this Chapter and any and all liability** associated with or related to that storage facility which arises after the issuance of the certificate of completion of injection operations.

11

*Id.* at § 30:1109(A)(3) (emphasis added). EPA's program does not include any such liability waiver. *See* 40 C.F.R. §§ 146.81-146.95. Moreover, under Louisiana's "Cessation of storage operations; limited liability release" statute, ownership of the Class VI wells automatically transfers to the state, without the liability, when the Louisiana Department of Energy and Natural Resources ("LDENR" or "Office of Conservation") issues the certificate of completion. *See* La. Rev. Stat. § 30:1109(A)(2), (6) ("It is the intent of this Section that the state shall not assume or have any liability by the mere act of assuming ownership of a storage facility after issuance of a certificate of completion of injection operations."). So, by statute, after releasing original owner and operator liabilities, there is no subsequent owner to whom liability for Louisiana Class VI well failures flows. *See id.* In other words, once Louisiana authorizes site closure with its certificate, the statute broadly releases virtually all liability for any injuries or issues that could occur if $CO_2$ escapes the injection zone.

The statute includes claw-back provisions that could apply to some of the Safe Drinking Water Act's enforcement liabilities. *See* La. Rev. Stat. § 30:1109(A)(3)-(5). But these provisions do not claw back the release from post-closure citizen suit liability that the Act provides at § 300j-8. *See* La. Rev. Stat. § 30:1109(A)(3)-(5), (G); 42 U.S.C. § 300j-8. Similarly, the release remains for

general liability under EPA's regulatory requirements, such as the prohibition on well leaks and contamination regardless of any permit compliance under 40 C.F.R. § 144.12(a) and post-closure record maintenance and delivery under 40 C.F.R. § 145.13.  Indeed, the claw-back provision at section 30:1109(G) would limit EPA's oversight and enforcement authority in favor of Louisiana by giving the Commissioner of LDENR's Office of Conservation discretion on when enforcement may be available.  *See* La. Rev. Stat. § 30:1109(G) ("The commissioner shall implement this [post-closure liability release] Section in a manner consistent with and as the commissioner deems necessary to carry out the purposes and requirements of the federal Safe Drinking Water Act.)

Further, nothing in § 30:1109 would reverse its liability release from all other federal and state laws, including the Clean Water Act, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" and also known as Superfund), and the Resource Conservation and Recovery Act ("RCRA").  *See*, *e.g.*, 33 U.S.C. §§ 1319, 1365 (Clean Water Act); 42 U.S.C. §§ 9609, 9613 (CERCLA); 42 U.S.C. §§ 6928, 6972 (RCRA).

Pursuant to 40 C.F.R. § 145.23(b), Louisiana's Application also includes a "Class VI Underground Injection Control Program Description" that, among other things, describes the staff and expertise that would implement the program. Excerpt 14 at 2-3 (Certified Index No. EPA-HQ-OW-2023-0073-

13

0008).  The Application appointed LDENR as the administrator of the proposed Class VI well program.  *Id*. at 2.  However, LDENR stated that it did not have expertise in-house for all areas necessary to evaluate all technical aspects of permit applications and ensure program enforcement, like modeling, risk analysis, and testing and monitoring of wells.  *See id*. at 2-3.  Instead, LDENR indicated it would hire unnamed third-party contractors to handle many aspects of the permitting evaluation and monitoring process for its program, but gave no information on whether and how it has access to such expertise.  *See id*.

### D. EPA's Approval of Louisiana's Class VI Primacy Application and Adoption of Louisiana's Laws Under the Safe Drinking Water Act.

Under the Safe Drinking Water Act, EPA delegates primary enforcement authority through rulemaking.  42 U.S.C. § 300h(b)(1).  In exercising its rulemaking power, the Act requires EPA to ensure that state programs "contain minimum requirements for effective programs to prevent underground injection which endangers drinking water sources."  *Id.*  When EPA approves a primacy program by rule, the specified laws and regulations within that program, such as in this case the liability waiver, are adopted under the Safe Drinking Water Act and become federal law.  *See* 40 C.F.R. § 147.950.

The public expressed tremendous concern over EPA's potential delegation of authority to Louisiana.  EPA received more than 40,000 comments

on the proposed approval before the comment period closed.[2]  Many of the comments submitted, including those from Petitioners, argued that EPA could not approve Louisiana's liability waiver, that LDENR failed to obtain expertise necessary to carry out EPA's Class VI UIC well program, and that Louisiana's poor track record of enforcing other well programs dictated against delegation. *See, e.g.,* Excerpt 1 (Certified Index No. EPA-HQ-OW-2023-0073-0213); Excerpt 12 (Certified Index No. EPA-HQ-OW-2023-0073-0720); Excerpt 15 (Certified Index No. EPA-HQ-OW-2023-0073-0146); Excerpt 16 (Certified Index No. EPA-HQ-OW-2003-0073-0206); Excerpt 18 (Certified Index No. EPA-HQ-OW-2023-0073-0219).

On January 5, 2024, EPA issued a final rule adopting Louisiana's program, including the liability waivers in La. R.S. § 30:1109.  89 Fed. Reg. at 711; 40 C.F.R. § 147.950.  Petitioners timely filed their Petition for Review, and this action ensued.

## SUMMARY OF THE ARGUMENT

EPA's approval of Louisiana's Application for primary enforcement authority over Class VI wells violates the Safe Drinking Water Act and EPA's

---

[2] The Rulemaking Docket at Regulations.gov lists the "Number of Comments Received" at 48,620. EPA, Rulemaking Docket: Louisiana Underground Injection Control Program; Class VI Primacy, https://www.regulations.gov/docket/EPA-HQ-OW-2023-0073 (last visited June 10, 2024).

minimum regulations because (1) EPA lacks authority under the Act to waive liability under federal and state law; and (2) Louisiana's program is "less stringent" than EPA's and the liability waiver conflicts with minimum enforcement requirements. EPA additionally violated the Administrative Procedure Act (the "APA") because it (1) failed to examine whether post-site closure liabilities waived by Louisiana's program make their program less stringent, and (2) failed to explain why it didn't follow the Class VI regulations and guidance when the state failed to demonstrate it had the technical expertise to implement the program.

