No. 24-60084

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE;
HEALTHY GULF; ALLIANCE FOR AFFORDABLE ENERGY,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN,
*Respondents*.

Petition for Review of Action of the
U.S. Environmental Protection Agency

**BRIEF FOR RESPONDENTS**

TODD KIM
Assistant Attorney General

Of Counsel:                           TSUKI HOSHIJIMA
                                      Environment and Natural Resources
JAY PRZYBORSKI                         Division
ALEC MULLEE                           U.S. Department of Justice
U.S. Environmental Protection         P.O. Box 7411
Agency                                Washington, D.C. 20044
                                      (202) 532-3285
                                      tsuki.hoshijima@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS

Respondents are governmental parties and are not required to furnish a certificate of interested parties under Fifth Circuit Rule 28.2.1.

/s/ *Tsuki Hoshijima*

## STATEMENT ON ORAL ARGUMENT

Petitioners have requested oral argument. Pet. Br. iii. Respondents do not oppose the request.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT ON ORAL ARGUMENT ....................................................i

TABLE OF AUTHORITIES.....................................................................iv

INTRODUCTION.....................................................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE ....................................................................3

I.  Underground injection control under the Safe Drinking
    Water Act...................................................................................3

II. EPA's approval of Louisiana's program..........................................6

SUMMARY OF THE ARGUMENT ...........................................................8

STANDARD OF REVIEW........................................................................11

ARGUMENT ..........................................................................................11

I.  EPA carefully considered Louisiana's long-term
    liability provision and appropriately concluded that
    Louisiana's program was approvable. ...........................................13

    A.  The Louisiana provision applies only after all site
        closure regulations have been met and, even
        then, has limited effect...........................................................15

    B.  The Louisiana provision does not undermine any
        protections under the Safe Drinking Water Act...................20

C.  Even if the Louisiana provision were to release future obligations under other federal environmental laws, which is doubtful, that possibility did not require EPA to disapprove Louisiana's program ............................................................... 32

II.  EPA reasonably concluded that Louisiana has adequate capacity to implement its regulatory program. ............................................................................. 38

CONCLUSION ............................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004) ................................................................... 11

*Ctr. for Biological Diversity v. Regan,*
No. CV 21-119, 2024 WL 1602457 (D.D.C. Apr. 12, 2024) ................ 31

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ................................................................... 11

*Hydro Res., Inc. v. EPA,*
608 F.3d 1131 (10th Cir. 2010) .................................................... 11

*Int'l Paper Co. v. Ouellette,*
479 U.S. 481 (1987) ................................................................... 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................... 11, 41

*Ohio River Valley Env't Coal., Inc. v. Kempthorne,*
473 F.3d 94 (4th Cir. 2006) ......................................................... 38

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez,*
403 F.3d 324 (5th Cir. 2005) ....................................................... 37

*Sierra Club v. La. Dep't of Env't Quality,*
100 F.4th 555 (5th Cir. 2024) ...................................................... 36

*State v. Williams,*
2010-1514 (La. 3/15/11), 60 So. 3d 1189 ....................................... 24

*United States v. King,*
660 F.3d 1071 (9th Cir. 2011) ...................................................... 36

**Rules**

Fed. R. App. P. 32(a)(5) ................................................................. 46

Fed. R. App. P. 32(a)(6) ................................................................. 46

Fed. R. App. P. 32(a)(7)(B) ........................................................... 46

Fed. R. App. P. 32(f) ...................................................................... 46

Fifth Cir. R. 28.2.1 ............................................................................ i

**Federal Statutes**

5 U.S.C. § 706(2)(A) ...................................................................... 11

33 U.S.C. § 1365(e) ....................................................................... 29

42 U.S.C. § 300h(a) .......................................................................... 3

42 U.S.C. § 300h(b) .......................................................................... 3

42 U.S.C. § 300h(b)(1) ..................................................................... 3

42 U.S.C. § 300h-1(b) ...................................................................... 3

42 U.S.C. § 300h-1(b)(1) ............................................................... 37

42 U.S.C. § 300h-1(b)(3) ........................................... 4, 34, 38, 44

42 U.S.C. § 300h-1(c) ...................................................................... 4

42 U.S.C. § 300h-1(d) .................................................................... 34

42 U.S.C. § 300h-2 .................................................................. 22, 34

42 U.S.C. § 300h-2(a)(1) ....................................... 4, 34, 35, 44

42 U.S.C. § 300h-2(d) ................................................ 27, 28, 36

42 U.S.C. §§ 300h-300h-9 ............................................... 3

42 U.S.C. § 300h-9(c) .................................................... 6

42 U.S.C. § 300i(a) .......................................... 4, 29, 44

42 U.S.C. § 300j-7 ...................................................... 11

42 U.S.C. § 300j-8(e) ................................................. 29

Pub. L. No. 117-58, div. D, tit. III, § 40306, 135 Stat. 429, 1002 (codified at 42 U.S.C. § 300h-9(c)) .................................................. 6