First, EPA violated the Safe Drinking Water Act when it adopted Louisiana's liability waiver into federal law contrary to the provisions of the Act. An agency acts contrary to law if the statute at issue does not give it "the legal authority to take the action that is under dispute." *Michigan v. E.P.A.*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). Here, the enforcement provisions of the Safe Drinking Water Act expressly prohibit waivers of the Act's liability provisions, 42 U.S.C. § 300h-2(d), as well as other rights under other statutes, 42 U.S.C. § 300j-8(e). EPA's rulemaking authority under the Act's UIC well program is for regulations designed to "prevent underground injection which endangers drinking water sources." *See* 42 U.S.C. § 300h(b)(1). Louisiana's liability waiver does the opposite; it puts underground sources of drinking water at greater risk.

Second, EPA violated the Safe Drinking Water Act because it adopted a program whose liability waiver means it fails to meet minimum regulatory requirements and is less stringent than federal regulations. For primacy, Louisiana's laws and regulations must "meet the requirements of" and be "at least as stringent as" the federal regulations. 42 U.S.C. §§ 300h and 300h-1(b)(1)(A); *see* 40 C.F.R. § 145.11(b)(1). Louisiana's program releases operators from post-closure obligations and liabilities that would be in place under the federal program—including liabilities from other statutes. *See* La. Rev. Stat. § 30:1109(A)(3). That release means the requirements of federal post-closure regulations may not be met. The Louisiana program's broad release of owners and operators from post-site closure liabilities under the Act itself, as well as under other federal and state laws, also means Louisiana's liability waiver renders the state's program less stringent on its face. The liability waiver restricts the ability to enforce the Safe Drinking Water Act after site closure in numerous ways, including the ability "to enjoin any threatened or continuing violation of any program requirement, including permit conditions, without the necessity of a prior revocation of the permit." *See* 40 C.F.R. § 145.13(2). The minimum regulations for Class VI wells encompass violations that could occur after site closure, and thus after Louisiana's automatic liability waiver applies. Because

17

operators under Louisiana's program are not subject to the full range of post-site closure enforcement actions, the state's program is less stringent than EPA's.

Third, the APA required EPA to examine any differences between the two programs to determine whether those differences may cause stringency issues. *See Ohio River Valley Env't Coal. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (requiring an agency to examine whether a difference in a state program makes it less stringent than the federal program). EPA violated the APA when it failed to examine the Louisiana program's waiver of post-site closure liabilities that it previously acknowledged apply under EPA's Class VI program, and failed to consider whether Louisiana's waiver of those liabilities makes the state's program less stringent.

Fourth, EPA also failed to give a satisfactory explanation for finding Louisiana can implement the Class VI program where the Application acknowledges the state does not have all the required technical expertise in important areas, such as risk analysis and modeling, and fails to indicate how it will obtain such expertise. Moreover, it was arbitrary and capricious for EPA to ignore uncontroverted evidence of Louisiana's failure to effectively enforce other, less complicated well programs.

These violations of the Safe Drinking Water Act and the APA render EPA's approval invalid. The federal rule approving Louisiana's Application should thus be vacated and remanded for further review.

## STANDARD OF REVIEW

The Administrative Procedure Act's standard of review governs here. *See Legal Env't Assistance Found., Inc. v. U.S. E.P.A.*, 118 F.3d 1467, 1473 (11th Cir. 1997) (reviewing EPA's decision not to withdraw a Safe Drinking Water Act primacy approval). Under the APA standard, this Court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency's action is unlawful if it violates its authorizing statute or its own regulations. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 963-64 (5th Cir. 2023) (finding a rule unlawful where not authorized by statute); *Gulf States Mfrs., Inc. v. N. L. R. B.*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("[T]he failure of an agency to follow its regulations renders its decision invalid."). An agency's action is also unlawful if it "fails to account for relevant factors or evinces a clear error of judgment," including by departing from a prior position without explanation. *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024) (quotation omitted). On this front, "due deference

to agencies does not make arbitrary and capricious review toothless; rather, it has serious bite." *Id.* at 470 (quotation omitted).

## ARGUMENT

### I. The Community Groups Have Standing.

Petitioners are three organizations that work to protect Louisianans from, among other things, the kinds of harm that Class VI wells could bring.  Healthy Gulf and Alliance for Affordable Energy ("Alliance"), as member organizations, have standing if a member has standing, the interests the organizations seek to protect are germane to their purposes, and members' individual participation in the suit is not needed.  *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As a non-membership organization, Deep South Center for Environmental Justice ("DSCEJ") has standing if EPA's approval will impair its activities and thus drain its resources.  *See Vote.Org v. Callanen*, 89 F.4th 459, 470 (5th Cir. 2023).

### A. Associational Standing.

EPA's unlawful approval of Louisiana's Application injures Alliance and Healthy Gulf members.  Without careful construction and operation and meticulous oversight of supercritical $CO_2$ injection for permanent storage, the construction, operation, and closure of Class VI wells threatens these members' interests, and the waiver of liability leaves them without recourse for potential

damages should $CO_2$ escape the injection zone any time after site closure. As described in Parts A and B, *supra*, the challenges involved in regulating long-term carbon sequestration include the buoyancy of and tendency for $CO_2$ to migrate upward toward the surface, the corrosive nature of $CO_2$ and its ability to damage the well, $CO_2$ migration through the state's faulted and fractured geology, and the many potential conduits to the surface and to groundwater posed by the state's extensive oil and gas history.