**State Statutes**

La. Stat. Ann. § 30:6 ................................................. 31

La. Stat. Ann. § 30:12 ............................................... 31

La. Stat. Ann. § 30:1107.B ......................................... 31

La. Stat. Ann. § 30:1109 ........................................ 7, 14

La. Stat. Ann. § 30:1109.A ......................................... 30

La. Stat. Ann. § 30:1109.A.(1) ............................ 17, 18, 21

La. Stat. Ann. § 30:1109.A.(1)(a)-(e) ......................... 18

La. Stat. Ann. § 30:1109.A.(1)(c) ......................... 21, 33

La. Stat. Ann. § 30:1109.A.(1)(e) ......................... 21, 23

La. Stat. Ann. § 30:1109.A.(2) ............................... 17

La. Stat. Ann. § 30:1109.A.(3) ......................... 17, 19, 26, 27, 37

La. Stat. Ann. § 30:1109.A.(4) ................................ 19, 33

La. Stat. Ann. § 30:1109.A.(5) ................................ 17, 19

La. Stat. Ann. § 30:1109.G .................................... 28, 30

La. Stat. Ann. § 30:1110.E ........................................ 18

La. Stat. Ann. §§ 30:1101–30:1112 ............................... 34

N.D. Cent. Code § 38-22-17 ...................................... 14

Wyo. Stat. Ann. § 35-11-319.................................... 14

**Federal Regulations**

40 C.F.R. § 144.3 ................................................ 22

40 C.F.R. § 144.6 ................................................. 4

40 C.F.R. § 144.6(f) .............................................. 4

40 C.F.R. § 144.8 ................................................ 43

40 C.F.R. § 144.12(a) ............................................ 22

40 C.F.R. § 145.1(g) ............................................. 35

40 C.F.R. § 145.13(a) ............................................ 28

40 C.F.R. § 145.22 ............................................... 41

40 C.F.R. § 145.22(a)(2) ......................................... 39

40 C.F.R. § 145.23 ............................................... 41

40 C.F.R. § 145.23(b)(1) ......................................... 39

40 C.F.R. § 145.23(e) ....................................................... 42

40 C.F.R. § 145.25 .......................................................... 20

40 C.F.R. § 145.33 ...................................................... 38, 45

40 C.F.R. § 145.34 ...................................................... 38, 45

40 C.F.R. pt. 146, subpt. H................................................ 5, 12, 36

40 C.F.R. § 146.81 ........................................................... 5

40 C.F.R. § 146.93 .......................................................... 25

40 C.F.R. § 146.93(b)-(c) .................................................. 5, 16

40 C.F.R. § 146.93(b)(3) ................................................... 6, 17

40 C.F.R. § 146.93(b)(4) ...................................................... 6

40 C.F.R. § 146.93(d)-(h) .................................................... 17

40 C.F.R. § 146.93(f)-(h) .................................................... 24

40 C.F.R. § 147.1(e) ........................................................ 34

40 C.F.R. § 147.950 ......................................................... 6

40 C.F.R. § 147.950 tbl. 1 .................................................. 34

40 C.F.R. § 147.950(a) .................................................. 34, 35

## State Administrative Code

La. Admin. Code tit. 43, pt. XVII, § 103.D.4............................... 28

La. Admin. Code tit. 43, pt. XVII, § 209.L................................. 24

La. Admin. Code tit. 43, pt. XVII, § 209.M ..................................................25

La. Admin. Code tit. 43, pt. XVII, § 3633 .........................................23, 25

La. Admin. Code tit. 43, pt. XVII, § 3633.A.2 ....................................15

La. Admin. Code tit. 43, pt. XVII, § 3633.A.2a ..................................16

La. Admin. Code tit. 43, pt. XVII, § 3633.A.2c ..................................16

La. Admin. Code tit. 43, pt. XVII, § 3633.A.2d ..................................16

La. Admin. Code tit. 43, pt. XVII, § 3633.A.3 ...............................16,18

La. Admin. Code tit. 43, pt. XVII, § 3633.A.4 .....................................16

La. Admin. Code tit. 43, pt. XVII, § 3633.A.5-8 ...............................17

La. Admin. Code tit. 43, pt. XVII, § 3633.A.6-8...............................23, 24

La. Admin. Code tit. 43, pt. XVII, § 3633.B...........................................26

**Federal Register**

75 Fed. Reg. 77230 (Dec. 10, 2010) ...................................4, 13, 21, 33, 35

83 Fed. Reg. 17758 (Apr. 24, 2018) .........................................................14

85 Fed. Reg. 64053 (Oct. 9, 2020) ...........................................................14

88 Fed. Reg. 28450 (May 4, 2023) .............................................................6

88 Fed. Reg. 55610 (Aug. 16, 2023)....................................................7, 14

89 Fed. Reg. 703 (Jan. 5, 2024)   1, 4, 5-8, 13-14, 19-21, 28, 30, 37-38, 40, 41, 42, 43

**Other Authorities**

Wendy B. Jacobs & Debra L. Stump, "Proposed Liability Framework for Geological Sequestration of Carbon Dioxide," Harvard Law School, Emmett Environmental Law & Policy Clinic (Oct. 2010), https://www. belfercenter.org/publication/proposed-liability-framework-geological-sequestration-carbon-dioxide ............................................................. 13

# INTRODUCTION

As part of the Safe Drinking Water Act's cooperative-federalism scheme, Congress gave States a chance to take primary enforcement responsibility ("primacy") over the federal program that regulates underground injection wells. The U.S. Environmental Protection Agency laid out a detailed set of requirements that States would have to meet to obtain primacy. When Louisiana applied for primacy over wells used for geologic storage of carbon dioxide, EPA reviewed Louisiana's application through a full notice-and-comment rulemaking process before issuing its approval. 89 Fed. Reg. 703 (Jan. 5, 2024).

Petitioners (collectively, "Deep South") challenge that approval, but they do not dispute Louisiana's compliance with most of EPA's requirements for approval of a state underground injection control program. Instead, Deep South focuses narrowly on one Louisiana statutory provision that addresses long-term liability. EPA recognized stakeholder concerns with that provision and explained why Louisiana's program nonetheless met EPA's requirements for approval. The provision allows a limited transfer of future liability only after all well

closure requirements have been met and the closed well does not endanger drinking water or public health and safety.

As to Deep South's concerns about Louisiana's capacity to properly implement its program, EPA adequately explained its finding that Louisiana has the necessary personnel and resources. EPA also explained how it will continue to oversee Louisiana's program.

The petition should be denied.

## STATEMENT OF THE ISSUES

1.      Whether EPA's approval of Louisiana's program was arbitrary or capricious where Louisiana law includes a long-term liability provision that, in limited circumstances after all well closure requirements are met, transfers any future liability to a state-administered and industry-funded trust fund.

2.      Whether EPA adequately explained its finding that Louisiana has the necessary personnel and resources to implement the program and that EPA would maintain continuing oversight over Louisiana's program.

## STATEMENT OF THE CASE

## I.   Underground injection control under the Safe Drinking Water Act

Congress enacted the Safe Drinking Water Act to protect the nation's drinking water. Among other things, the Act protects sources of drinking water by regulating wells that inject fluids underground. 42 U.S.C. §§ 300h to 300h-9. The Act does so through a cooperative-federalism approach in which States may implement their own underground injection control programs in line with federally established requirements.

The Safe Drinking Water Act directs EPA to establish minimum requirements for state programs that regulate underground injection wells. 42 U.S.C. § 300h(a)–(b). To meet those requirements, a state program must prohibit any unpermitted underground injection of fluids and allow injection only if it will not endanger drinking water sources. *Id.* § 300h(b)(1).

If a State demonstrates to EPA that its program meets the minimum requirements, then EPA approves the program. *Id.* § 300h-1(b). EPA's approval gives the State "primary enforcement responsibility," also known as "primacy," over the injection of fluids

underground. *Id.* § 300h-1(b)(3); 89 Fed. Reg. at 704. For any State without an approved program, EPA must prescribe a federal regulatory program. 42 U.S.C. § 300h-1(c). If a State has primacy and EPA determines that a person in that State is violating a requirement of the State's program, then EPA must give the State a chance to act before EPA enforces the requirement. *Id.* § 300h-2(a)(1). Even in States with primacy, EPA retains the authority to respond if contamination of an underground source of drinking water may present an imminent and substantial endangerment to public health. *Id.* § 300i(a).

EPA has established requirements under the Act for state programs that regulate six types of underground injection wells, known as Class I to VI wells. 40 C.F.R. § 144.6. Class VI wells are used for carbon sequestration—the injection of carbon dioxide into deep rock formations for long-term storage. *Id.* § 144.6(f); 75 Fed. Reg. 77230, 77233 (Dec. 10, 2010). Storing carbon dioxide underground can help mitigate climate change by reducing the amount of carbon dioxide emitted into the atmosphere. 75 Fed. Reg. at 77233.

EPA's requirements for Class VI programs include a wide range of safeguards to protect drinking water sources and human health.