Dr. Alex Kolker, an expert geologist, describes threats of injuries from $CO_2$ migration, including contaminating groundwater by dissolving minerals and leaching toxic pollutants, and "safety risks associated with $CO_2$ escaping from the subsurface, as it could lead to a blow-out, explosion, or destabilizing event at the surface." Excerpt 7 at 11, 13-14. Dr. Kolker also describes how, without proper oversight and geologic characterization at the permitting stage, $CO_2$ injection pressures can lead to subsurface movements, and cause seismic activity and land subsidence. *See* Excerpt 7 at 5-7. Further, $CO_2$ leakage can be acutely dangerous in high concentrations in the air, as exhibited by a leak that occurred in Satartia, Mississippi, where 49 residents were hospitalized, and residents reported health issues for months after. Excerpt 9 at 9 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 12). In Louisiana, Class VI wells have been proposed in places with unstable geography where these wells have the

greatest potential to fail, such as near the collapsing Sulphur Salt Dome. *See* Robertson Decl. ¶¶ 9, 12. These areas already experience extreme rainfall, unprecedented freezes, and powerful hurricanes, and Class VI wells without proper planning and oversight are vulnerable to the impacts of these weather events. *See* Eustis Decl. ¶ 11; George Decl. ¶ 5; Robertson Decl. ¶ 11; Solet Decl. ¶ 9.

The portions of Louisiana's program that eliminate liability and important enforcement mechanisms, and that do not ensure adequate technical expertise to evaluate permitting and monitoring decisions, increase these risks and threaten members' homes, personal safety, and recreational areas they enjoy. EPA's granting of Louisiana's Primacy Application without proper protections causes these increased risks, and a decision from this Court vacating that approval and restoring permitting authority to EPA would thus redress them. *See* Burke Decl. ¶ 18; Eustis Decl. ¶ 19; George Decl. ¶ 15; Robertson Decl. ¶ 17; Solet Decl. ¶ 14.

Members of these organizations live, work, worship, and recreate in and near the areas where Class VI injection wells are planned to be constructed, such as Black Lake, Lake Charles, Lake Maurepas, Grand Isle, Houma, Sulphur, and Gulf waters off Louisiana's coast. *See* Burke Decl. ¶ 13; Eustis Decl. ¶¶ 6, 10–11; George Decl. ¶¶ 6, 8–10; Robertson Decl. ¶¶ 7–8; Solet Decl. ¶¶ 5, 9; *see*

22

Excerpt 1 at 35–36 (describing the locations of Class VI wells proposed in Louisiana). Improperly constructed and improperly regulated carbon sequestration through Class VI wells harms these members by threatening areas where members regularly fish, birdwatch, and boat with contamination, subsidence, and air pollution, thereby decreasing their aesthetic and recreational value. *See* Eustis Decl. ¶¶ 10–11; George Decl. ¶ 8; Solet Decl. ¶ 8.

Notably, the inclusion of the liability release by itself creates a procedural hurdle for any enforcement, even for those liabilities that Louisiana's disjointed claw-back provisions may restore. *See* La. Rev. Stat. § 1109. In every event, the permitting of wells without long-term liability will impact areas where members live and recreate by threatening harms in those areas from releases or leaks after site-closure, and removing members' ability to hold owners and operators liable if damage occurs. *See, e.g.,* George Decl. ¶ 13; Solet Decl. ¶¶ 8, 11.

In addition, based on their experience working for and with industries in Louisiana, these members are concerned that the liability waiver disincentivizes long-term efficacy and harms residents like them. For example, Justin Solet worked as a blowout specialist in the oil and gas industry for nearly a decade. Solet Decl. ¶ 6. He has seen this industry fail to comply with clear legal requirements and explains that "the liability waiver and automatic ownership transfer will disincentivize applicants from constructing and operating Class VI

wells that are protective of long-term safety and that will permanently sequester carbon dioxide." *Id.* at ¶¶ 6, 11. The companies running these projects "will take advantage of the liability waiver to avoid responsibility for shortcuts and accidents in drilling and operation of Class VI wells." *Id.* at ¶ 11. Other members have similar concerns, based on similar experiences, concerns that extend to further impair their enjoyment of the areas where Louisiana will permit Class VI wells. *See* Eustis Decl. ¶ 16; George Decl. ¶ 13; Robertson Decl. ¶ 13; *see also* Solet Decl. ¶ 7, 11.

The members' knowledge of Louisiana's implementing agency's, LDENR's, lack of adequate regulation of and pollution from regulated industry in the state further justifies their concerns. These members describe numerous, repeated examples of LDENR's inability to address leaks and spills in a timely manner, to monitor wells and infrastructure effectively, and more. *See* Eustis Decl. ¶¶ 10–15, 18; George Decl. ¶ 7–12, 14; Robertson Decl. ¶¶ 7–10, 15–16; Solet Decl. ¶¶ 7–9, 12. Healthy Gulf member Cynthia Robertson lives approximately one mile from a $CO_2$ leak that occurred earlier this year, which led to a shelter in place order for her neighborhood and was addressed only after a delayed response by the pipeline operator. *See* Robertson Decl. ¶ 15. Members describe how enforcement authorities often show up days after pollution is reported and lack proper protective gear or monitoring equipment. *See* Eustis

Decl. ¶¶ 9, 11–15, 17–18; George Decl. ¶ 12; Robertson Decl. ¶ 16. Mr. Solet explained that LDENR is "already ill-equipped to enforce its regulations for orphaned and abandoned oil and gas wells and deal with over 3000 recordable oil spills a year," and is thus even less equipped to add more to its plate, like permitting Class VI wells, which are new territory for the industry and Louisiana. Solet Decl. ¶¶ 10, 12; *see also* Eustis Decl. ¶¶ 11–13 and 15 (describing LDENR's poor track record for responding to oil spills and plugging orphaned and abandoned wells); George Decl. ¶ 12 (describing the State's delayed response to an oil spill).

In sum, handing off the Class VI program to LDENR, which has not shown it can administer it, harms these members' ability to reside, work, worship, or recreate safely in areas with proposed wells, and Louisiana's liability waiver impairs members' ability to seek relief from injuries stemming from carbon dioxide leakage after site-closure. *See* Solet Decl. ¶ 11-12; George Decl. ¶ 13-14.