Owners or operators of wells must obtain a permit for each well, which requires meeting technical, financial, and reporting and recordkeeping requirements. 89 Fed. Reg. at 704. The requirements cover the entire life cycle of a well, from the initial siting decision to post-injection monitoring and, ultimately, closure. The wide range of requirements include: technical criteria for well siting to ensure that the geology will contain the carbon dioxide where it is injected; modeling to identify the areas that injection will affect; evaluation of potential pathways for fluid movement; well construction requirements to ensure that the well will not leak; testing and monitoring, including after injection has ended, to ensure that the carbon dioxide is contained; operating requirements to ensure safety; enough financial assurance to cover all project costs, including emergency response; and requirements for post-injection site care and site closure. *Id.*; 40 C.F.R. pt. 146, subpt. H.

Under EPA's Class VI requirements, post-injection site care requires monitoring for at least fifty years or for an alternative monitoring period that, based on a site-specific showing, is long enough to ensure protection of drinking water. 40 C.F.R. § 146.93(b)–(c); *see also id.* § 146.81 (defining "post-injection site care"). After the required

monitoring period, the owner or operator must show that no more monitoring is necessary. *Id.* § 146.93(b)(3). If that showing cannot be made, then the site cannot close, and monitoring must continue. *Id.* § 146.93(b)(4).

Congress recently reaffirmed its support for States taking primacy over carbon storage wells. In the 2021 Infrastructure Investment and Jobs Act (also known as the Bipartisan Infrastructure Law), Congress established a $50 million grant program to help States run their own Class VI programs. Pub. L. No. 117-58, div. D, tit. III, § 40306, 135 Stat. 429, 1002 (codified at 42 U.S.C. § 300h-9(c)).

## II.   EPA's approval of Louisiana's program

Louisiana has had primacy over Class I to V wells since 1982. 40 C.F.R. § 147.950. In 2021, Louisiana applied to EPA for approval of its program to regulate Class VI wells. 89 Fed. Reg. at 704.

In May 2023, EPA proposed to approve the application and sought public comment. 88 Fed. Reg. 28450 (May 4, 2023). EPA based the proposed approval on a full technical and legal review of Louisiana's application. *Id.* at 28453–54. EPA specifically recognized stakeholder concerns about Louisiana's long-term liability provision. *Id.* at 28453

(citing La. Stat. Ann. § 30:1109). EPA proposed to find that the Louisiana provision, when implemented consistent with the relevant provisions in the Memorandum of Agreement Addendum between EPA and Louisiana, meets federal requirements. *Id.* EPA also noted that it was working with Louisiana to confirm that specific aspects of the long-term liability provision align with EPA's interpretation. *Id.*

In June 2023, Louisiana supplemented its application with the recently enacted Act No. 378, which revised certain state statutes relevant to Louisiana's application, including the long-term liability provision. 88 Fed. Reg. 55610, 55611 (Aug. 16, 2023). EPA sought another round of public comment on Louisiana's supplemental submission. *Id.*

In January 2024, EPA approved Louisiana's application for primacy over Class VI wells. 89 Fed. Reg. 703. The approval followed EPA's "comprehensive technical and legal evaluation" of Louisiana's application against the federal requirements. *Id.* at 706. EPA concluded that Louisiana had shown that its program will have adequate in-house staff and access to contractor support. *Id.* EPA also considered the recent revisions to the long-term liability provision and the relevant

provisions of the Memorandum of Agreement Addendum, and EPA

concluded that Louisiana's program meets federal requirements. *Id.*

## SUMMARY OF THE ARGUMENT

Deep South does not dispute Louisiana's compliance with most of

EPA's requirements for approval of a state underground injection

control program. Instead, Deep South focuses narrowly on one

Louisiana statutory provision that addresses any liability that might

arise after all well closure requirements are met.

**I.A.** Louisiana's long-term liability provision applies only after all

site closure regulations have been met, and even then, its effect is

limited. The provision allows Louisiana to issue a certificate of

completion of injection operations after several conditions are met. The

owner or operator of the well must meet all regulatory closure

requirements, including the extensive post-injection monitoring and

closure requirements that Louisiana law imposes in compliance with

EPA regulations. The owner or operator must also show that the

injected carbon dioxide will remain in place and that the site does not

endanger drinking water or public health and safety. Only then does

the Louisiana provision allow a limited transfer of any future liability to a state-administered and industry-funded trust fund.

**B.** The Louisiana long-term liability provision does not undermine any protections under the Safe Drinking Water Act. Under the express terms of the provision, all regulatory requirements for injection wells must be met before the certificate is issued. That includes all regulatory requirements that apply at the end of a carbon storage well's life cycle, including deed notation and record retention. Because all the requirements will have been met by the time a certificate is issued, no violation of those requirements could subsequently occur—so the certificate could not release any obligation to comply with those requirements.

**C.** Deep South is incorrect that EPA improperly approved, and adopted into federal law, the Louisiana provision's release of obligations under federal environmental laws other than the Safe Drinking Water Act. It is not certain what liability under other federal laws could even arise many years after the end of injection, after a site has been shown to be safe. Whatever such liability might arise, the Louisiana provision

would not extinguish it—at most, it would transfer the liability to the state-administered and industry-funded trust fund.

EPA did not incorporate the Louisiana provision "into federal law" anyway. The Louisiana long-term liability provision is not a "requirement" of Louisiana's approved program that EPA incorporated into federal regulations. Without adoption into federal law, it is not clear how the Louisiana provision, by its own force, could release any liability under federal law. In any event, nothing in the Safe Drinking Water Act or EPA regulations requires EPA to disapprove a state program where the program meets EPA's minimum requirements and the State also has a state law provision, such as the one here, that addresses other matters outside the scope of the federal regulations.

**II.** EPA reasonably concluded that Louisiana has the capacity to implement its regulatory program. In the administrative record, EPA adequately addressed concerns about Louisiana's staff resources, expertise, and contractor support. EPA also adequately addressed comments claiming that Louisiana has a poor record of regulating other well types, and EPA explained how it will retain adequate oversight over Louisiana's administration of its program.

## STANDARD OF REVIEW

Because the Safe Drinking Water Act's judicial review provision does not specify a standard of review, 42 U.S.C. § 300j-7, the Administrative Procedure Act's standard applies, *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496 (2004); *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1145 (10th Cir. 2010). Under the Administrative Procedure Act standard, the Court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). If the agency has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decision must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

Deep South does not challenge Louisiana's compliance with most of the technical criteria that EPA laid out as requirements for state program approval. For instance, a state program must ensure that

injection wells are suitably located, constructed in a way that prevents injection into underground drinking water sources, and operated safely. *See* 40 C.F.R. pt. 146, subpt. H. Deep South makes no claim that Louisiana's program fails to meet those requirements.

Deep South focuses more narrowly on Louisiana's long-term liability provision. Deep South tries to frame that issue in several different ways: that the provision caused EPA's approval of Louisiana's program to exceed its statutory authority, that the provision made Louisiana's program less stringent than federal requirements, and that EPA failed to explain its approach to the provision. Pet. Br. Argument II, III, IV.A. Whatever the framing, Deep South's arguments are unavailing. EPA evaluated the Louisiana provision and explained that the provision did not preclude approval of Louisiana's program because all underground injection control program requirements would be met before the provision could have any effect.