### B. Organizational Standing.

Petitioner Deep South Center for Environmental Justice ("DSCEJ") serves communities in Louisiana "harmed by racially disproportionate pollution burdens and vulnerable to climate change," including through "building the capacities of community-based organizations in Louisiana to find solutions to

environmental issues" and through "education, research, and community engagement in governmental decision making." Wright Decl. ¶ 6. DSCEJ's regular programming consists of a Research and Policy Program that provides in-depth studies of policies impacting environmental justice communities, a Student Engagement Program that develops curricula for students to learn about climate science, community sustainability, and racial justice, and a Community Advisory Board that conducts epidemiological studies in communities and connects them to agencies responsible for protecting their health. Wright Decl. ¶¶ 10-12. DSCEJ has had to divert significant resources—approximately 850 hours of DSCEJ staff time—from the regular programming to educate its staff and the public about the dangers of carbon injection, secure basic procedural protections for the proposed permitting process from LDENR, and gather evidence and advocate against Louisiana's program as a result of Louisiana's deficient Class VI Primacy Application. Wright Decl. ¶¶ 13–18, 22.

If Louisiana retains primacy without adequate oversight and protections, DSCEJ will need to continue to divert resources to scrutinize each Class VI permit that LDENR considers. *Id*. ¶ 20. Recognizing the volume of Class VI injection wells proposed in Louisiana, DSCEJ will need to divert significant resources to monitor Class VI wells and related infrastructure due to the liability waiver and automatic ownership transfer in Louisiana's program, and to

conduct monitoring and community education due to lack of LDENR staffing and expertise. *Id.* ¶¶ 19–21, 23. Because of EPA's expertise and the lack of a liability waiver in its Class VI program, when EPA had permitting authority DSCEJ did not need to divert significant resources from its regular programming to advocate against the permitting of Class VI wells in Louisiana. *Id.* ¶ 25. EPA's approval of Louisiana's program thus has impaired and will continue to impair DSCEJ's mission because it has made it more difficult for the organization to focus on its regular programming, and DSCEJ has been forced to, and will continue to have to, "divert[] significant resources" from its direct service programming. *Texas State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022).

## II. EPA's Approval Exceeded Its Authority and Violated the Act.

EPA unlawfully adopted a program that waives liability under the Safe Drinking Water Act and other federal environmental statutes. An agency acts contrary to law if the statute at issue does not give it "the legal authority to take the action that is under dispute." *Michigan v. E.P.A.*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). The Safe Drinking Water Act's provisions make clear that the Act should ***not*** displace other, relevant laws that impose liability for underground

injection.  The UIC subchapter enforcement provisions expressly prohibit state

authorities from lifting Safe Drinking Water Act injection well requirements:

> Nothing in this subchapter shall diminish any authority of a State
> or political subdivision to adopt or enforce any law or regulation
> respecting underground injection but ***no such law or regulation shall
> relieve any person of any requirement otherwise applicable under this
> subchapter***.

42 U.S.C. § 300h-2(d) (emphasis added).  And the Act's general provision that

sets forth its enforcement mechanisms contains a similar preservation clause.

*See* 42 U.S.C. § 300j-8(e) ("Nothing in this section shall restrict any right which

any person (or class of persons) may have under any statute or common law . . .

to seek any other relief.").  A statute that specifically preserves liability under

other relevant laws cannot be read to authorize EPA to waive such liability

under the general provisions governing its approval of state programs.  *See, e.g.*,

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t

is a commonplace of statutory construction that the specific governs the

general.").

EPA has consistently recognized this limitation against liability relief for

owners and operators of Class VI wells.  In promulgating its regulations, EPA

noted that after site closure is approved and the operator is released from the

post-injection site care plan, the owner or operator may "remain liable under

tort and other remedies, or under other Statutes including, but not limited to the

Clean Air Act, CERCLA, and RCRA." 75 Fed. Reg. at 77272 (citations omitted); *see also* Excerpt 9 at 56 ("[S]ite closure does not eliminate any potential responsibility or liability of the owner or operator under other provisions of law.").

Despite the clear statutory commands and its own past statements, EPA approved a program that includes a broad liability waiver that applies upon the issuance of Louisiana's "certificate of completion of injection operations." *See* La. Rev. Stat. § 30:1109(A)(3). At that moment, owners and operators are not only relieved of obligations to monitor the $CO_2$ plume and pressure front, but, along with the generators of the $CO_2$ in the well, are additionally "released from any and all liability associated with or related to that storage facility." *Id.*[3] This post-closure liability waiver is significant. As EPA has acknowledged, Class VI wells may create such liability under not just the Safe Drinking Water Act but also other federal environmental statutes. *See* 75 Fed. Reg. at 77260. For example, the injected $CO_2$ stream may leave the confines of the permitted well, may contain a listed hazardous waste, or may mobilize substances in the subsurface that could react with groundwater to produce listed hazardous

---

[3] Section 1109(A)'s waiver does contain some exceptions, *see* La. Rev. Stat. § 30:1109(A)(3), (4), but even with those exceptions it protects owners, operators, and generators broadly, including against other applicable federal statutory environmental statutes.

substances, creating liability under Clean Air Act, 42 U.S.C. §§ 7401-7671; CERCLA (Superfund), 42 U.S.C. §§ 9601-9675; or RCRA, 42 U.S.C. §§ 6901-6992. 75 Fed. Reg. at 77260. EPA's approval of Louisiana's liability waiver exceeded its authority under the Act.

In *Center for Biological Diversity v. Regan*, a federal district court recently invalidated an EPA approval of a state program that did not follow the underlying statute's provisions governing liability. No. CV 21-119 (RDM), 2024 WL 1602457, at *2 (D.D.C. Apr. 12, 2024). There, EPA approved Florida's primacy for the Clean Water Act's 404 permitting program where Florida's program conferred "broad [Endangered Species Act] liability protection" using a combination of two different statutory routes to conferring such protections. *Id.* Reversing that approval, the district court explained: "The long and short of it is that the ESA creates two paths for extending take liability coverage . . . . Neither authorizes the scheme that the EPA and the FWS" used. *Id.* at *36 (citations omitted). Here, not only does EPA's decision approving Louisiana's Class VI program similarly warrant reversal for its extra-statutory route to conferring broad liability protection, it further merits reversal because Louisiana's conferred liability protection is contrary to the Safe Drinking Water Act's express enforcement protections.