Deep South also raises a short argument about Louisiana's capacity to properly implement the program. That argument also lacks merit because EPA adequately explained its finding that Louisiana has the necessary personnel and resources, and EPA explained how it will

maintain a continuing oversight role to ensure that the program is properly implemented.

## I. EPA carefully considered Louisiana's long-term liability provision and appropriately concluded that Louisiana's program was approvable.

According to industry and some carbon capture advocates, uncertainty about long-term liability has been one of the barriers to deployment of carbon capture and storage. *See* Wendy B. Jacobs & Debra L. Stump, "Proposed Liability Framework for Geological Sequestration of Carbon Dioxide," Harvard Law School, Emmett Environmental Law & Policy Clinic (Oct. 2010), https://www. belfercenter.org/publication/proposed-liability-framework-geological-sequestration-carbon-dioxide. Some have thus called for the transfer of post-closure liability to the state or federal government or to a publicly or industry-funded entity. 75 Fed. Reg. at 77271.

EPA itself does not have authority under the Safe Drinking Water Act to transfer long-term liability for carbon storage wells, as EPA concluded in 2010 when it promulgated its Class VI regulations. *Id.* at 77272. But EPA did not foreclose States from considering such measures. 89 Fed. Reg. at 707–08; Response to Comments, EPA-HQ-

OW-2023-0073-0754, at 17, JA___. The two other States with approved Class VI programs—North Dakota and Wyoming—have state laws that address long-term liability for carbon storage wells. *See* 85 Fed. Reg. 64053 (Oct. 9, 2020); 83 Fed. Reg. 17758 (Apr. 24, 2018); N.D. Cent. Code § 38-22-17; Wyo. Stat. Ann. § 35-11-319.

Louisiana has enacted a provision into state law that addresses long-term liability for carbon storage wells. La. Stat. Ann. § 30:1109. EPA acknowledged stakeholder concerns about this provision when it proposed to approve Louisiana's primacy application, giving the public a chance to weigh in. 88 Fed. Reg. at 28453. EPA allowed a second round of public comment after the Louisiana legislature revised the provision. 88 Fed. Reg. at 55611. Following the two rounds of public input, EPA explained its analysis of the provision in the administrative record. 89 Fed. Reg. at 706–08; Response to Comments 14–19, JA___–___. Based on that analysis, EPA concluded that the provision did not impede approval of Louisiana's program. 89 Fed. Reg. at 706.

Louisiana's long-term liability provision does not have any effect until all underground injection control program requirements, including the last of the closure requirements, are met. The provision thus does

not undermine any protections under the Safe Drinking Water Act. Even if the provision were to release future obligations under federal environmental laws, which is doubtful, that possibility did not require EPA to disapprove Louisiana's program.

### A. The Louisiana provision applies only after all site closure regulations have been met and, even then, has limited effect.

Deep South's concerns about Louisiana's long-term liability provision are overstated. Louisiana law, consistent with EPA regulations, imposes extensive post-injection monitoring and closure requirements at the end of a carbon storage well's life cycle. Those requirements ensure that there will be no danger to drinking water sources. Only after all those requirements are met does the Louisiana provision allow a limited transfer of any future liability to a state-administered and industry-funded trust fund.

Louisiana law requires extensive monitoring after injection of carbon dioxide into a well comes to an end. After the end of injection, the owner or operator must monitor the injected area to ensure that there is no danger to underground sources of drinking water. La. Admin. Code tit. 43, pt. XVII, § 3633.A.2. Monitoring must continue for

at least fifty years or for an alternative monitoring period approved by the State—in consultation with EPA—that site-specific data show is appropriate and ensures non-endangerment of drinking water sources. *Id.* § 3633.A.2.a, A.3. After that, the owner or operator must show that no additional monitoring is necessary. *Id.* § 3633.A.2.c. If that showing cannot be made, then the site cannot close, and monitoring must continue. *Id.* § 3633.A.2.d. These requirements are consistent with the federal requirements that EPA established, 40 C.F.R. § 146.93(b)–(c), and Deep South does not argue otherwise.

Louisiana law also imposes closure requirements that apply after the post-injection monitoring requirements are met. An owner or operator must obtain the State's permission to close the site by demonstrating non-endangerment. La. Admin. Code tit. 43, pt. XVII, § 3633.A.2.c., A.4. After that, the owner or operator must: plug monitoring wells in a way that will ensure non-endangerment of drinking water; submit a site closure report and retain it for at least ten years; record a notation on the property deed that will, for all time, provide any purchaser with information about the carbon storage; and preserve records for at least ten years before delivering them to the

State. *Id.* § 3633.A.5–8. These requirements are also consistent with the federal requirements, 40 C.F.R. § 146.93(b)(3), (d)–(h), and Deep South does not argue otherwise.

The Louisiana provision allows for a limited transfer of any future liability only after all these monitoring and closure requirements are met. La. Stat. Ann. § 30:1109. The Louisiana provision authorizes the State's Commissioner of Conservation to issue a "certificate of completion of injection operations" to an operator of a carbon storage facility. *Id.* § 30:1109.A(1). The certificate has several consequences: (1) it transfers ownership of the remaining project, including the stored carbon dioxide, to the State; (2) it releases the storage operator and owner from "any and all future duties or obligations under this Chapter and any and all liability associated with or related to that storage facility which arises after the issuance of the certificate of completion of injection operations"; and (3) it assigns "principal responsibility" over "continued monitoring of the site, including remediation of any well leakage," to the Carbon Dioxide Geologic Storage Trust Fund. *Id.* § 30:1109.A(2)–(3), (5). The state-administered and industry-funded

Carbon Dioxide Geologic Storage Trust Fund remains available for long-term monitoring and remediation. *Id.* § 30:1110.E.

The Louisiana provision includes various conditions and limitations on its effect. The certificate may be issued only after post-injection monitoring for fifty years or for an alternative site-specific monitoring period established under the State's rules. *Id.* § 30:1109.A(1); *see* La. Admin. Code tit. 43, pt. XVII, § 3633.A.3 (requirements for site-specific alternative monitoring period). To obtain the certificate, the operator must make each of these showings: (1) that the reservoir is reasonably expected to retain mechanical integrity, (2) that the carbon dioxide will reasonably remain in place, (3) that the storage facility does not endanger drinking water or public health and safety, (4) that all post-injection monitoring regulations have been complied with, and (5) that the storage facility has been closed in accordance with all applicable site-closure regulations. La. Stat. Ann. § 30:1109.A(1)(a)–(e). The provision thus addresses only whatever liability might arise after the site has been shown to be safe and has been closed in compliance with all applicable regulations.

Even then, the release does not apply if the Carbon Dioxide Geologic Storage Trust Fund lacks the funds "to address or remediate any duty, obligation, or liability that may arise after issuance of the certificate of completion of injection operations." *Id.* § 30:1109.A(4). Accordingly, the provision is better understood as a conditional transfer of any future liability to the Trust Fund, rather than an extinguishment of liability. Deep South is incorrect that following the certificate, there will be nobody left "to whom liability for Louisiana Class VI well failures flows." Pet. Br. 12.