EPA's transgression is particularly egregious because, on EPA's approval, a state's program for primary enforcement authority takes on "the force and effect of federal law." *Sierra Club v. Louisiana Dep't of Env't Quality*, 100 F.4th 555, 564 (5th Cir. 2024) (reviewing Louisiana Clean Air Act primacy); 40 C.F.R. § 147.950(a) ("The requirements set forth in the statutes and regulations approved by EPA . . . are hereby incorporated by reference and made a part of the applicable UIC program under the [Safe Drinking Water Act] for the State of Louisiana."); *United States v. King*, 660 F.3d 1071, 1078 (9th Cir. 2011) ("[w]hen the federal government approved Idaho's UIC program, it specifically incorporated Idaho's entire permitting process into the [Safe Drinking Water Act]"). EPA's unlawful approval of Louisiana's Application means that waivers of federal environmental protections are now incorporated into federal law, undercutting the authority and enforceability of the very federal statutes that EPA implements and oversees.

In sum, EPA's decision to adopt Louisiana's program with its liability release was in excess of its authority and contrary to law. This Court should reverse.

### III. Louisiana's Program Is Less Stringent Than Federal Regulations.

EPA unlawfully adopted a program that fails to meet minimum regulatory requirements and is less stringent than federal regulations because it releases

operators from obligations and liabilities that would be in place under the federal program—including liabilities from other statutes. *See* La. Rev. Stat. § 30:1109(A)(3). For primacy, Louisiana's laws and regulations must "meet the requirements of" and be "at least as stringent as" the federal regulations. 42 U.S.C. §300h-1(b) (state program must "meet[ ] the requirements of" federal Class VI UIC regulations); *id.* § 300h(b) (state program "shall contain minimum requirements"); 40 C.F.R. § 145.11(b)(1) (state program "must . . . establish requirements at least as stringent as the corresponding listed provisions" in the federal UIC program); Excerpt 10 at vi (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 10) (EPA guidance for UIC "Program Class VI Primacy" stating: "To receive primacy, a state . . . must demonstrate to EPA that its UIC Program is at least as stringent as the federal standards."); *see Legal Env't Assistance Found., Inc. v. U.S. E.P.A.*, 118 F.3d 1467, 1469 (11th Cir. 1997) (stating state UIC Programs must meet federal minimum requirements). Louisiana's program must also "keep such records and make such reports with respect to its activities under its underground injection control program" as required by the federal regulations. 42 U.S.C. §§ 300h-1(a)(1)(A). But Louisiana's program includes a release from obligations and liability such that federal regulations may not be met and required records may not be kept. Further, Louisiana's release curtails EPA's and impacted persons' ability to enforce the Safe Drinking Water

Act post-site closure—removing a fundamental protection in the Safe Drinking Water Act—as well as other environmental protection statutes. Louisiana's program also lacks the breadth of emergency powers necessary to fulfill Safe Drinking Water Act enforcement requirements.

Louisiana's program is less stringent on its face because, while purporting to include regulations that mirror EPA's own, its statute knocks down those same provisions with its liability waiver. EPA's program requires that after site closure, the owner or operator (1) "must submit a site closure report to the Director within 90 days of site closure," which "must include" key information about "injection and monitoring well plugging," the status of its $CO_2$, and other post-closure activities and "must thereafter be retained . . . for 10 years," 40 C.F.R. § 146.93(f); (2) "must record a notation on the deed to the facility property or any other document that is normally examined during title search that will in perpetuity provide any potential purchaser of the property" with specific information regarding the sequestration activities at the site, *id.* § 146.93(g); and (3) "must retain for 10 years following site closure, records collected during the post-injection site care period," after which they must deliver those records to the Director. *Id.* § 146.93(h).

While Louisiana's Administrative Code mirrors these post-closure requirements, *see* La. Admin. Code tit. 43, pt. XVII, § 3633(A)(6) - ( 8), its statute

expressly waives those same requirements upon the issuance of a certificate of completion of injection operations:

> ***Upon the issuance of the certificate of completion of injection operations***, the storage operator, all generators of any injected carbon dioxide, all owners of carbon dioxide stored in the storage facility, and all owners otherwise having any interest in the storage facility ***shall be released from any and all future duties or obligations*** under this Chapter . . . .

La. Rev. Stat. § 30:1109(A)(3) (emphasis added). That issuance and statutory release may happen ***before*** the post-site closure regulations are met, especially given the program's ambiguity on when, exactly, a certificate of completion of injection operations may issue.

Specifically, § 30:1109(A)(1)(6), calls for a showing that "the storage facility has been closed in accordance with all applicable regulations related to site closure" before a certificate of completion can issue. But the regulations at La. Admin. Code tit. 43, pt. XVII, § 3633 ("Closure and Post-Closure") do not define what counts as "closure" compared to "post-closure" requirements—a difference the title emphasizes. In fact, unlike Louisiana's regulation, EPA's corresponding title and provisions do not include the term "post-closure." 40 C.F.R. § 146.93 ("Post-injection site care and site closure."). So, Louisiana's program creates a new category for its regulation, "post-closure" obligations, distinct from its "closure" obligations. And several of its provisions, including those corresponding with EPA's 40 C.F.R. § 146.93(f), (g), and (h) for post-

34

closure reports, recordation, and recordkeeping, among other things, appear to be post-closure obligations. *See* La. Admin. Code tit. 43, pt. XVII, §§ 3633(A)(6), (7), (8). Since Louisiana's statute requires "applicable regulations related to site closure," and ***not*** post-closure, to be met for its certificate of completion to issue, that certificate, together with its liability release and ownership transfer, can happen before 40 C.F.R. § 146.93(f), (g), and (h) and the corresponding "post-closure" state regulations have been met. *See* La. Rev. Stat. § 30:1109(A)(1)(e); La. Admin. Code tit. 43, pt. XVII, §§ 3633(A)(6), (7), (8).[4]

As a result, if the state, the entity to which the property (without liability) automatically transfers, later sells the property, the deed need not contain the protective information the federal regulations require. *See* 40 C.F.R. § 146.93(g). Similarly, contrary to the federal regulations, the release of post-closure duties suggests an operator or owner need not prepare a site closure report, depriving