In addition, the release also does not extend to any liability arising from noncompliance with underground injection control regulations before the certificate is issued. La. Stat. Ann. § 30:1109.A(3). Nor does the release extend to any fraud by the owner or operator. *Id.* § 30:1109.A(5).

Louisiana also agreed to certain conditions in an addendum to its Memorandum of Agreement with EPA. EPA-HQ-OW-2023-0073-0007, JA___–___. The Memorandum of Agreement is the central agreement between Louisiana and EPA on the implementation of the State's underground injection control program. 89 Fed. Reg. at 706; 40 C.F.R.

§ 145.25. In the addendum, Louisiana agreed that it would not issue a certificate of completion until all site closure requirements are met. Memorandum of Agreement Addendum 4, JA___. Louisiana also agreed to coordinate with EPA before approving any site closure to ensure consistency with the Safe Drinking Water Act. *Id.*

### B. The Louisiana provision does not undermine any protections under the Safe Drinking Water Act.

Deep South argues that the Louisiana long-term liability provision allows the release of some obligations that a well owner or operator must meet under EPA's Safe Drinking Water Act regulations. Pet. Br. 31–36. But EPA explained in the record that the Louisiana provision does not allow issuance of a certificate of completion until all regulatory requirements for injection wells are met. The Louisiana provision thus does not undermine the stringency of Louisiana's program.

As EPA explained, there is no "concern that transfer of liability could occur before the site is closed and the non-endangerment standard is met." 89 Fed. Reg. at 708. That is because, under the express terms of the Louisiana provision, Louisiana cannot issue a certificate until there has been post-injection monitoring for fifty years or for an alternative monitoring period that is justified by site-specific data. La. Stat. Ann.

§ 30:1109.A(1). A certificate also requires showings of non-endangerment of drinking water and of compliance with "all applicable regulations related to site closure." La. Stat. Ann. § 30:1109.A(1)(c), (e); *supra* Argument Section I.A.

A certificate of completion that is issued in accordance with those conditions would not release any obligations under the Safe Drinking Water Act's underground injection control program. To obtain a certificate, the well owner or operator must show that the carbon dioxide will remain in place and will not endanger drinking water. The well owner or operator also must comply with all regulatory requirements for the final stage of the well's life cycle, which is site closure.

Because the well owner or operator will have "fully complied" with all program requirements at that point, they are "no longer subject to any Class VI regulatory requirements and therefore no 'violations' could occur." 89 Fed. Reg. at 708; *see also* 75 Fed. Reg. at 77272 ("Once an owner or operator has met all regulatory requirements . . . for Class VI wells and [the regulator] has approved site closure . . . , the owner or operator will generally no longer be subject to enforcement under [the

Safe Drinking Water Act, 42 U.S.C. § 300h-2] for noncompliance with [underground injection control] regulatory requirements.").

At that point, the well owner or operator could not violate the prohibition in 40 C.F.R. § 144.12(a), either. That regulation prohibits any well owner or operator from taking certain actions in a manner that allows for contamination of underground drinking water. By the time a certificate could be issued under the Louisiana provision, the well owner or operator would not even be an "owner or operator" within the meaning of § 144.12(a), since the closed well would no longer be "subject to regulation under the [underground injection control] program." 40 C.F.R. § 144.3. Further, section 144.12(a) provides that the well owner or operator may not "construct, operate, maintain, convert, plug, abandon, or conduct any other injection activity" in a way that could contaminate drinking water. None of those prohibited actions could take place once a well is properly closed.

Deep South suggests that Louisiana might nonetheless issue the certificate before the last of the Safe Drinking Water Act requirements are met. Deep South points to the final set of requirements for injection wells, which are that the well owner or operator: submit a site closure

report and retain the report for ten years; record a property deed notation about the stored carbon dioxide; and retain records for ten years and deliver the records to the State at the end of the retention period. Pet. Br. 33; La. Admin. Code tit. 43, pt. XVII, § 3633.A.6–8. Those requirements are in a state regulation titled "Closure and Post-Closure." La. Admin. Code tit. 43, pt. XVII, § 3633. Deep South suggests, based only on that title, that Louisiana might consider those requirements to be "post-closure" requirements rather than "closure" requirements. Pet. Br. 34. Even though the Louisiana provision requires "all applicable regulations related to site closure" to be met before certificate issuance, Deep South speculates that the State might issue the certificate before the supposedly "post-closure" requirements of deed recordation and record retention are met. Pet. Br. 34.

EPA addressed that issue in the administrative record. EPA explained that the Louisiana provision prohibits the State from issuing a certificate until the site complies "with *all* applicable regulations related to site closure, which the EPA interprets to include site closure regulations concerning deed recordation and record retention." Response to Comments 14, JA___; *see* La. Stat. Ann. § 30:1109.A(1)(e).

That interpretation is sound. Louisiana's deed recordation and record retention requirements mirror the federal closure requirements. *Compare* La. Admin. Code tit. 43, pt. XVII, § 3633.A.6–8, *with* 40 C.F.R. § 146.93(f)–(h). Deep South nonetheless suggests that Louisiana might consider them to be in a distinct category of "post-closure" requirements. But that suggestion rests on the section title in the state regulation, and that title is generally not considered to be part of the law. *Cf. State v. Williams*, 2010-1514 (La. 3/15/11), 60 So. 3d 1189, 1192 ("[T]he title of an act is not part of a statute . . . ."). And if a title could help characterize whether a requirement is for "closure" or "post-closure," then the title of the regulation's *sub*section is more relevant. All the requirements at issue are part of § 3633.A, which is titled "Post-Injection Site Care and Site Closure." Nothing in either that subsection title or the regulatory text refers to any "post-closure" requirements, as distinct from "closure" requirements. In other well regulations where Louisiana intended to distinguish between "closure" and "post-closure" requirements, Louisiana did so more clearly. *Compare*, *e.g.*, La. Admin. Code tit. 43, pt. XVII, § 209.L ("Closure (Plug and Abandon)"

requirements for Class I wells, including "Standards for Well Closure"), *with id.* § 209.M ("Post-Closure Care" for Class I wells).

To the extent there were any remaining doubt, Louisiana's agreement with EPA dispels it. In the Memorandum of Agreement Addendum, Louisiana agreed that it would not issue a certificate until a site "fully complies with the site closure requirements in 40 CFR 146.93 and [La. Admin. Code tit. 43, pt. XVII, § 3633]." Memorandum of Agreement Addendum 4, JA___. The cited federal regulation, which includes the deed recordation and record retention requirements mirrored in the state regulation, does not mention any "post-closure" requirements that might be distinct from "closure" requirements. *See* 40 C.F.R. § 146.93.

EPA thus explained in the record that the Memorandum of Agreement Addendum confirms that all regulatory requirements, "which include deed recordation and record retention requirements," will be met. Response to Comments 14, JA___. Because the State will not issue a certificate until compliance with all well requirements, including the final requirements following site closure, the Louisiana provision does not undermine the stringency of Louisiana's program.