---

[4] Louisiana inserts further confusion into its program when its "Closure; Post-Closure" regulation suggests potential to issue a certificate of closure long before a well is, in fact, closed: "Certificate of Completion. The commissioner shall not issue a certificate of completion pursuant to R.S. 1109 unless the operator has sufficient financial surety with the Office of Conservation to adequately close the facility, plug all existing wells, and provide for post-injection site care and site closure." La. Admin. Code tit. 43, pt. XVII, §§ 3633(B). Louisiana's liability waiver statute includes this regulation as a requirement for issuance of a certificate of completion. La Rev. Stat. § 30:1109(A)(1)(d) (showing must include "compli[ance] with all applicable regulations related to … the issuance of the certificate of completion of injection operations").

future landowners and planners of safety and other information and depriving authorities of information that is needed to help [them] "impose appropriate conditions on subsequent drilling activities that may penetrate the injection or confining zone(s)." *See id.* § 146.93(f); Excerpt 9 at 55   And without retention and deposit of the site closure records collected during post-injection site care, it may be impossible to determine whether an owner or operator was noncompliant with laws and regulations prior to issuance of the certificate of completion. *See* 40 C.F.R. § 146.93(h).

Louisiana's legislative history indicates that Louisiana intended to waive liability that EPA has repeatedly stated owners and operators remain liable for *after* site closure. *See*, *e.g.*, 75 Fed. Reg. at 77272; Excerpt 9 at 56.  For instance, EPA's Class VI program specifically provides that "an owner or operator may be held liable for regulatory non-compliance under circumstances even after site closure is approved . . . such as where the owner or operator provided erroneous data to support approval of site closure."  75 Fed. Reg. at 77272. In contrast, Louisiana considered, but rejected, similar language about erroneous data that would have been consistent with EPA's program.  Earlier versions of H.B. 571 did not release liability in situations where "the commissioner determines that the operator provided deficient or erroneous information that was material and relied upon by the commissioner to support

approval of site closure or issuance of a certificate of completion of injection operations." Excerpt 13 at 8 (Certified Index No. EPA-HQ-OW-2023-0073-0720, Ex. A). Louisiana also considered but rejected language not to release liability in situations where "the commissioner determines that there is fluid migration for which the operator is responsible that causes or threatens imminent and substantial endangerment to an underground source of drinking water." *Id.*; *compare id. with* La. Rev. Stat. § 30:1109(G). Ultimately, Louisiana adopted legislation that omitted these exceptions from its liability waiver.

Moreover, Louisiana's liability waiver conflicts with EPA's minimum requirements for enforcement authority at 40 C.F.R. § 145.13. To meet these requirements, among other things, a state "shall have available" the ability to "enjoin any threatened or continuing violation of any program requirement…." 40 C.F.R. § 145.13(a)(2). The reference to "any program requirement" at 40 C.F.R. § 145.13 includes post-closure enforcement. A number of program requirements for Class VI wells apply after the issuance of a certificate of completion of injection operations, including requirements to retain and submit records. *See*, *e.g.*, 40 C.F.R. § 146.93 (requiring operators to retain records collected during the post-injection site care period for 10 years after site closure and deliver them to the director after the retention period); *see also* 40 C.F.R. § 144.12 (prohibiting movement of fluid into underground sources of drinking

water).  By releasing an operator from "any and all future duties" under the Class VI program, the liability waiver removes the ability to enjoin an operator's noncompliance with these post-site closure requirements.  This frustration of enforcement authority warrants rejection of Louisiana's program.  *See, e.g.*, Clean Air Act Proposed Disapproval or in the Alternative, Proposed Interim Approval Operating Permits Program; State of Idaho, 60 Fed. Reg. 54990, 55000 (Oct. 27, 1995) (finding an Idaho law that granted a source immunity from civil or criminal prosecution for voluntarily-disclosed violations "impermissibly interfere[d]" with enforcement requirements and thus barred full approval of the state program).

The liability waiver also removes the ability of citizens to enforce against an operator for post-site closure violations—including for fluid migration that endangers human health, underground sources of drinking water, or the environment.  The Safe Drinking Water Act allows "any person" to "commence a civil action … against any person … who is alleged to be in violation of any requirement prescribed by or under [the Safe Drinking Water Act]."  42 U.S. Code § 300j–8(a)(1); *see Concerned Pastors for Soc. Action v. Khouri*, 194 F. Supp. 3d 589, 603 (E.D. Mich. 2016) (discussing relief under Safe Drinking Water Act citizen suit provisions).  Louisiana's program eliminates the ability of those who live near these sites or whose health and welfare are endangered to prevent or

38

limit harms that arise post-site closure because the statute releases the owner from liability. This curtailment of federal enforcement rights is exacerbated by Louisiana's automatic transfer to the state of a well site's ownership (without liability also transferring) upon issuance of the certificate of closure. *See* La. Rev. Stat. § 30:1109(2), (6). So, the state seeks to release itself from post-closure injunctive enforcement, as well. In short, Louisiana's program is less stringent than and does not meet the minimum requirements of the federal program because it lessens and curtails people's ability to ensure the enforcement and protections of the Safe Drinking Water Act.

Similarly, if more sweepingly, Louisiana's program is less stringent than the federal program because it releases owners, operators, and $CO_2$ generators from post-closure liability under other federal statutes. As discussed above, the Clean Water Act, CERCLA, and RCRA all provide for governmental and citizen enforcement when those statutes are violated. *See supra* § II, *see e.g.*, 33 U.S.C. §§ 1319, 1365 (Clean Water Act); 42 U.S.C. §§ 9609, 9613 (CERCLA); 42 U.S.C. §§ 6928, 6972 (RCRA). The federal Safe Drinking Water Act not only does not purport to interfere with those federal protections, it expressly preserves them. *See* 42 U.S.C. §§ 300h-2(d) (UIC program enforcement), 300j-8(e) (general enforcement). So, when Louisiana's program releases post-closure liabilities that would otherwise be enforceable under those federal

environmental statutes, it makes its program less stringent than the federal program that does not block those protections.