*Contra* Pet. Br. 33. The provision does not nullify the requirement to prepare a site closure report, *contra id.* at 35, nor wipe away the requirement to retain and deliver records, *contra id.* at 36.[1]

As further assurance, EPA explained that even after certificate issuance, the Louisiana provision allows the well owner or operator to be held liable "for previous regulatory noncompliance, such as violation of recordkeeping requirements." Response to Comments 14, JA___; *see* La. Stat. Ann. § 30:1109.A(3) (not allowing liability release for "noncompliance with applicable underground injection control laws and regulations prior to issuance of the certificate").

And even if Louisiana were to issue the certificate without waiting for the end of the record retention period, it is not apparent that a well

---

[1] There is no inconsistency between this conclusion and the language in Louisiana's regulation that the State "shall not issue" a certificate until the operator has sufficient financial surety to adequately close the site. Pet. Br. 35 n.4 (citing La. Admin. Code tit. 43, pt. XVII, § 3633.B). That regulation has not been updated since the Louisiana legislature's 2023 revision of the long-term liability provision to require that all closure requirements must be met before certificate issuance. *See* Louisiana application supplement, EPA-HQ-OW-2023-0073-0686, at 8–9, JA___–___. The regulation is not inconsistent with the revised statutory provision, and as a practical matter, the later condition in the revised statutory provision (i.e., that all closure requirements are met) will dictate the timing of certificate issuance.

owner or operator would be released from any remaining record-retention requirements. Under the express terms of the Louisiana provision, a release would apply only to "future duties or obligations" and liabilities that "arise[] after the issuance of the certificate." La. Stat. Ann. § 30:1109.A(3). The obligation to retain and deliver records may be existing obligations that attach at the time of closure or even at the time of permit issuance, rather than those that "arise" after the certificate. But the Court need not resolve that issue given that such premature issuance of the certificate is not allowed in the first place.

State legislative history about other unenacted limitations on the release does not undercut this conclusion. Deep South points out that the Louisiana legislature considered, yet did not enact, further limitations on liability release. Pet. Br. 36–37. The provisions that the Louisiana legislature did enact, reinforced by Louisiana's agreement with EPA, give sufficient assurance that Louisiana cannot issue the certificate until all regulatory requirements for injection wells have been met.

For these reasons, the Louisiana provision is not inconsistent with the saving clause in 42 U.S.C. § 300h-2(d). Pet. Br. 28. That clause

states: "Nothing in [the Safe Drinking Water Act] shall diminish any authority of a State or political subdivision to adopt or enforce any law or regulation respecting underground injection but no such law or regulation shall relieve any person of any requirement otherwise applicable under [the Safe Drinking Water Act]." 42 U.S.C. § 300h-2(d). The Louisiana provision does not "relieve" any person of a Safe Drinking Water Act requirement because all injection well requirements will have been met by the time a certificate can be issued.

Similarly, the Louisiana provision is not inconsistent with the requirement in EPA's regulations that a State with primacy must have certain "remedies for violations of State program requirements." 40 C.F.R. § 145.13(a). By the time a certificate can be issued under the Louisiana provision, "no 'violations' could occur" that need a remedy because all program requirements through the end of closure will have been met. 89 Fed. Reg. at 708; *see also* Response to Comments 18, JA___. Louisiana also continues to have emergency authority to address any imminent and substantial endangerment of health and safety. Response to Comments 18, JA___ (citing La. Stat. Ann. § 30:1109.G; La. Admin. Code tit. 43, pt. XVII, § 103.D.4).

Nor does the Louisiana provision conflict with the saving clause in 42 U.S.C. § 300j-8(e). Pet. Br. 28. That clause states that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any requirement prescribed by or under this subchapter or to seek any other relief." 42 U.S.C. § 300j-8(e). That provision merely says that "[n]othing in this section," i.e., the Act's citizen-suit provision, will restrict other rights to relief. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987) (similar reading of saving clause in Clean Water Act citizen-suit provision, 33 U.S.C. § 1365(e)). It imposes no limitation on any state law. In any event, by the time a certificate is issued, there would be no remaining "requirement" under the Safe Drinking Water Act's underground injection control program that a citizen suit could be brought to enforce.

The Louisiana provision does not interfere with EPA's emergency authority under 42 U.S.C. § 300i(a), either. Pet. Br. 40. That statute allows EPA to take emergency action to respond to an imminent and substantial endangerment of drinking water "[n]otwithstanding any other provision of [the Safe Drinking Water Act.]" 42 U.S.C. § 300i(a).

EPA explained that EPA thus maintains "its independent authority" to address emergency situations even while Louisiana has primacy. 89 Fed. Reg. at 709; *see also* Response to Comments 4, JA___.

As a final backstop, Louisiana has agreed to implement the provision in a way that does not undermine the Safe Drinking Water Act. Deep South incorrectly characterizes the Louisiana provision as an "automatic liability waiver." Pet. Br. 17. The limited liability transfer is not automatic. Rather, it occurs only once Louisiana issues a certificate. La. Stat. Ann. § 30:1109.A. The Louisiana legislature specifically directed the State to implement the provision "in a manner consistent with and as the [Commissioner of Conservation] deems necessary to carry out the purposes and requirements of the federal Safe Drinking Water Act." *Id.* § 30:1109.G. Louisiana signed an agreement with EPA promising to do just that. *See* Memorandum of Agreement Addendum 1–2 (agreeing that the State "shall administer the Class VI [underground injection control] program consistent with . . . the Safe

Drinking Water Act"); Response from Louisiana to EPA Questions, EPA-HQ-OW-2023-0073-0757, at 6, JA___.[2]

If there ever were a circumstance in which issuing the certificate would interfere with the Safe Drinking Water Act, then the provision gives Louisiana the authority—indeed, the obligation—not to issue such a certificate. The public would have a chance to identify any such circumstance because a certificate can be issued only after notice and a public hearing. La. Stat. Ann. § 30:1107.B (citing La. Stat. Ann. § 30:6); Response from Louisiana to EPA Questions at 6, JA___. An aggrieved party can also seek judicial review of a certificate. La. Stat. Ann. § 30:12; Response from Louisiana to EPA Questions at 6, JA___. These safeguards ensure that Louisiana will not implement the provision in a way that undermines drinking water protections under the Safe Drinking Water Act.[3]

---

[2] This record document includes EPA's questions in black font and Louisiana's responses in red font. The back-and-forth was before the 2023 revisions to the Louisiana provision that imposed further limits on certificate issuance, but even then, Louisiana assured EPA that it will implement the provision consistent with the Safe Drinking Water Act. Response from Louisiana to EPA Questions at 6, JA___.

[3] Deep South's citation to an out-of-circuit district court decision about entirely different statutes is inapt. Pet. Br. 30 (citing *Ctr. for Biological Diversity v. Regan*, No. CV 21-119, 2024 WL 1602457, at *36 (D.D.C.

### C. Even if the Louisiana provision were to release future obligations under other federal environmental laws, which is doubtful, that possibility did not require EPA to disapprove Louisiana's program.

Deep South argues that EPA exceeded its authority by approving, and adopting into federal law, the Louisiana provision's release of obligations under federal environmental laws other than the Safe Drinking Water Act. Pet. Br. 27–31. But EPA did not adopt the Louisiana provision into federal law. It is doubtful that the Louisiana provision, by its own force, could even discharge liabilities under other federal environmental laws, and in any event the provision did not require EPA to disapprove Louisiana's program.