Lastly, by waiving liability for violations post-site closure, Louisiana's program frustrates the emergency powers required by the Safe Drinking Water Act. "[U]pon receipt of information that a contaminant which is present in or is likely to enter a public water system or underground source of drinking water … which may present an imminent and substantial endangerment to the health of persons," and where state and local authorities have not acted to protect the health of such persons, 42 U.S.C. § 300i(a) empowers EPA to take action that it "may deem necessary to protect the health of such persons."  The actions EPA may take under this circumstance include, but are not limited to, issuing orders to protect the health of persons using the water system, including by requiring the provision of alternative water supplies by the entities that caused or contributed to the endangerment, and by commencing a civil action for appropriate relief, including a restraining order or permanent or temporary injunction. 42 U.S.C. § 300i(a).  Louisiana's liability waiver ensures that there is no entity for EPA to take such emergency action against.

Consequently, because the liability waiver means that Louisiana's program does not meet minimum requirements and is less stringent than the

federal program, EPA's decision to adopt Louisiana's program was arbitrary and capricious and the Agency's action should be set aside.

## IV. EPA Failed to Offer a Satisfactory Explanation for Its Approval.

A rule is arbitrary and capricious if: "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, APA review requires this Court to (1) ensure that EPA examined the relevant data and articulated a satisfactory explanation for its action, and (2) assess whether the agency based its decision on a consideration of the relevant factors. *Sw. Elec. Power Co. v. U.S. E.P.A.*, 920 F.3d 999, 1013 (5th Cir. 2019).

In responding to comments that the liability waiver makes Louisiana's program less stringent than EPA's, EPA failed to examine the broad range of liabilities that could apply after site closure or explain how those differences in Louisiana's program made or did not make it less stringent than the federal program. This was despite EPA's previous acknowledgement that the same

41

post-site closure liabilities commenters raised would still apply under EPA's program.  *See* 75 Fed. Reg. at 77272; Excerpt 1 at 10, 13-14.

EPA also acted arbitrarily and capriciously when it ignored its own guidance directing that the state demonstrate it has the staff and experience to implement the Class VI program.  In doing so, EPA failed to consider relevant data and the risk of handing over the Class VI program to a state without the demonstrated technical expertise to implement the program safely—a state that has also failed to implement other, less complicated, well programs safely.

### A. EPA Failed to Explain Why It Did Not Consider Post-Site Closure Liabilities in Its Stringency Evaluation.

In approving a state program, EPA must evaluate differences between its own regulations and the provisions in the proposed state program to determine whether the state program is less stringent.  *See Ohio River Valley Env't Coal. v. Kempthorne*, 473 F.3d 94, 103 (4th Cir. 2006) (explaining the agency's obligation is to "find not only that the amended program contains counterparts to all federal regulations, but also that it is no less stringent . . .").

Here, in its Response to Comments on stringency issues, EPA failed to examine Louisiana's broad waiver of post-site closure requirements and liabilities under La. Rev. Stat. § 30:1109(A)(3), let alone explain whether it makes the program less stringent.  *See* Excerpt 11 at 17-18 (Certified Index No. EPA-HQ-OW-2023-0073-0754).  As described in Part II, *supra*, Louisiana's

liability waiver broadly relieves owners and operators from liabilities from other statutes such as the Clean Water Act, RCRA, and CERCLA, once the certificate of closure issues—a waiver contrary to the Safe Drinking Water Act and that EPA has expressly rejected from the federal program. In addition, as described in Part III, *supra*, Louisiana's liability release appears to relieve owners and operators from post-site closure recordkeeping and deed notation obligations under the Class VI regulations, as well as future liabilities for potential violations under general program requirements of the UIC program. *See* 40 CFR §§ 146.93(g)-(h), 144.12. Notably, Petitioners and others raised these post-site closure stringency issues to EPA, and EPA has previously acknowledged that the liabilities described continue under its program. Excerpt 1 at 10, 13-14; Excerpt 12 at 8-9; *see also* Excerpt 19 (Certified Index No. EPA-HQ-OW-2023-0073-0003); 75 Fed. Reg. at 77272; Excerpt 9 at 56. Accordingly, EPA's failure to examine this relevant information or to explain its adoption of a program with different post-site closure liabilities and obligations from its own program made its decision arbitrary and capricious.

*Ohio River Valley Env't Coal.*, illustrates a similar APA violation where the Office of Surface Mining's ("OSM") primacy approval under the Surface Mining Control and Reclamation Act ("SMCRA") failed to explain whether a definition in the state program made the program less stringent than OSM's.

43

473 F.3d 94 at 103. In *Ohio River Valley Env't Coal.,* OSM argued it could approve a state definition of "material damage" without explaining why it is not less stringent than the federal program because there was no federal definition or requirement in the regulations for a specific definition of "material damage." *Id.* The court found that because the definition made the "proposed program different than the nationwide program," OSM was required to "analyze that different feature and explain whether and why the added provision renders the amended state program more, less, or equally effective compared to the federal requirements." *Id.* Likewise, here EPA did not analyze the ways Louisiana's program—and especially its liability waiver—is different from EPA's program, and as a result EPA failed to examine whether those differences make Louisiana's program less stringent.

Thus, EPA failed to consider an "important aspect" of the stringency of Louisiana's program—namely, that Louisiana's program waives post-site closure liabilities that EPA itself has stated cannot be waived—making its decision arbitrary and capricious. 75 Fed. Reg. at 77272; *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43*; Elec. Power Co.,* 920 F.3d at 1013. EPA's approval must be set aside because it fails to explain, or even assess, the impact of waiving these post-site closure liabilities on the program's stringency.