To start, it is not certain what liability under other federal environmental laws could even arise after a certificate is issued. As discussed above in Argument Section I.A, the Louisiana provision allows for certificate issuance only after the well owner or operator shows that there is no danger to drinking water sources or to public

---

Apr. 12, 2024)). That case addressed Endangered Species Act challenges to EPA's approval of a state permitting program under the Clean Water Act. *See id.* At most, that case stands for the basic proposition that EPA's approval of a state program must comply with relevant statutes, which it did here.

health and safety. La. Stat. Ann. § 30:1109.A(1)(c). All Safe Drinking Water Act requirements would have been met by then. EPA did once acknowledge that even after well closure, "an owner or operator *may, depending on the fact scenario*" have liability under federal statutes such as the Clean Air Act; Comprehensive Environmental Response, Compensation, and Liability Act; or the Resource Conservation and Recovery Act. 75 Fed. Reg. at 77272 (emphasis added). It will be many years from now until it can be seen whether any liability of that sort actually arises. Many years will have passed by the time the entire carbon dioxide injection project reaches completion, followed by post-injection monitoring for fifty years or an alternative monitoring period justified by site-specific data. *Supra* Argument Section I.A.

Even if any liability under federal environmental law were to arise after all that time, the Louisiana provision would not purport to extinguish that liability. The provision would at most transfer any liability to the state-administered, industry-funded trust fund. *Id.* If the fund cannot cover the liability, then the owner or operator would remain on the hook. La. Stat. Ann. § 30:1109.A(4).

Anyway, Deep South mischaracterizes the nature and effect of EPA's action when it claims that EPA "incorporated into federal law" a release of future liability under other federal environmental statutes. Pet. Br. 31. EPA's approval of Louisiana's program gives Louisiana primacy, or primary enforcement responsibility, over underground water sources. 42 U.S.C. § 300h-1(b)(3). If EPA finds that a person "who is subject to" a "requirement" of Louisiana's approved program is violating such a requirement, then EPA must notify Louisiana. *Id.* §§ 300h-2(a)(1), 300h-1(d). But EPA may itself enforce the requirement if Louisiana does not timely commence enforcement action. *Id.* § 300h-2(a)(1).

To that end, EPA incorporated the "requirements set forth" in certain listed Louisiana statutes and regulations into federal regulations. 40 C.F.R.§ 147.950(a); *see also id.* § 147.1(e) ("Regulatory provisions incorporated by reference . . . are enforceable by the Administrator pursuant to [42 U.S.C. § 300h-2]."). The list included the entire Louisiana Geologic Sequestration of Carbon Dioxide Act, which contains the Louisiana provision at issue. *Id.* § 147.950(a) tbl. 1 (citing La. Stat. Ann. §§ 30:1101–30:1112). But EPA did not incorporate every

aspect of that state legislation into federal regulations. Rather, EPA incorporated only the EPA-enforceable "requirements" into federal regulations. *Id.* § 147.950(a).

The Louisiana long-term liability provision is not part of that incorporation. That provision is not a "requirement" that EPA could enforce against a person "who is subject to" that requirement. 42 U.S.C. § 300h-2(a)(1). It imposes no obligation on the owner or operator of a carbon storage well. EPA adopted only the federally enforceable "requirements" of Louisiana's regulatory program into federal regulations, *see* 40 C.F.R. § 147.950(a), and that does not include the long-term liability provision.

Any remaining doubt is dispelled by EPA regulations that clarify that "[w]here an approved State program has a greater scope of coverage than required by Federal law[,] the additional coverage is not part of the federally approved program." 40 C.F.R. § 145.1(g). The Louisiana long-term liability provision is outside the scope of the federal minimum requirements for state underground injection control programs. The minimum requirements that EPA established for state programs approval include no such liability provision. 75 Fed. Reg. at

77271–72; *see* 40 C.F.R. pt. 146, subpt. H. The Safe Drinking Water Act retains the authority of states to adopt laws on underground injection that go beyond the scope of EPA's regulations, 42 U.S.C. § 300h-2(d), but that does not mean that such state laws are incorporated into federal law.

Deep South's contrary authorities are not on point. Pet. Br. 31. *Sierra Club v. Louisiana Department of Environmental Quality* addressed a different type of regulatory program under a different statute—state implementation plans under the Clean Air Act—and did not address any state provisions outside the scope of EPA's minimum requirements. 100 F.4th 555, 564 (5th Cir. 2024). *United States v. King* addressed a state underground injection control program, but it found that a state permitting requirement was part of the "requirements" incorporated into federal law and it did not address any state provisions that were not "requirements." 660 F.3d 1071, 1078 (9th Cir. 2011). Deep South is thus incorrect that EPA has given federal effect to Louisiana's release of future liabilities under federal law.

Without adoption into federal law, it is not clear that the Louisiana provision, by its own force, could release any liability under

federal environmental law. Although the Louisiana provision uses broad language to release "any and all" remaining liability, La. Stat. Ann. § 30:1109.A(3), it is doubtful that that language can be interpreted to encompass liability under federal environmental laws. Such a release under state law would likely be inconsistent with those federal environmental laws and thus preempted under the U.S. Constitution's Supremacy Clause. *See Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005) (explaining implied conflict preemption). The best reading of the Louisiana provision, which would avoid that constitutional issue, is that it releases only state law liability that arises after certificate issuance.

That said, the Court need not decide the effectiveness of any hypothetical future state law release of a liability under federal law because it does not affect EPA's approval of Louisiana's program. Consistent with its statutory authority, EPA concluded that Louisiana's program meets the minimum requirements for approval. 42 U.S.C. § 300h-1(b)(1); 89 Fed. Reg. at 706–07; Response to Comments 17–18, JA___–___. Nothing in the Safe Drinking Water Act or EPA regulations requires EPA to disapprove a state program where the program meets

EPA's minimum requirements and the State also has a state law provision, such as the one here, that addresses other matters outside the scope of the federal regulations. And if the Louisiana provision were someday to cause Louisiana's program to fail EPA's minimum requirements, then EPA always has the authority to withdraw primacy. 42 U.S.C. § 300h-1(b)(3); 40 C.F.R. §§ 145.33–.34.[4]

## II. EPA reasonably concluded that Louisiana has adequate capacity to implement its regulatory program.

There is no merit to Deep South's argument that EPA was required to disapprove Louisiana's program because of a lack of staff resources and because of Louisiana's history of regulating other types of wells. EPA addressed those issues in the administrative record, and its findings are adequately supported.

_____

[4] For the reasons explained throughout this argument section, EPA adequately explained its approach to the Louisiana long-term liability provision in the record. *See* 89 Fed. Reg. at 706–08; Response to Comments 14–19, JA___–___. Deep South's arguments to the contrary lack merit. Pet. Br. 42–44. *Ohio River Valley Environmental Coalition, Inc. v. Kempthorne* pertains to a different agency's approval of a state program under a different statute and stands only for the general proposition that the arbitrary-or-capricious standard requires an agency to explain how it analyzed a state provision that is different from a federal requirement. 473 F.3d 94, 103 (4th Cir. 2006). EPA did so here.