**B. EPA Lacked the Basis to Conclude that Louisiana Has the Expertise to Implement the Class VI Program.**

EPA failed to follow its own guidance or provide a reasonable explanation before concluding that Louisiana or its implementing agency, LDENR, had the required expertise to implement its Class VI program, despite information that should have given EPA cause for pause and further review.  The Safe Drinking Water Act requires a satisfactory showing that the state will implement its Class VI program to meet the requirements of the federal regulations.  *See* 42 U.S.C. § 300h-1(b).  As part of this showing, primacy applications must include a "description of the State agency staff who will carry out the State program, including the number, occupations, and general duties of the employees."  40 C.F.R. § 145.23(b)(1).  EPA's Class VI Guidelines further explain that "[b]ecause of the extent and complexity of the information that must be reviewed in response to Class VI permit applications and evaluated throughout the operational and post-injection phases of a Class VI project," states should "demonstrate in their primacy application" technical expertise to evaluate all phases of a Class VI well project.  *See* Excerpt 10 at 18.  But, here, EPA did not require the state to make this demonstration, despite Louisiana's admission that

it currently lacked such expertise and LDENR's challenges in administering other well programs.

In finding whether EPA was arbitrary and capricious in concluding that Louisiana nonetheless has shown expertise to implement the Class VI injection well program, this Court must "determine whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Calumet Shreveport Ref., L.L.C. v. E.P.A.*, 86 F.4th 1121, 1133 (5th Cir. 2023) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29 at 30). Where EPA's decision is "premised on reasoning that fails to account for relevant factors" or "evinces a clear error of judgment," it is arbitrary and capricious. *Calumet*, 86 F.4th at 1133.

Here, Louisiana conceded that LDENR does not have expertise in all the technical and policy areas relevant to evaluating Class VI permit applications and that "third-party contractor experience will be needed for reviews associated with site characterization, modeling, risk, and environmental justice analysis." Excerpt 14 at 2-3. Further, Louisiana confirmed it may not be able to obtain that expertise in-house, stating, "[t]hird-party risk analysts may need to be contracted out in perpetuity." Excerpt 14 at 2-3. While EPA allows use of contractor support, states are expected to "demonstrate in their primacy application that they have in-house staff or access to contractor support" for all

46

the technical areas of expertise.  Excerpt 10 at 10.  Louisiana's Application fails to provide any details about access to contractors in these areas, neither generally nor specifically, such as identification of the contractors or their qualifications.  Access to contractors with expertise and experience in Class VI permitting could prove challenging, as there have been few permits issued nationwide and thus little expertise obtained in this highly technical field.  *See* Excerpt 1 at 29-30.  And with so many operators applying for Applications, many contractors will likely be conflicted out of contracting with LDENR.

Yet, EPA claims without support that LDENR can access contract expertise in all technical areas.  Excerpt 11 at 6.  EPA simply has not explained how the Application demonstrated expertise to evaluate all phases of a Class VI well project. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; Excerpt 10 at 10-11; *see also Calumet*, 86 F.4th at 1142 ("Unsubstantiated agency speculation does not overcome" claims proven by the record).

Moreover, EPA's unsupported assertion on expertise runs counter to the evidence of LDENR's incompetence in implementing UIC programs.  The Louisiana Legislative Auditor's detailed performance audits on oil and gas wells conducted from 2014-2020 concluded that LDENR failed to effectively monitor active wells and enforce violations and failed to require adequate financial security.  *See* Excerpt 20 at 3-4 (Certified Index No. EPA-HQ-OW-2023-0073-

0213, Exhibit 15); Excerpt 21 at 2-6 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 22) Excerpt 22 at 1-2 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Exhibit 16).  LDENR's past failures in monitoring well projects under its purview highlight the need to ascertain whether it has expertise to implement its Class VI program.

EPA also failed to consider serious environmental issues connected to LDENR's oversight of its UIC well programs.  Public comments described past LDENR injection well disasters in Louisiana, like Bayou Corne, where a Class III UIC well regulated by LDENR close to the edge of a salt dome, near a wooded swamp in the Bayou Corne area of Louisiana, created a sinkhole more than 24 acres in size and required evacuation of the nearby town's 350 residents. *See* Excerpt 24 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 18). The collapse released "tens of millions of cubic feet of explosive gases, which have seeped into the aquifer and wafted up to the community" and "still has no end in sight." *Id*. The air, soil and water contamination in Grand Bois involving Class II UIC wells, among other things, is another example of LDENR's poor oversight and enforcement.  *See* Excerpt 25 (Certified Index No. EPA-HQ-OW-2023-0073-0213, Ex. 19).  EPA did not address these incidents, LDENR's role in them, or their ongoing impacts to the soil, air, and groundwater.

EPA's failure to reasonably explain why it did not require Louisiana to demonstrate access to expertise in all areas of Class VI permitting and enforcement, particularly given LDENR's troubling track record, was arbitrary and capricious.

## CONCLUSION

For these reasons, this Court should reverse and vacate EPA's approval of Louisiana's Application for Primary Enforcement Authority over the Class VI UIC Well Program.

June 12, 2024

Respectfully submitted,
EARTHJUSTICE

*/s/ James Yskamp*
James Yskamp (PA319444)
EARTHJUSTICE
25000 Euclid Ave, Suite 305
Euclid, OH 44117
(570) 404-0237
jyskamp@earthjustice.org

Elizabeth Livingston de Calderon (LA31443)
EARTHJUSTICE
900 Camp Street, Unit 303
New Orleans, LA 70130
(504) 910-1712
ecalderon@earthjustice.org

Claire Taigman (IL6341853)
EARTHJUSTICE
311 S. Wacker Dr., Ste. 1400
Chicago, IL 60640
(312) 500-2190
ctaigman@earthjustice.org

## CERTIFICATE OF SERVICE

I certify that this brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on June 12, 2024.  I certify that this brief was served on counsel for all parties via email and the Court's CM/ECF system.

June 12, 2024                    */s/ James Yskamp*
                                James Yskamp
                                EARTHJUSTICE
                                25000 Euclid Ave, Suite 305
                                Euclid, OH 44117
                                (570) 404-0237
                                jyskamp@earthjustice.org


                                *Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,079 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.1.

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Calisto MT 14-point font.

June 12, 2024

*/s/ James Yskamp*
James Yskamp
EARTHJUSTICE
25000 Euclid Ave, Suite 305
Euclid, OH 44117
(570) 404-0237
jyskamp@earthjustice.org
*Counsel for Petitioners*