A State seeking primacy must submit a complete description of its underground injection control program. 40 C.F.R. § 145.22(a)(2). The program description must state the number, occupations, and general duties of the state agency staff that will carry out the state program. *Id.* § 145.23(b)(1).

Louisiana met that requirement by submitting an organizational chart of its Department of Natural Resources, Office of Conservation, Injection and Mining Division. Program Description at 13, EPA-HQ-OW-2023-0073-0008, JA___. The chart shows the current personnel available to run the Class VI program, as well as seven new positions that Louisiana will fill to support the program. *Id.* Louisiana identified the technical and policy areas in which its staff have in-house experience. *Id.* at 2–3, JA___–___. Louisiana also explained that some contractor experience will be needed for permit review and risk analysis. *Id.* Louisiana then explained its funding sources, including the funding for hiring the added staff. *Id.* at 3–4, JA___–___.

Based on the information that Louisiana provided, EPA reasonably found that the Louisiana underground injection control program "is comprised of staff with expertise in the variety of technical

specialties needed to issue and oversee Class VI permits, including site characterization, modeling, well construction and testing, and finance." 89 Fed. Reg. at 708. EPA also found that Louisiana "has a plan in place to expand its program to further support Class VI activities within the state by hiring seven additional staff and third-party contractors for modeling, risk and environmental justice analysis." *Id.*; Response to Comments 2–3, JA___–___.

Deep South does not argue that the Louisiana's employees lack the expertise that Louisiana claims, and Deep South acknowledges that a state program may permissibly supplement its capacity with contractor support. Pet. Br. 46. States and EPA routinely rely on contractor support to review permit applications. Response to Comments 7, JA___. Moreover, Louisiana's in-house staff have the necessary expertise to oversee the contractors. Response to Comments 6, JA___.

Deep South merely nitpicks that Louisiana did not provide enough details on its plans to obtain contractor support. Pet. Br. 47. Nothing in EPA's regulations required Louisiana to identify the specific contractors it planned to hire or the exact qualifications that those contractors will

have. *See* 40 C.F.R. § 145.22 (setting out required elements of a state's submission); *id.* § 145.23 (enumerating required information in a state's program description). Louisiana's explanation of its plans to obtain contractor support and its funding for doing so was enough to support EPA's approval. *See Motor Vehicle Mfrs.*, 463 U.S. at 43 (requiring agency to show only a "rational connection between the facts found and the choice made"). Deep South's bare speculation that qualified and unconflicted contractors might be hard to find, which is supported only by an unsourced assertion in its own comment, does not make EPA's finding unreasonable. Pet. Br. 47. Plus, as further assurance, EPA committed to be "ready to provide additional support as needed, including technical support, site specific analysis, and access to the experience and knowledge of the EPA staff in the regions, Headquarters, and the Office of Research and Development." 89 Fed. Reg. at 708.

EPA also adequately addressed comments claiming that Louisiana has a poor record of regulating other well types. 89 Fed. Reg. at 708–09. Louisiana explained its compliance tracking and enforcement program as part of its application. Program Description at 8–9, JA___–___; 40

C.F.R. § 145.23(e). EPA concluded that Louisiana has allocated an "appropriate and adequate" portion of its budget to inspect permittees to ensure compliance and to enforce program requirements. 89 Fed. Reg. at 709. Louisiana has performed an average of 3,000 inspections related to underground injection control per year. Response to Comments 6, JA___. Louisiana has also taken, on average, over 500 underground injection control enforcement actions per year. 89 Fed. Reg. at 709. Louisiana receives reports of violations from the public, and anyone who is concerned about inaction by Louisiana can also report a violation directly to EPA. *Id.* Louisiana has also committed to EPA that it will take timely and appropriate enforcement action. Response to Comments 3, JA___; Memorandum of Agreement Addendum 7, JA___.

Deep South's arguments to the contrary lack merit. Deep South points to reports by the Louisiana Legislative Auditor on the Louisiana Department of Natural Resources' regulation of oil and gas wells. But the reports "only evaluated oil and gas wells used for production" and "did not evaluate regulation over disposal wells or injection wells." Regulation of Oil and Gas Wells and Management of Orphaned Wells

(May 28, 2014), EPA-HQ-OW-2023-0073-0213, att. 16, at 1 n.1, JA___.

EPA does not regulate oil and gas production wells under the Safe

Drinking Water Act. The Department of Natural Resources' record for

programs "not related to [underground injection control] program

implementation" are not so relevant. 89 Fed. Reg. at 709.

Nor do past environmental incidents involving underground

injection control wells indicate that Louisiana's regulatory program is

inadequate. Pet. Br. 48. For instance, EPA explained that in the Bayou

Corne incident, Louisiana fined the permittee and ensured a return to

compliance—which shows the program operating as intended. Response

to Comments 5, JA___. EPA concluded that such incidents do not affect

its conclusion that Louisiana has met the requirements for program

approval. *Id.*

EPA will retain adequate oversight over Louisiana's

administration of its program. 89 Fed. Reg. at 709–10. Louisiana will

submit quarterly and annual reports to EPA with various specified

information. 40 C.F.R. § 144.8; Memorandum of Agreement Addendum

8–9, JA___–___. EPA will conduct annual performance evaluations of

the state program to ensure the program's consistency with federal

regulations. Memorandum of Agreement Addendum 9, JA___.

Louisiana will demonstrate its staff competency as part of these annual

reviews, and EPA will annually evaluate Louisiana on various

performance factors that include having the necessary technical

knowledge and staffing. Response to Comments 6, JA___. Louisiana has

agreed to "promptly inform" EPA of any changes to its resources, such

as its personnel budget, that might affect its ability to administer the

program. Memorandum of Agreement Addendum 2, JA___. Thus, EPA

will be maintaining oversight to ensure that Louisiana follows through

on its plans to obtain contractor expertise and to conduct inspections

and enforcement.

EPA also retains its independent authority to respond if

contamination of an underground source of drinking water may present

an imminent and substantial endangerment to health. 42 U.S.C.

§ 300i(a). EPA also maintains authority to enforce violations of the state

program's requirements if EPA gives the State notice and the state does

not timely act. *Id.* § 300h-2(a)(1). If it becomes necessary, EPA also

retains the ability to withdraw approval by determining that Louisiana

no longer meets federal requirements. *Id.* § 300h-1(b)(3); 40 C.F.R.

§§ 145.33–.34; Response to Comments 3, JA___. EPA's decision to

approve the Louisiana program is thus adequately supported by the law

and by the administrative record.

## CONCLUSION

The petition should be denied.

Respectfully submitted,

 /s/ *Tsuki Hoshijima*
TODD KIM
Assistant Attorney General

Of Counsel:

JAY PRZYBORSKI
ALEC MULLEE
U.S. Environmental Protection
Agency

TSUKI HOSHIJIMA
U.S. Department of Justice
Environment and Natural Resources
Division

# CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit in Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Rule 32(f), this document contains 8,448 words.

2. This document complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

*/s/ Tsuki Hoshijima*