No. 24-60084

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DEEP SOUTH CENTER FOR ENVIRONMENTAL JUSTICE;
HEALTHY GULF; ALLIANCE FOR AFFORDABLE ENERGY,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN,
*Respondents*.

Petition for Review of Action of the
U.S. Environmental Protection Agency

**STATUTORY AND REGULATORY ADDENDUM**

TODD KIM
Assistant Attorney General

Of Counsel:

JAY PRZYBORSKI
ALEC MULLEE
U.S. Environmental Protection
Agency

TSUKI HOSHIJIMA
Environment and Natural Resources
 Division
U.S. Department of Justice
P.O. Box 7411
Washington, D.C. 20044
(202) 532-3285
tsuki.hoshijima@usdoj.gov

# TABLE OF CONTENTS*

**Federal Statutes**

5 U.S.C. § 706 ....................................................................ADD-1

33 U.S.C. § 1365 ...............................................................ADD-2

42 U.S.C. § 300h-9 ...........................................................ADD-5

**State Statutes**

La. Stat. Ann. § 30:6.........................................................ADD-7

La. Stat. Ann. § 30:12.......................................................ADD-9

La. Stat. Ann. § 30:1107..................................................ADD-11

La. Stat. Ann. § 30:1110..................................................ADD-13

N.D. Cent. Code § 38-22-17............................................ADD-17

Wyo. Stat. Ann. § 35-11-319...........................................ADD-19

**Federal Regulations**

40 C.F.R. § 144.3 ............................................................ADD-21

40 C.F.R. § 144.8 ............................................................ADD-27

40 C.F.R. § 145.1 ............................................................ADD-31

40 C.F.R. § 145.25 ..........................................................ADD-33

40 C.F.R. § 145.33 ..........................................................ADD-35

---

* Respondents' addendum does not include statutes and regulations that are already included in Petitioners' June 12, 2024 addendum.

40 C.F.R. § 145.34 ...................................................................ADD-37

40 C.F.R. § 146.81 ...................................................................ADD-39

40 C.F.R. § 147.1 .....................................................................ADD-41

**State Regulations**

La. Admin. Code tit. 43, pt. XVII, § 103 .........................................ADD-43

La. Admin. Code tit. 43, pt. XVII, § 209 .........................................ADD-53

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
        Part I. The Agencies Generally
            Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

  **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

  **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

    **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    **(B)** contrary to constitutional right, power, privilege, or immunity;

    **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    **(D)** without observance of procedure required by law;

    **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

5 U.S.C.A. § 706, 5 USCA § 706

---

United States Code Annotated
   Title 33. Navigation and Navigable Waters (Refs & Annos)
     Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
      Subchapter V. General Provisions

33 U.S.C.A. § 1365

§ 1365. Citizen suits

Effective: December 4, 2018

Currentness

### (a) Authorization; jurisdiction

Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf--

**(1)** against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

**(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

### (b) Notice

No action may be commenced--

**(1)** under subsection (a)(1) of this section--

**(A)** prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

**(B)** if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

---

ADD-2

**(2)** under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

**(c) Venue; intervention by Administrator; United States interests protected**

**(1)** Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such standard or limitation may be brought under this section only in the judicial district in which such source is located.

**(2)** In such action under this section, the Administrator, if not a party, may intervene as a matter of right.

**(3) Protection of interests of United States**

Whenever any action is brought under this section in a court of the United States, the plaintiff shall serve a copy of the complaint on the Attorney General and the Administrator. No consent judgment shall be entered in an action in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator.

**(d) Litigation costs**

The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

**(e) Statutory or common law rights not restricted**

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

**(f) Effluent standard or limitation**

For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) a standard of performance or requirement under section 1322(p) of this title; (6) a certification under section 1341 of this title; (7) a permit or condition of a permit issued under section 1342 of this title that is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (8) a regulation under section 1345(d) of this title.

ADD-3

**(g) "Citizen" defined**

For the purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.

**(h) Civil action by State Governors**

A Governor of a State may commence a civil action under subsection (a), without regard to the limitations of subsection (b) of this section, against the Administrator where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State.

**CREDIT(S)**

(June 30, 1948, c. 758, Title V, § 505, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 888; amended Pub.L. 100-4, Title III, § 314(c), Title IV, § 406(d)(2), Title V, §§ 504, 505(c), Feb. 4, 1987, 101 Stat. 49, 73, 75, 76; Pub.L. 115-282, Title IX, § 903(c)(3), Dec. 4, 2018, 132 Stat. 4356.)

33 U.S.C.A. § 1365, 33 USCA § 1365
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 6A. Public Health Service (Refs & Annos)
      Subchapter XII. Safety of Public Water Systems
        Part C. Protection of Underground Sources of Drinking Water (Refs & Annos)

42 U.S.C.A. § 300h-9

§ 300h-9. Secure geologic storage permitting

Effective: November 15, 2021
Currentness

**(a) Definitions**

In this section:

**(1) Administrator**

The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(2) Class VI well**

The term "Class VI well" means a well described in section 144.6(f) of title 40, Code of Federal Regulations (or successor regulations).

**(b) Authorization of appropriations for geologic sequestration permitting**

There is authorized to be appropriated to the Administrator for the permitting of Class VI wells by the Administrator for the injection of carbon dioxide for the purpose of geologic sequestration in accordance with the requirements of the Safe Drinking Water Act (42 U.S.C. 300f et seq.) and the final rule of the Administrator entitled "Federal Requirements Under the Underground Injection Control (UIC) Program for Carbon Dioxide (CO2) Geologic Sequestration (GS) Wells" (75 Fed. Reg. 77230 (December 10, 2010)), $5,000,000 for each of fiscal years 2022 through 2026.

**(c) State permitting program grants**

**(1) Establishment**

The Administrator shall award grants to States that, pursuant to section 1422 of the Safe Drinking Water Act (42 U.S.C. 300h-1), receive the approval of the Administrator for a State underground injection control program for permitting Class VI wells for the injection of carbon dioxide.

**(2) Use of funds**

A State that receives a grant under paragraph (1) shall use the amounts received under the grant to defray the expenses of the State related to the establishment and operation of a State underground injection control program described in paragraph (1).

**(3) Authorization of appropriations**

There is authorized to be appropriated to the Administrator to carry out this subsection $50,000,000 for the period of fiscal years 2022 through 2026.

**CREDIT(S)**

(Pub.L. 117-58, Div. D, Title III, § 40306, Nov. 15, 2021, 135 Stat. 1002.)

42 U.S.C.A. § 300h-9, 42 USCA § 300h-9
Current through P.L. 118-78. Some statute sections may be more current, see credits for details.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-6

West's Louisiana Statutes Annotated
  Louisiana Revised Statutes
    Title 30. Minerals, Oil, and Gas and Environmental Quality (Refs & Annos)
      Subtitle I. Minerals, Oil, and Gas (Refs & Annos)
        Chapter 1. Commissioner of Conservation (Refs & Annos)
          Part I. Department of Conservation (Refs & Annos)

LSA-R.S. 30:6

§ 6. Hearings; notice; rules of procedure; emergency; service of process;
public records; request for hearings; orders and compliance orders

Effective: June 14, 2023

Currentness

A. The commissioner shall prescribe the rules of order or procedure in hearings or other proceedings before him under this Chapter.

B. No rule, regulation, order, or change, renewal, or extension thereof, shall, in the absence of an emergency, be made by the commissioner under the provisions of this Chapter except after a public hearing upon at least ten days' notice given in the manner and form prescribed by him. This hearing shall be held at a time and place and in the manner prescribed by the commissioner. The commissioner, in his discretion, may designate a member of his staff to conduct public hearings on his behalf. Any person having an interest in the subject matter of the hearing shall be entitled to be heard. Whenever any application shall be made to the commissioner of conservation for creation, revision, or modification of any unit or units for production of oil or gas, or for adoption of any plan for spacing of wells or for cycling of gas, pressure maintenance or restoration, or other plan of secondary recovery, the applicant shall be required to file with the application two copies of a map of such unit or units or well spacing pattern or two explanations of such plan of cycling, pressure maintenance or restoration, or other secondary recovery program and at least thirty days' notice shall be given of the hearings to be held thereon, in the manner prescribed by the commissioner of conservation and a copy of such plat or explanation of program shall remain on file in the office of conservation in Baton Rouge and in the office of the district manager of the conservation district in which the property is located, and be open for public inspection, at least thirty days prior to such hearing.

C. If the commissioner finds an existing emergency which in his judgment requires the making, changing, renewal, or extension of a rule, regulation, or order without first having a hearing, the emergency rule, regulation, or order shall have the same validity as if a hearing had been held after due notice. The emergency rule, regulation, or order shall remain in force no longer than fifteen days from its effective date. In any event, it shall expire when the rule, regulation, or order made after notice and hearing with respect to the same subject matter becomes effective.

D. Should the commissioner elect to give notice by personal service, it may be made by any officer authorized to serve process or any agent of the commissioner in the same manner as is provided by law for the service of citation in civil actions in the district courts. Proof of the service by an agent shall be by the affidavit of the person making it.

E. All rules, regulations, and orders made by the commissioner shall be in writing and shall be entered in full by him in a book kept for that purpose. This book shall be a public record and shall be open for inspection at all times during reasonable office

ADD-7

hours. A copy of a rule, regulation, or order, certified by the commissioner, shall be received in evidence in all courts of this state with the same effect as the original.

F. Any interested person has the right to have the commissioner call a hearing for the purpose of taking action in respect to a matter within the jurisdiction of the commissioner by making a request therefor in writing. Upon receiving the request the commissioner shall promptly call a hearing. After the hearing, and with all convenient speed and in any event within thirty days after the conclusion of the hearing the commissioner shall take whatever action he deems appropriate with regard to the subject matter. In the event of failure or refusal of the commissioner to issue an order within the period of thirty days, he may be compelled to do so by mandamus at the suit of any interested person.

G. Notwithstanding the provisions of Subsections B and C to the contrary, the commissioner, upon determining that a violation of this Chapter or the regulations adopted hereunder has occurred, may impose a civil penalty as provided in this Chapter. Additionally, upon determining that a violation of this Chapter or the regulations adopted hereunder has occurred, the commissioner may issue an order requiring compliance. Any such order issued shall state, with reasonable specificity, the nature of the violation, any cessation of activities or affirmative operations required to achieve compliance, and a time limit within which compliance with the order must be achieved. Noncompliance with any such order to comply shall constitute a violation of this Chapter, and the commissioner may impose a civil penalty for such violation. Any person subjected to a civil penalty shall have the right to a public hearing if requested in writing, which written request shall suspend the imposition of the penalty until final action is taken by the commissioner after hearing.

H. When an application for any permit to construct or drill a Class V or Class VI well related to the geologic sequestration of carbon dioxide becomes complete, the commissioner shall notify the governing authority of any parish included in the permit application. The notice to the governing authority of the parish shall be made no later than the date on which public notice is issued in accordance with applicable law or regulations. Notice may be made by electronic mail to the parish president, police jury president, or mayor-president, depending on the form of parish government.

**Credits**

Amended by Acts 1954, No. 174, § 1; Acts 1954, No. 489, § 1; Acts 1982, No. 321, § 1; Acts 1986, No. 514, § 1, eff. July 2, 1986; Acts 1990, No. 598, § 1; Acts 2023, No. 378, § 1, eff. June 14, 2023.

LSA-R.S. 30:6, LA R.S. 30:6
The Code of Evidence and the Children's Code are current through the 2024 First Extraordinary, Second Extraordinary and Regular Sessions. All other statutes and codes are current through the 2024 First Extraordinary and Second Extraordinary Sessions.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

West's Louisiana Statutes Annotated
  Louisiana Revised Statutes
    Title 30. Minerals, Oil, and Gas and Environmental Quality (Refs & Annos)
      Subtitle I. Minerals, Oil, and Gas (Refs & Annos)
        Chapter 1. Commissioner of Conservation (Refs & Annos)
          Part I. Department of Conservation (Refs & Annos)

LSA-R.S. 30:12

§ 12. Court review and injunction; venue; procedure; burden of proof

Currentness

A. (1) A person who is aggrieved by any law of this state with respect to conservation of oil or gas, or both, or by a provision of this Chapter, or by a rule, regulation, or order made by the assistant secretary of the office of conservation hereunder, or by an act done or threatened hereunder, and who has exhausted his administrative remedy, may obtain court review by a suit for injunction or judicial review against the assistant secretary as defendant.

(2) Suit for review shall be instituted in the district court of the parish in which the principal office of the assistant secretary is located and must be brought within sixty days of the administrative action that is the subject of the suit. In cases of judicial review of adjudication proceedings, the sixty days shall begin to run after mailing of notice of the final decision or order, or if a rehearing is requested within sixty days after the decision thereon.

B. (1) Judicial review of adjudication proceedings before the assistant secretary may be obtained whether or not the plaintiff has applied for a rehearing. A preliminary, procedural, or intermediate action or ruling by the assistant secretary is immediately reviewable if review of the final decision of the assistant secretary would not provide an adequate remedy and would inflict irreparable injury.

(2) Within thirty days after service of the petition or within further time allowed by the court, the assistant secretary shall transmit to the reviewing court the original or a certified copy of the entire record of the proceeding under review. By stipulation of all parties to the review proceedings, the record may be shortened. A party unreasonably refusing to stipulate to limit the record may be taxed by the court for the additional costs. The court may require or permit subsequent corrections or additions to the record.

(3) If, before the date set for hearing, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the assistant secretary, the court may order that the additional evidence be taken before the assistant secretary upon conditions determined by the court. The assistant secretary may modify his findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court.

(4) The review shall be conducted by the court without a jury and shall be confined to the record. In cases of alleged irregularities in procedure before the assistant secretary not shown in the record, proof thereon may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.

ADD-9

(5) The court may affirm the decision of the assistant secretary or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(a) In violation of constitutional or statutory provisions;

(b) In excess of the statutory authority of the agency;

(c) Made upon unlawful procedure;

(d) Affected by other error of law;

(e) Arbitrary or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(f) Manifestly erroneous in view of the reliable, probative, and, substantial evidence on the whole record. In the application of the rule, where the assistant secretary has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the assistant secretary's determination on credibility issues.

C. (1) Any suit for an injunction brought under this Section shall be tried summarily, and the attorney representing the assistant secretary may have the case set for trial after ten days' notice to the plaintiff or his attorney of record.

(2) The burden of proof shall be upon the plaintiff, and all pertinent evidence with respect to the validity or reasonableness of the order of the assistant secretary complained of shall be admissible. The law, the provision of this Chapter, or the rule, regulation, or order complained of shall be taken as prima facie valid. This presumption shall not be overcome in connection with any application for injunctive relief, including a temporary restraining order, by verified petition or affidavit of or in behalf of the applicant.

D. The right of appeal shall lie as hereinafter set forth in this Chapter.

**Credits**
Amended by Acts 1983, No. 409, § 1.

LSA-R.S. 30:12, LA R.S. 30:12
The Code of Evidence and the Children's Code are current through the 2024 First Extraordinary, Second Extraordinary and Regular Sessions. All other statutes and codes are current through the 2024 First Extraordinary and Second Extraordinary Sessions.

---

ADD-10

West's Louisiana Statutes Annotated
  Louisiana Revised Statutes
    Title 30. Minerals, Oil, and Gas and Environmental Quality (Refs & Annos)
      Subtitle I. Minerals, Oil, and Gas (Refs & Annos)
        Chapter 11. Louisiana Geologic Sequestration of Carbon Dioxide Act (Refs & Annos)

LSA-R.S. 30:1107

§ 1107. Certificates of public convenience and necessity; certificate of completion of injection operations

Effective: June 14, 2023
Currentness

A. The commissioner shall issue a certificate of public convenience and necessity or a certificate of completion of injection operations to each person applying therefor if, after a public hearing pursuant to the provisions of R.S. 30.6, held in the parish where the storage facility is to be located, he determines that it is required by the present or future public convenience and necessity, and such decision is based upon the following criteria; (1) the proposed storage facility meets the requirements of R.S. 30:1104(C) and (2) the proposed storage facility meets the requirements of any rules adopted under this Chapter. However, if any person has previously been issued a certificate of public convenience and necessity or a certificate of completion of injection operations by the commissioner, that certificate continues to remain valid and in force.

B. The commissioner shall issue a certificate of completion of injection operations to the operator applying therefor, if after a public hearing pursuant to R.S. 30:6, it is determined that such operator has met all of the conditions required for such certificate, including the requirements of R.S. 30:1109.

C. Notwithstanding any provision of this Chapter or any rule, regulation, or order issued by the commissioner under this Chapter to the contrary, accepting or acting pursuant to a certificate of public convenience and necessity or a certificate of completion of injection operations issued under this Chapter, compliance with the provisions of this Chapter or with rules, regulations, or orders issued by the commissioner under this Chapter or voluntarily performing any act which could be required by the commissioner pursuant to this Chapter or rules, regulations, or orders issued by the commissioner under this Chapter shall not have the following consequences:

(1) Cause any storage operator or transporter of carbon dioxide for storage to become or be classified as a common carrier or a public utility for any purpose whatsoever.

(2) Subject any storage operator or transporter of carbon dioxide for storage to any duties, obligations, or liabilities as a common carrier or public utility under the constitution and laws of this state.

(3) Increase the liability of any storage operator or transporter of carbon dioxide for storage for any taxes otherwise due to the state of Louisiana in the absence of any additions or amendments to any tax laws of this state.

**Credits**
Added by Acts 2009, No. 517, § 2. Amended by Acts 2023, No. 378, § 1, eff. June 14, 2023.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

LSA-R.S. 30:1107, LA R.S. 30:1107

The Code of Evidence and the Children's Code are current through the 2024 First Extraordinary, Second Extraordinary and Regular Sessions. All other statutes and codes are current through the 2024 First Extraordinary and Second Extraordinary Sessions.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-12

West's Louisiana Statutes Annotated
Louisiana Revised Statutes
Title 30. Minerals, Oil, and Gas and Environmental Quality (Refs & Annos)
Subtitle I. Minerals, Oil, and Gas (Refs & Annos)
Chapter 11. Louisiana Geologic Sequestration of Carbon Dioxide Act (Refs & Annos)

LSA-R.S. 30:1110

§ 1110. Carbon Dioxide Geologic Storage Trust Fund

Effective: June 14, 2023
Currentness

A. (1) There is hereby established a fund in the custody of the state treasurer to be known as the Carbon Dioxide Geologic Storage Trust Fund, hereinafter referred to as the "fund", which shall constitute a special custodial trust fund which shall be administered by the commissioner, who shall make disbursements from the fund solely in accordance with the purposes and uses authorized by this Chapter.

(2) After compliance with the requirements of Article VII, Section 9(B) of the Constitution of Louisiana relative to the Bond Security and Redemption Fund, and after a sufficient amount is allocated from that fund to pay all of the obligations secured by the full faith and credit of the state which become due and payable within any fiscal year, the treasurer shall pay into the fund, an amount equal to the monies received by the state treasury pursuant to this Chapter. The monies in this fund shall be used solely as provided in this Section and only in the amount appropriated by the legislature. All unexpended and unencumbered monies remaining in this fund at the end of the fiscal year shall remain in the fund. The monies in the fund shall be invested by the state treasurer in the same manner as monies in the state general fund and all returns of such investment shall be deposited to the fund. The funds received shall be placed in the special trust fund in the custody of the state treasurer to be used only in accordance with this Chapter and shall not be placed in the general fund. The funds provided to the commissioner pursuant to this Section shall at all times be and remain the property of the commissioner. The funds shall be used only for the purposes set forth in this Chapter and for no other governmental purposes, nor shall any branch of government be allowed to borrow any portion of the funds. It is the intent of the legislature that this fund and its increments shall remain intact and inviolate.

B. The following monies shall be placed into the fund:

(1) The fees, penalties, and bond forfeitures collected pursuant to this Chapter. All fees and self-generated revenue remaining on deposit for the office of conservation at the end of any fiscal year shall be deposited into the fund.

(2) Private contributions.

(3) Interest earned on the funds deposited in the fund.

(4) Civil penalties for violation of any rules or permit conditions imposed under this Chapter, or costs recovered from responsible parties for geologic storage facility closure or remediation pursuant to this Section and R.S. 30:1104, 1105, and 1106.

(5) Any grants, donations, and sums allocated from any source, public or private, for the purposes of this Chapter.

(6) Site-specific trust accounts; however, the monies of such accounts shall not be used for any geologic storage facility other than that specified for each respective account.

C. The commissioner is hereby authorized to levy on each storage facility the following fees or costs for the purpose of funding the fund:

(1) A fee payable to the office of conservation, in a form and schedule prescribed by the office of conservation, for each ton of carbon dioxide injected for storage into that storage facility. This fee is to be determined based upon the following formula:

(a) F x 144 < M.

(b) "F" is a per unit fee in dollars per ton set by the office of conservation.

(c) "144" is the minimum number of months over which a fee is to be collected.

(d) "M" is the maximum payment of five million dollars and is the total amount of fees to be collected before the payment of the fee can be suspended as provided in this Section.

(e) The fee cannot exceed five million dollars divided by one hundred forty-four divided by the total tonnage of carbon dioxide to be injected, (($5,000,000/ 144)/ total injection tonnage of carbon dioxide).

(f) Once five million dollars has been contributed to the fund for a storage facility, the fee assessments to that storage facility under this Section shall cease until such time as funds begin to be expended for that storage facility. The secretary of the Department of Energy and Natural Resources shall certify to the commissioner the date on which the balance in the fund for a storage facility equals or exceeds five million dollars. The fund fees shall not be collected or required to be paid on or after the first day of the second month following the certification, except that the commissioner shall resume collecting the fees on receipt of a certification from the secretary of the Department of Energy and Natural Resources that, based on the expenditures or commitments to expend monies, the fund has fallen below four million dollars for that storage facility.

(g) Notwithstanding the total number of storage facilities owned or operated by a storage operator, once ten million dollars has been contributed to the fund by a storage operator, the fee assessment to that storage operator under this Section shall cease until such time as funds begin to be expended for any storage facility owned or operated by that storage operator. The secretary of the Department of Energy and Natural Resources shall certify to the commissioner the date on which the balance in the fund for a storage operator equals or exceeds ten million dollars. The fund fees shall not be collected or required to be paid on or after the first day of the second month following the certification, except that the commissioner shall resume collecting the fees upon receipt of a certification from the secretary of the Department of Energy and Natural Resources that, based on the expenditures or commitments to expend monies, the fund has fallen below eight million dollars for that storage operator.

ADD-14

(h) At the end of each fiscal year, the fee may be redetermined by the commissioner based upon the estimated cost of administering and enforcing this Chapter for the upcoming year divided by the tonnage of carbon dioxide expected to be injected during the upcoming year. The total fee assessed shall be sufficient to assure a balance in the fund not to exceed five million dollars for any active storage facility within the state at the beginning of each fiscal year. Any amount received that exceeds the annual balance required shall be deposited in the fund, but appropriate credits shall be given against future fees or fees associated with other storage facilities operated by the same storage operator.

(2) An annual regulatory fee for storage facilities that have not received a certificate of completion of injection operations payable to the office of conservation, in a form and schedule prescribed by the office of conservation, on the carbon dioxide storage facility in an amount not to exceed fifty thousand dollars for Fiscal Year 2010-2011 and thereafter. Such fee shall be based upon the annual projected costs to the office of conservation for oversight and regulation of such storage facilities.

(3) An application fee payable to the office of conservation, in a form and schedule prescribed by the office of conservation, by industries under the jurisdiction of the office of conservation. The commissioner may, by rule in accordance with the Administrative Procedure Act, charge a fee that shall not exceed the actual or anticipated cost to the state for the review of the permit or application.

D. The provisions of the Louisiana Tax Code shall apply to the administration, collection, and enforcement of the fees imposed herein, and the penalties provided by that code shall apply to any person who fails to pay or report the fees. Proceeds from the fees, including any penalties and interest collected in connection with the fees, shall be deposited into the fund.

E. The fund shall be used solely for the following purposes:

(1) Operational and long-term inspecting, testing, and monitoring of the site, including remaining surface facilities and wells.

(2) Remediation associated with, arising from, or related to the site, including remediation of property and of any mechanical problems associated with remaining wells and site infrastructure.

(3) Repairing mechanical leaks at the site.

(4) Plugging and abandoning remaining wells or conversion for use as observation wells.

(5) Administration of this Chapter.

(6) Payment of fees and costs associated with the administration of the fund or site-specific accounts.

(7) Payment of fees and costs associated with the acquisition of appropriate insurance for future storage facility liability if it should become available, either commercially or through government funding.

F. No additional purposes for use of the fund may be added unless approved by a two-thirds vote of the elected members of each house of the legislature.

G. The commissioner is authorized to enter into agreements and contracts and to expend money in the fund for the following purposes:

(1) To fund research and development in connection with carbon sequestration technology and methods.

(2) To monitor any remaining surface facilities and wells.

(3) To remediate any mechanical problems associated with remaining wells or site infrastructure, or any other remediation associated with, arising from, or related to the site, including remediation of property.

(4) To repair mechanical leaks at the storage facility.

(5) To contract with a private legal entity pursuant to this Chapter.

(6) To plug and abandon remaining wells except for those wells to be used as observation wells.

(7) To contract for professional services to assist with permit or application reviews.

H. The commissioner shall keep accurate accounts of all receipts and disbursements related to the administration of the fund and site-specific trust funds and shall make a specific annual report addressing the administration of the funds to the Senate Committee on Natural Resources, the House Committee on Natural Resources and Environment, and the Senate Committee on Environmental Quality before March first.

I. Every five years the commissioner shall submit a report to the Senate Committee on Natural Resources, the House Committee on Natural Resources and Environment, and the Senate Committee on Environmental Quality before March first that assesses the effectiveness of the fund and other related provisions in this Chapter and provides other information as may be requested by the legislature to allow the legislature to assess the effectiveness of this Chapter.

**Credits**

Added by Acts 2009, No. 517, § 2. Amended by Acts 2020, No. 61, § 1; Acts 2021, No. 326, § 1; Acts 2023, No. 378, § 1, eff. June 14, 2023.

LSA-R.S. 30:1110, LA R.S. 30:1110
The Code of Evidence and the Children's Code are current through the 2024 First Extraordinary, Second Extraordinary and Regular Sessions. All other statutes and codes are current through the 2024 First Extraordinary and Second Extraordinary Sessions.

ADD-16

West's North Dakota Century Code Annotated
   Title 38. Mining and Gas and Oil Production
      Chapter 38-22. Carbon Dioxide Underground Storage

NDCC, 38-22-17

§ 38-22-17. Certificate of project completion--Release--Transfer of title and custody

Currentness

1. After carbon dioxide injections into a reservoir end and upon application by the storage operator, the commission shall consider issuing a certificate of project completion.

2. The certificate may only be issued after public notice and hearing. The commission shall establish notice requirements for this hearing.

3. The certificate may only be issued after the commission has consulted with the department of environmental quality.

4. The certificate may not be issued until at least ten years after carbon dioxide injections end.

5. The certificate may only be issued if the storage operator:

   a. Is in full compliance with all laws governing the storage facility.

   b. Shows that it has addressed all pending claims regarding the storage facility's operation.

   c. Shows that the storage reservoir is reasonably expected to retain the carbon dioxide stored in it.

   d. Shows that the carbon dioxide in the storage reservoir has become stable. Stored carbon dioxide is stable if it is essentially stationary or, if it is migrating or may migrate, that any migration will be unlikely to cross the storage reservoir boundary.

   e. Shows that all wells, equipment, and facilities to be used in the postclosure period are in good condition and retain mechanical integrity.

   f. Shows that it has plugged wells, removed equipment and facilities, and completed reclamation work as required by the commission.

6. Once a certificate is issued:

ADD-17

a. Title to the storage facility and to the stored carbon dioxide transfers, without payment of any compensation, to the state.

b. Title acquired by the state includes all rights and interests in, and all responsibilities associated with, the stored carbon dioxide.

c. The storage operator and all persons who generated any injected carbon dioxide are released from all regulatory requirements associated with the storage facility.

d. Any bonds posted by the storage operator must be released.

e. Monitoring and managing the storage facility is the state's responsibility to be overseen by the commission until such time as the federal government assumes responsibility for the long-term monitoring and management of storage facilities.

**Credits**

S.L. 2009, ch. 318, § 1, eff. July 1, 2009.

NDCC 38-22-17, ND ST 38-22-17
Current with legislation from the 2023 Regular Session and Special Session. The statutes are subject to change as determined by the North Dakota Code Revisor. (These changes will be incorporated later this year.)

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. ADD-18

West's Wyoming Statutes Annotated
  Title 35. Public Health and Safety (Refs & Annos)
    Chapter 11. Environmental Quality
      Article 3. Water Quality (Refs & Annos)

W.S.1977 § 35-11-319

§ 35-11-319. Certificate of project completion; release; transfer of title and custody

Effective: July 1, 2023

Currentness

(a) After all carbon dioxide injections underground or into pore space are completed as provided by a permit issued under W.S. 35-11-313 and upon application by the injector holding title to the carbon dioxide under W.S. 35-11-318, the department may issue a certificate of project completion. The department shall only issue a certificate upon satisfaction of the conditions imposed under subsections (b), (c) and (d) of this section and after providing public notice of the application, an opportunity for public comment and a public hearing on the application.

(b) A certificate of project completion shall not be issued until at least twenty (20) years after carbon dioxide injections end.

(c) A certificate of project completion shall not be issued until the injector with title to the carbon dioxide establishes to the satisfaction of the department that:

   (i) The injector is in full compliance with all laws governing the injection and storage of the carbon dioxide;

   (ii) The injector has addressed any pending claims regarding the injection and storage of the carbon dioxide;

   (iii) The underground place or pore space where the carbon dioxide was injected or stored is expected to no longer expand vertically or horizontally and poses no threat to human health, human safety, the environment or underground sources of drinking water;

   (iv) The stored or injected carbon dioxide is unlikely to cross any underground or pore space boundary and is not expected to endanger any underground source of drinking water or otherwise endanger human health, human safety or the environment;

   (v) All wells, equipment and facilities to be used in maintaining and managing the stored carbon dioxide are in good condition and will retain mechanical integrity;

   (vi) The injector has plugged any injection wells and has completed all reclamation required by the department.

(d) Upon the issuance of a certificate of project completion under subsection (a) of this section:

ADD-19

(i) In exchange for assuming responsibility and liability for the stored carbon dioxide as provided in this section, title to the stored or injected carbon dioxide, and any facilities used to inject or store the carbon dioxide, without payment of any compensation, shall be transferred to the state;

(ii) Title acquired by the state includes all rights, and interests in, and all responsibilities associated with, the stored or injected carbon dioxide;

(iii) Primary responsibility and liability for the stored or injected carbon dioxide shall be transferred to the state, provided that liability to the state shall not result in the payment of any damages in excess of the balance of the Wyoming geologic sequestration special revenue account created by W.S. 35-11-320(a);

(iv) The injector and all persons who generated any injected or stored carbon dioxide shall be forever released from all regulatory requirements associated with the continued storage and maintenance of the injected carbon dioxide;

(v) Any bond or financial assurance submitted to the department under W.S. 35-11-313 through 35-11-317 shall be released;

(vi) The state, through the department, shall assume responsibility to manage and monitor the stored carbon dioxide until such time when the federal government assumes responsibility for the long-term monitoring and management of stored carbon dioxide.

**Credits**

Laws 2022, ch. 101, § 1, eff. July 1, 2023.

W. S. 1977 § 35-11-319, WY ST § 35-11-319
Current through the end of the 2024 Budget Session of the Wyoming Legislature.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-20

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter D. Water Programs
            Part 144. Underground Injection Control Program (Refs & Annos)
               Subpart A. General Provisions

40 C.F.R. § 144.3

§ 144.3 Definitions.

Effective: January 10, 2011

Currentness

Terms not defined in this section have the meaning given by the appropriate Act. When a defined term appears in a definition, the defined term is sometimes placed within quotation marks as an aid to readers.

Administrator means the Administrator of the United States Environmental Protection Agency, or an authorized representative.

Application means the EPA standard national forms for applying for a permit, including any additions, revisions or modifications to the forms; or forms approved by EPA for use in approved States, including any approved modifications or revisions.

Appropriate Act and regulations means the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (RCRA); or Safe Drinking Water Act (SDWA), whichever is applicable; and applicable regulations promulgated under those statutes.

Approved State Program means a UIC program administered by the State or Indian Tribe that has been approved by EPA according to SDWA sections 1422 and/or 1425.

Aquifer means a geological "formation," group of formations, or part of a formation that is capable of yielding a significant amount of water to a well or spring.

Area of review means the area surrounding an injection well described according to the criteria set forth in § 146.06 or in the case of an area permit, the project area plus a circumscribing area the width of which is either ¼ of a mile or a number calculated according to the criteria set forth in § 146.06.

Cesspool means a "drywell" that receives untreated sanitary waste containing human excreta, and which sometimes has an open bottom and/or perforated sides.

Contaminant means any physical, chemical, biological, or radiological substance or matter in water.

Director means the Regional Administrator, the State director or the Tribal director as the context requires, or an authorized representative. When there is no approved State or Tribal program, and there is an EPA administered program, "Director" means the Regional Administrator. When there is an approved State or Tribal program, "Director" normally means the State or Tribal director. In some circumstances, however, EPA retains the authority to take certain actions even when there is an approved State or Tribal program. In such cases, the term "Director" means the Regional Administrator and not the State or Tribal director.

ADD-21

Draft permit means a document prepared under § 124.6 indicating the Director's tentative decision to issue or deny, modify, revoke and reissue, terminate, or reissue a "permit." A notice of intent to terminate a permit, and a notice of intent to deny a permit, as discussed in § 124.5 are types of "draft permits." A denial of a request for modification, revocation and reissuance, or termination, as discussed in § 124.5 is not a "draft permit."

Drilling mud means a heavy suspension used in drilling an "injection well," introduced down the drill pipe and through the drill bit.

Drywell means a well, other than an improved sinkhole or subsurface fluid distribution system, completed above the water table so that its bottom and sides are typically dry except when receiving fluids.

Eligible Indian Tribe is a Tribe that meets the statutory requirements established at 42 U.S.C. 300j–11(b)(1).

Emergency permit means a UIC "permit" issued in accordance with § 144.34.

Environmental Protection Agency ("EPA") means the United States Environmental Protection Agency.

EPA means the United States "Environmental Protection Agency."

Exempted aquifer means an "aquifer" or its portion that meets the criteria in the definition of "underground source of drinking water" but which has been exempted according to the procedures in § 144.7.

Existing injection well means an "injection well" other than a "new injection well."

Facility or activity means any UIC "injection well," or any other facility or activity that is subject to regulation under the UIC program.

Fluid means any material or substance which flows or moves whether in a semisolid, liquid, sludge, gas, or any other form or state.

Formation means a body of consolidated or unconsolidated rock characterized by a degree of lithologic homogeneity which is prevailingly, but not necessarily, tabular and is mappable on the earth's surface or traceable in the subsurface.

Formation fluid means "fluid" present in a "formation" under natural conditions as opposed to introduced fluids, such as "drilling mud."

Generator means any person, by site location, whose act or process produces hazardous waste identified or listed in 40 CFR part 261.

Geologic sequestration means the long-term containment of a gaseous, liquid, or supercritical carbon dioxide stream in subsurface geologic formations. This term does not apply to carbon dioxide capture or transport.

Ground water means water below the land surface in a zone of saturation.

Hazardous waste means a hazardous waste as defined in 40 CFR 261.3.

Hazardous waste management facility ("HWM facility") means all contiguous land, and structures, other appurtenances, and improvements on the land used for treating, storing, or disposing of hazardous waste. A facility may consist of several treatment, storage, or disposal operational units (for example, one or more landfills, surface impoundments, or combination of them).

HWM facility means "Hazardous Waste Management facility"

Improved sinkhole means a naturally occurring karst depression or other natural crevice found in volcanic terrain and other geologic settings which have been modified by man for the purpose of directing and emplacing fluids into the subsurface.

Indian lands means "Indian country" as defined in 18 U.S.C. 1151. That section defines Indian country as:

(a) All land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation;

(b) All dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State; and

(c) All Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

Indian Tribe means any Indian Tribe having a Federally recognized governing body carrying out substantial governmental duties and powers over a defined area.

Injection well means a "well" into which "fluids" are being injected.

Injection zone means a geological "formation" group of formations, or part of a formation receiving fluids through a "well."

Interstate Agency means an agency of two or more States established by or under an agreement or compact approved by the Congress, or any other agency of two or more States or Indian Tribes having substantial powers or duties pertaining to the control of pollution as determined and approved by the Administrator under the "appropriate Act and regulations."

Major facility means any UIC "facility or activity" classified as such by the Regional Administrator, or, in the case of approved State programs, the Regional Administrator in conjunction with the State Director.

Manifest means the shipping document originated and signed by the "generator" which contains the information required by subpart B of 40 CFR part 262.

New injection wells means an "injection well" which began injection after a UIC program for the State applicable to the well is approved or prescribed.

Owner or operator means the owner or operator of any "facility or activity" subject to regulation under the UIC program.

Permit means an authorization, license, or equivalent control document issued by EPA or an approved State to implement the requirements of this part, parts 145, 146 and 124. "Permit" includes an area permit (§ 144.33) and an emergency permit (§ 144.34). Permit does not include UIC authorization by rule (§ 144.21), or any permit which has not yet been the subject of final agency action, such as a "draft permit."

Person means an individual, association, partnership, corporation, municipality, State, Federal, or Tribal agency, or an agency or employee thereof.

Plugging means the act or process of stopping the flow of water, oil or gas into or out of a formation through a borehole or well penetrating that formation.

Point of injection means the last accessible sampling point prior to waste fluids being released into the subsurface environment through a Class V injection well. For example, the point of injection of a Class V septic system might be the distribution box —the last accessible sampling point before the waste fluids drain into the underlying soils. For a dry well, it is likely to be the well bore itself.

Project means a group of wells in a single operation.

Radioactive Waste means any waste which contains radioactive material in concentrations which exceed those listed in 10 CFR part 20, appendix B, table II, column 2.

RCRA means the Solid Waste Disposal Act as amended by the Resource Conservation and Recovery Act of 1976 (Pub.L. 94–580, as amended by Pub.L. 95–609, Pub.L. 96–510, 42 U.S.C. 6901 et seq.).

Regional Administrator means the Regional Administrator of the appropriate Regional Office of the Environmental Protection Agency or the authorized representative of the Regional Administrator.

Sanitary waste means liquid or solid wastes originating solely from humans and human activities, such as wastes collected from toilets, showers, wash basins, sinks used for cleaning domestic areas, sinks used for food preparation, clothes washing operations, and sinks or washing machines where food and beverage serving dishes, glasses, and utensils are cleaned. Sources of these wastes may include single or multiple residences, hotels and motels, restaurants, bunkhouses, schools, ranger stations, crew quarters, guard stations, campgrounds, picnic grounds, day-use recreation areas, other commercial facilities, and industrial facilities provided the waste is not mixed with industrial waste.

Schedule of compliance means a schedule of remedial measures included in a "permit," including an enforceable sequence of interim requirements (for example, actions, operations, or milestone events) leading to compliance with the "appropriate Act and regulations."

SDWA means the Safe Drinking Water Act (Pub.L. 93–523, as amended; 42 U.S.C. 300f et seq.).

Septic system means a "well" that is used to emplace sanitary waste below the surface and is typically comprised of a septic tank and subsurface fluid distribution system or disposal system.

Site means the land or water area where any "facility or activity" is physically located or conducted, including adjacent land used in connection with the facility or activity.

State means any of the 50 States, the District of Columbia, Guam, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, the Trust Territory of the Pacific Islands, the Commonwealth of the Northern Mariana Islands, or an Indian Tribe treated as a State.

State Director means the chief administrative officer of any State, interstate, or Tribal agency operating an "approved program," or the delegated representative of the State director. If the responsibility is divided among two or more States, interstate, or Tribal agencies, "State Director" means the chief administrative officer of the State, interstate, or Tribal agency authorized to perform the particular procedure or function to which reference is made.

State/EPA agreement means an agreement between the Regional Administrator and the State which coordinates EPA and State activities, responsibilities and programs.

ADD-24

Stratum (plural strata) means a single sedimentary bed or layer, regardless of thickness, that consists of generally the same kind of rock material.

Subsurface fluid distribution system means an assemblage of perforated pipes, drain tiles, or other similar mechanisms intended to distribute fluids below the surface of the ground.

Total dissolved solids means the total dissolved (filterable) solids as determined by use of the method specified in 40 CFR part 136.

Transferee means the owner or operator receiving ownership and/or operational control of the well.

Transferor means the owner or operator transferring ownership and/or operational control of the well.

UIC means the Underground Injection Control program under Part C of the Safe Drinking Water Act, including an "approved State program."

Underground injection means a "well injection."

Underground source of drinking water (USDW) means an aquifer or its portion:

(a)(1) Which supplies any public water system; or

(2) Which contains a sufficient quantity of ground water to supply a public water system; and

(i) Currently supplies drinking water for human consumption; or

(ii) Contains fewer than 10,000 mg/l total dissolved solids; and

(b) Which is not an exempted aquifer.

USDW means "underground source of drinking water."

Well means: A bored, drilled, or driven shaft whose depth is greater than the largest surface dimension; or, a dug hole whose depth is greater than the largest surface dimension; or, an improved sinkhole; or, a subsurface fluid distribution system.

Well injection means the subsurface emplacement of fluids through a well.

**Credits**

[49 FR 45305, Nov. 15, 1984; 52 FR 20676, June 2, 1987; 53 FR 37412, Sept. 26, 1988; 58 FR 63895, Dec. 3, 1993; 59 FR 64345, Dec. 14, 1994; 64 FR 68565, Dec. 7, 1999; 75 FR 77287, Dec. 10, 2010]

SOURCE: 48 FR 14189, Apr. 1, 1983; 52 FR 20676, June 2, 1987; 52 FR 45797, Dec. 1, 1987; 53 FR 28147, July 26, 1988; 53 FR 37412, Sept. 26, 1988, unless otherwise noted.

AUTHORITY: Safe Drinking Water Act, 42 U.S.C. 300f et seq.; Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.

ADD-25

Notes of Decisions (11)

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-26

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter D. Water Programs
                Part 144. Underground Injection Control Program (Refs & Annos)
                    Subpart A. General Provisions

40 C.F.R. § 144.8

§ 144.8 Noncompliance and program reporting by the Director.

Effective: January 10, 2011
Currentness

The Director shall prepare quarterly and annual reports as detailed below. When the State is the permit-issuing authority, the State Director shall submit any reports required under this section to the Regional Administrator. When EPA is the permit-issuing authority, the Regional Administrator shall submit any report required under this section to EPA Headquarters.

(a) Quarterly reports. The Director shall submit quarterly narrative reports for major facilities as follows:

(1) Format. The report shall use the following format:

(i) Provide an alphabetized list of permittees. When two or more permittees have the same name, the lowest permit number shall be entered first.

(ii) For each entry on the list, include the following information in the following order:

(A) Name, location, and permit number of the noncomplying permittees.

(B) A brief description and date of each instance of noncompliance for that permittee. Instances of noncompliance may include one or more the kinds set forth in paragraph (a)(2) of this section. When a permittee has noncompliance of more than one kind, combine the information into a single entry for each such permittee.

(C) The date(s) and a brief description of the action(s) taken by the Director to ensure compliance.

(D) Status of the instance(s) of noncompliance with the date of the review of the status or the date of resolution.

(E) Any details which tend to explain or mitigate the instance(s) of noncompliance.

(2) Instances of noncompliance to be reported. Any instances of noncompliance within the following categories shall be reported in successive reports until the noncompliance is reported as resolved. Once noncompliance is reported as resolved it need not appear in subsequent reports.

(i) Failure to complete construction elements. When the permittee has failed to complete, by the date specified in the permit, an element of a compliance schedule involving either planning for construction or a construction step (for example, begin construction, attain operation level); and the permittee has not returned to compliance by accomplishing the required elements of the schedule within 30 days from the date a compliance schedule report is due under the permit.

(ii) Modifications to schedules of compliance. When a schedule of compliance in the permit has been modified under §§ 144.39 or 144.41 because of the permittee's noncompliance.

(iii) Failure to complete or provide compliance schedule or monitoring reports. When the permittee has failed to complete or provide a report required in a permit compliance schedule (for example, progress report or notice of noncompliance or compliance) or a monitoring report; and the permittee has not submitted the complete report within 30 days from the date it is due under the permit for compliance schedules, or from the date specified in the permit for monitoring reports.

(iv) Deficient reports. When the required reports provided by the permittee are so deficient as to cause misunderstanding by the Director and thus impede the review of the status of compliance.

(v) Noncompliance with other permit requirements. Noncompliance shall be reported in the following circumstances:

(A) Whenever the permittee has violated a permit requirement (other than reported under paragraph (a)(2)(i) or (ii) of this section), and has not returned to compliance within 45 days from the date reporting of noncompliance was due under the permit; or

(B) When the Director determines that a pattern of noncompliance exists for a major facility permittee over the most recent four consecutive reporting periods. This pattern includes any violation of the same requirement in two consecutive reporting periods, and any violation of one or more requirements in each of four consecutive reporting periods; or

(C) When the Director determines significant permit noncompliance or other significant event has occurred, such as a migration of fluids into a USDW.

(vi) All other. Statistical information shall be reported quarterly on all other instances of noncompliance by major facilities with permit requirements not otherwise reported under paragraph (a) of this section.

(b) Annual reports—

(1) Annual noncompliance report. Statistical reports shall be submitted by the Director on nonmajor UIC permittees indicating the total number reviewed, the number of noncomplying nonmajor permittees, the number of enforcement

actions, and number of permit modifications extending compliance deadlines. The statistical information shall be organized to follow the types of noncompliance listed in paragraph (a) of this section.

(2) For State-administered UIC Programs only. In addition to the annual noncompliance report, the State Director shall:

(i) Submit each year a program report to the Administrator (in a manner and form prescribed by the Administrator) consisting of:

(A) A detailed description of the State's implementation of its program;

(B) Suggested changes, if any to the program description (see § 145.23(f) ) which are necessary to reflect more accurately the State's progress in issuing permits;

(C) An updated inventory of active underground injection operations in the State.

(ii) In addition to complying with the requirements of paragraph (b)(2)(i) of this section, the Director shall provide the Administrator, on February 28th and August 31st of each of the first two years of program operation, the information required in 40 CFR 146.15, 146.25, and 146.35.

(iii) All Class VI program reports shall be consistent with reporting requirements set forth in § 146.91 of this chapter.

(c) Schedule.

(1) For all quarterly reports. On the last working day of May, August, November, and February, the State Director shall submit to the Regional Administrator information concerning noncompliance with permit requirements by major facilities in the State in accordance with the following schedule. The Regional Administrator shall prepare and submit information for EPA-issued permits to EPA Headquarters in accordance with the same schedule.

**QUARTERS COVERED BY REPORTS ON NONCOMPLIANCE BY MAJOR FACILITIES**

**[Date for completion of reports]**

| | |
|---|---|
| January, February, and March | [1] May 31 |
| April, May, and June | [1] Aug. 31 |
| July, August, and September | [1] Nov. 30 |
| October, November, and December | [1] Feb. 28 |

(2) For all annual reports. The period for annual reports shall be for the calendar year ending December 31, with reports completed and available to the public no more than 60 days later.

**Credits**

[75 FR 77288, Dec. 10, 2010]


SOURCE: 48 FR 14189, Apr. 1, 1983; 52 FR 20676, June 2, 1987; 52 FR 45797, Dec. 1, 1987; 53 FR 28147, July 26, 1988; 53 FR 37412, Sept. 26, 1988, unless otherwise noted.


AUTHORITY: Safe Drinking Water Act, 42 U.S.C. 300f et seq.; Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.


Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.


## Footnotes

1        Reports must be made available to the public for inspection and copying on this date.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-30

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter D. Water Programs
                Part 145. State Uic Program Requirements (Refs & Annos)
                    Subpart A. General Program Requirements

40 C.F.R. § 145.1

§ 145.1 Purpose and scope.

Effective: January 10, 2011
Currentness

(a) This part specifies the procedures EPA will follow in approving, revising, and withdrawing State programs under section 1422 (underground injection control—UIC) of SDWA, and includes the elements which must be part of submissions to EPA for program approval and the substantive provisions which must be present in State programs for them to be approved.

(b) State submissions for program approval must be made in accordance with the procedures set out in subpart C. This includes developing and submitting to EPA a program description (§ 145.23), an Attorney General's Statement (§ 145.24), and a Memorandum of Agreement with the Regional Administrator (§ 145.25).

(c) The substantive provisions which must be included in State programs to obtain approval include requirements for permitting, compliance evaluation, enforcement, public participation, and sharing of information. The requirements are found in subpart B. Many of the requirements for State programs are made applicable to States by cross-referencing other EPA regulations. In particular, many of the provisions of parts 144 and 124 are made applicable to States by the references contained in § 145.11.

(d) Upon submission of a complete program, EPA will conduct a public hearing, if interest is shown, and determine whether to approve or disapprove the program taking into consideration the requirements of this part, the Safe Drinking Water Act and any comments received.

(e) Upon approval of a State program, the Administrator shall suspend the issuance of Federal permits for those activities subject to the approved State program.

(f) Any State program approved by the Administrator shall at all times be conducted in accordance with the requirements of this part.

(g) Nothing in this part precludes a State from:

(1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this part;

(2) Operating a program with a greater scope of coverage than that required under this part. Where an approved State program has a greater scope of coverage than required by Federal law the additional coverage is not part of the federally approved program.

(h) Section 1451 of the SDWA authorizes the Administrator to delegate primary enforcement responsibility for the Underground Injection Control Program to eligible Indian Tribes. An Indian Tribe must establish its eligibility to be treated as a State before it is eligible to apply for Underground Injection Control grants and primary enforcement responsibility. All requirements of parts 124, 144, 145, and 146 that apply to States with UIC primary enforcement responsibility also apply to Indian Tribes except where specifically noted.

(i) States seeking primary enforcement responsibility for Class VI wells must submit a primacy application in accordance with subpart C of this part and meet all requirements of this part. States may apply for primary enforcement responsibility for Class VI wells independently of other injection well classes.

**Credits**

[53 FR 37412, Sept. 26, 1988; 59 FR 64345, Dec. 14, 1994; 75 FR 77290, Dec. 10, 2010]

SOURCE: 48 FR 14202, Apr. 1, 1983; 53 FR 37412, Sept. 26, 1988, unless otherwise noted.

AUTHORITY: 42 U.S.C. 300f et seq.

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-32

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 145. State Uic Program Requirements (Refs & Annos)
          Subpart C. State Program Submissions

40 C.F.R. § 145.25

§ 145.25 Memorandum of Agreement with the Regional Administrator.

Currentness

(a) Any State that seeks to administer a program under this part shall submit a Memorandum of Agreement. The Memorandum of Agreement shall be executed by the State Director and the Regional Administrator and shall become effective when approved by the Administrator. In addition to meeting the requirements of paragraph (b) of this section, the Memorandum of Agreement may include other terms, conditions, or agreements consistent with this part and relevant to the administration and enforcement of the State's regulatory program. The Administrator shall not approve any Memorandum of Agreement which contains provisions which restrict EPA's statutory oversight responsibility.

(b) The Memorandum of Agreement shall include the following:

(1) Provisions for the prompt transfer from EPA to the State of pending permit applications and any other information relevant to program operation not already in the possession of the State Director (e.g., support files for permit issuance, compliance reports, etc.). When existing permits are transferred from EPA to State for administration, the Memorandum of Agreement shall contain provisions specifying a procedure for transferring the administration of these permits. If a State lacks the authority to directly administer permits issued by the Federal government, a procedure may be established to transfer responsibility for these permits.

Note: For example, EPA and the State and the permittee could agree that the State would issue a permit(s) identical to the outstanding Federal permit which would simultaneously be terminated.

(2) Provisions specifying classes and categories of permit applications, draft permits, and proposed permits that the State will send to the Regional Administrator for review, comment and, where applicable, objection.

(3) Provisions specifying the frequency and content of reports, documents and other information which the State is required to submit to EPA. The State shall allow EPA to routinely review State records, reports, and files relevant to the administration and enforcement of the approved program. State reports may be combined with grant reports where appropriate.

(4) Provisions on the State's compliance monitoring and enforcement program, including:

ADD-33

(i) Provisions for coordination of compliance monitoring activities by the State and by EPA. These may specify the basis on which the Regional Administrator will select facilities or activities within the State for EPA inspection. The Regional Administrator will normally notify the State at least 7 days before any such inspection; and

(ii) Procedures to assure coordination of enforcement activities.

(5) When appropriate, provisions for joint processing of permits by the State and EPA, for facilities or activities which require permits from both EPA and the State under different programs. See § 124.4.

(6) Provisions for modification of the Memorandum of Agreement in accordance with this part.

(c) The Memorandum of Agreement, the annual program and grant and the State/EPA Agreement should be consistent. If the State/EPA Agreement indicates that a change is needed in the Memorandum of Agreement, the Memorandum of Agreement may be amended through the procedures set forth in this part. The State/EPA Agreement may not override the Memorandum of Agreement.

Note: Detailed program priorities and specific arrangements for EPA support of the State program will change and are therefore more appropriately negotiated in the context of annual agreements rather than in the MOA. However, it may still be appropriate to specify in the MOA the basis for such detailed agreements, e.g., a provision in the MOA specifying that EPA will select facilities in the State for inspection annually as part of the State/EPA agreement.

SOURCE: 48 FR 14202, Apr. 1, 1983; 53 FR 37412, Sept. 26, 1988, unless otherwise noted.

AUTHORITY: 42 U.S.C. 300f et seq.

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter D. Water Programs
                Part 145. State Uic Program Requirements (Refs & Annos)
                    Subpart D. Program Approval, Revision and Withdrawal

40 C.F.R. § 145.33

§ 145.33 Criteria for withdrawal of State programs.

Currentness

(a) The Administrator may withdraw program approval when a State program no longer complies with the requirements of this part, and the State fails to take corrective action. Such circumstances include the following:

(1) When the State's legal authority no longer meets their requirements of this part, including:

(i) Failure of the State to promulgate or enact new authorities when necessary; or

(ii) Action by a State legislature or court striking down or limiting State authorities.

(2) When the operation of the State program fails to comply with the requirements of this part, including:

(i) Failure to exercise control over activities required to be regulated under this part, including failure to issue permits;

(ii) Repeated issuance of permits which do not conform to the requirements of this part; or

(iii) Failure to comply with the public participation requirements of this part.

(3) When the State's enforcement program fails to comply with the requirements of this part, including:

(i) Failure to act on violations of permits or other program requirements;

(ii) Failure to seek adequate enforcement penalties or to collect administrative fines when imposed; or

(iii) Failure to inspect and monitor activities subject to regulation.

(4) When the State program fails to comply with the terms of the Memorandum of Agreement required under § 145.24.

SOURCE: 48 FR 14202, Apr. 1, 1983; 53 FR 37412, Sept. 26, 1988, unless otherwise noted.

AUTHORITY: 42 U.S.C. 300f et seq.

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-36

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter D. Water Programs
                Part 145. State Uic Program Requirements (Refs & Annos)
                    Subpart D. Program Approval, Revision and Withdrawal

40 C.F.R. § 145.34

§ 145.34 Procedures for withdrawal of State programs.

Currentness

(a) A State with a program approved under this part may voluntarily transfer program responsibilities required by Federal law to EPA by taking the following actions, or in such other manner as may be agreed upon with the Administrator.

(1) The State shall give the Administrator 180 days notice of the proposed transfer and shall submit a plan for the orderly transfer of all relevant program information not in the possession of EPA (such as permits, permit files, compliance files, reports, permit applications) which are necessary for EPA to administer the program.

(2) Within 60 days of receiving the notice and transfer plan, the Administrator shall evaluate the State's transfer plan and shall identify any additional information needed by the Federal government for program administration and/or identify any other deficiencies in the plan.

(3) At least 30 days before the transfer is to occur the Administrator shall publish notice of the transfer in the Federal Register and in enough of the largest newspapers in the State to provide Statewide coverage, and shall mail notice to all permit holders, permit applicants, other regulated persons and other interested persons on appropriate EPA and State mailing lists.

(b) Approval of a State UIC program may be withdrawn and a Federal program established in its place when the Administrator determines, after holding a public hearing, that the State program is not in compliance with the requirements of SDWA and this part.

(1) Notice to State of public hearing. If the Administrator has cause to believe that a State is not administering or enforcing its authorized program in compliance with the requirements of SDWA and this part, he or she shall inform the State by registered mail of the specific areas of alleged noncompliance. If the State demonstrates to the Administrator within 30 days of such notification that the State program is in compliance, the Administrator shall take no further action toward withdrawal and shall so notify the State by registered mail.

(2) Public hearing. If the State has not demonstrated its compliance to the satisfaction of the Administrator within 30 days after notification, the Administrator shall inform the State Director and schedule a public hearing to discuss withdrawal of the State program. Notice of such public hearing shall be published in the Federal Register and in enough of the largest newspapers in the State to attract statewide attention, and mailed to persons on appropriate State and EPA mailing lists.

This hearing shall be convened not less than 60 days nor more than 75 days following the publication of the notice of the hearing. Notice of the hearing shall identify the Administrator's concerns. All interested persons shall be given opportunity to make written or oral presentation on the State's program at the public hearing.

(3) Notice to State of findings. When the Administrator finds after the public hearing that the State is not in compliance, he or she shall notify the State by registered mail of the specific deficiencies in the State program and of necessary remedial actions. Within 90 days of receipt of the above letter, the State shall either carry out the required remedial action or the Administrator shall withdraw program approval. If the State carries out the remedial action or, as a result of the hearing is found to be in compliance, the Administrator shall so notify the State by registered mail and conclude the withdrawal proceedings.

SOURCE: 48 FR 14202, Apr. 1, 1983; 53 FR 37412, Sept. 26, 1988, unless otherwise noted.

AUTHORITY: 42 U.S.C. 300f et seq.

Notes of Decisions (1)

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-38

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter D. Water Programs
        Part 146. Underground Injection Control Program: Criteria and Standards (Refs & Annos)
          Subpart H. Criteria and Standards Applicable to Class VI Wells (Refs & Annos)

40 C.F.R. § 146.81

§ 146.81 Applicability.

Effective: January 10, 2011
Currentness

(a) This subpart establishes criteria and standards for underground injection control programs to regulate any Class VI carbon dioxide geologic sequestration injection wells.

(b) This subpart applies to any wells used to inject carbon dioxide specifically for the purpose of geologic sequestration, i.e., the long-term containment of a gaseous, liquid, or supercritical carbon dioxide stream in subsurface geologic formations.

(c) This subpart also applies to owners or operators of permit- or rule-authorized Class I, Class II, or Class V experimental carbon dioxide injection projects who seek to apply for a Class VI geologic sequestration permit for their well or wells. Owners or operators seeking to convert existing Class I, Class II, or Class V experimental wells to Class VI geologic sequestration wells must demonstrate to the Director that the wells were engineered and constructed to meet the requirements at § 146.86(a) and ensure protection of USDWs, in lieu of requirements at §§ 146.86(b) and 146.87(a). By December 10, 2011, owners or operators of either Class I wells previously permitted for the purpose of geologic sequestration or Class V experimental technology wells no longer being used for experimental purposes that will continue injection of carbon dioxide for the purpose of GS must apply for a Class VI permit. A converted well must still meet all other requirements under part 146.

(d) Definitions. The following definitions apply to this subpart. To the extent that these definitions conflict with those in §§ 144.3 or 146.3 of this chapter these definitions govern for Class VI wells:

Area of review means the region surrounding the geologic sequestration project where USDWs may be endangered by the injection activity. The area of review is delineated using computational modeling that accounts for the physical and chemical properties of all phases of the injected carbon dioxide stream and displaced fluids, and is based on available site characterization, monitoring, and operational data as set forth in § 146.84.

Carbon dioxide plume means the extent underground, in three dimensions, of an injected carbon dioxide stream.

Carbon dioxide stream means carbon dioxide that has been captured from an emission source (e.g., a power plant), plus incidental associated substances derived from the source materials and the capture process, and any substances added to the stream to enable or improve the injection process. This subpart does not apply to any carbon dioxide stream that meets the definition of a hazardous waste under 40 CFR part 261.

ADD-39

Confining zone means a geologic formation, group of formations, or part of a formation stratigraphically overlying the injection zone(s) that acts as barrier to fluid movement. For Class VI wells operating under an injection depth waiver, confining zone means a geologic formation, group of formations, or part of a formation stratigraphically overlying and underlying the injection zone(s).

Corrective action means the use of Director-approved methods to ensure that wells within the area of review do not serve as conduits for the movement of fluids into underground sources of drinking water (USDW).

Geologic sequestration means the long-term containment of a gaseous, liquid, or supercritical carbon dioxide stream in subsurface geologic formations. This term does not apply to carbon dioxide capture or transport.

Geologic sequestration project means an injection well or wells used to emplace a carbon dioxide stream beneath the lowermost formation containing a USDW; or, wells used for geologic sequestration of carbon dioxide that have been granted a waiver of the injection depth requirements pursuant to requirements at § 146.95; or, wells used for geologic sequestration of carbon dioxide that have received an expansion to the areal extent of an existing Class II enhanced oil recovery or enhanced gas recovery aquifer exemption pursuant to § 146.4 and § 144.7(d) of this chapter. It includes the subsurface three-dimensional extent of the carbon dioxide plume, associated area of elevated pressure, and displaced fluids, as well as the surface area above that delineated region.

Injection zone means a geologic formation, group of formations, or part of a formation that is of sufficient areal extent, thickness, porosity, and permeability to receive carbon dioxide through a well or wells associated with a geologic sequestration project.

Post-injection site care means appropriate monitoring and other actions (including corrective action) needed following cessation of injection to ensure that USDWs are not endangered, as required under § 146.93.

Pressure front means the zone of elevated pressure that is created by the injection of carbon dioxide into the subsurface. For the purposes of this subpart, the pressure front of a carbon dioxide plume refers to a zone where there is a pressure differential sufficient to cause the movement of injected fluids or formation fluids into a USDW.

Site closure means the point/time, as determined by the Director following the requirements under § 146.93, at which the owner or operator of a geologic sequestration site is released from post-injection site care responsibilities.

Transmissive fault or fracture means a fault or fracture that has sufficient permeability and vertical extent to allow fluids to move between formations.

SOURCE: 45 FR 42500, June 24, 1980; 53 FR 28148, July 26, 1988; 53 FR 37414, Sept. 26, 1988; 75 FR 77291, Dec. 10, 2010, unless otherwise noted.

AUTHORITY: Safe Drinking Water Act, 42 U.S.C. 300f et seq.; Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq.

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-40

Code of Federal Regulations
   Title 40. Protection of Environment
      Chapter I. Environmental Protection Agency (Refs & Annos)
         Subchapter D. Water Programs
            Part 147. State, Tribal, and EPA–Administered Underground Injection Control Programs (Refs & Annos)
               Subpart A. General Provisions

40 C.F.R. § 147.1

§ 147.1 Purpose and scope.

Effective: January 10, 2011
Currentness

(a) This part sets forth the applicable Underground Injection Control (UIC) programs for each of the States, territories, and possessions identified pursuant to the Safe Drinking Water Act (SDWA) as needing a UIC program, including any Indian country geographically located within those States, territories, and possessions.

(b) The applicable UIC programs set forth in this part may be State-administered programs approved by EPA, Tribally-administered programs approved by EPA, or Federally-administered programs promulgated by EPA. In some cases, the applicable UIC program for a particular area may consist of a State-administered or Tribally-administered program applicable to some classes of wells and a Federally-administered program applicable to other classes of wells. Approval of a State or Tribal program is based upon a determination by the Administrator that the program meets the requirements of section 1422 or section 1425 of the SDWA, any other applicable provisions of this subpart, and the applicable provisions of 40 CFR parts 124, 144, 145 and 146. A Federally-administered program is promulgated in those instances where the State or Tribe has not submitted any program for approval or where the submitted program does not meet the minimum Federal statutory and regulatory requirements.

(c) In the case of each State or Tribal program approved by EPA pursuant to section 1422 of the SDWA, the relevant subpart describes the major elements of that program, including the relevant State or Tribal statutes and regulations, the Statement(s) of Legal Authority, the Memorandum of Agreement, and the Program Description. State or Tribal statutes and regulations that contain standards, requirements, and procedures applicable to owners or operators have been incorporated by reference pursuant to regulations of the Office of the Federal Register. Material incorporated by reference is available for inspection in the appropriate EPA Regional office, in EPA Headquarters, and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call (202) 741–6030, or go to: http://www.archives.gov/ federal_register/code_of_federal_regulations/ ibr_locations.html. Other State or Tribal statutes and regulations containing standards and procedures that constitute elements of a State or Tribal program but do not apply directly to owners or operators have been listed but have not been incorporated by reference.

(d) In the case of any program promulgated under section 1422 for a State or Tribe that is to be administered by EPA, the relevant State or Tribal subpart makes applicable the provisions of 40 CFR parts 124, 144, 146, and 148, and any other additional requirements pertinent to the specific State or Tribal program.

(e) Regulatory provisions incorporated by reference (in the case of approved State or Tribal programs) or promulgated by EPA (in the case of EPA–administered programs), and all permit conditions or permit denials issued pursuant to such regulations, are enforceable by the Administrator pursuant to section 1423 of the SDWA.

(f) Class VI well owners or operators must comply with § 146.91(e) notwithstanding any State program approvals.

**Credits**

[73 FR 63646, Oct. 27, 2008; 75 FR 77303, Dec. 10, 2010]

SOURCE: 49 FR 20197, May 11, 1984; 50 FR 28942, July 17, 1985; 52 FR 17680, May 11, 1987; 53 FR 43086, 43104, Oct. 25, 1988; 73 FR 63646, Oct. 27, 2008; 81 FR 74929, Oct. 28, 2016; 81 FR 95483, Dec. 28, 2016; 81 FR 95484, Dec. 28, 2016; 83 FR 36435, July 30, 2018; 84 FR 15121, April 15, 2019, unless otherwise noted.

AUTHORITY: 42 U.S.C. 300f et seq.; and 42 U.S.C. 6901 et seq.

Current through August 8, 2024, 89 FR 65063. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

ADD-42

Louisiana Administrative Code
    Title 43. Natural Resources
        Part XVII. Injection and Mining
            Subpart 1. Statewide Order NO. 29-N-1
                Chapter 1. Class I, III, IV and V Injection Wells

La. Admin Code. tit. 43, Pt XVII, § 103

§ 103. General Provisions

Currentness

A. Applicability. These rules and regulations apply to all owners and operators of proposed and existing Class I, III, IV, and V injection wells in the state of Louisiana. For Class I wells, these rules shall only apply to nonhazardous waste disposal as described in § 103.C.1.b. and c. below. Applicable rules for Class I hazardous waste disposal is in Statewide Order No. 29-N-2 (LAC 43:XVII.Chapter 2).

B. Prohibition of Unauthorized Injection. Any underground injection, except as authorized by a permit or rule, is prohibited after the effective date of these regulations. Construction of any well required to have a permit under these regulations is prohibited until the permit has been issued.

C. Classification of Injection Wells

1. Class I

a. Wells used by generators of hazardous wastes or owners or operators of hazardous waste management facilities to inject hazardous waste beneath the lowermost formation containing, within 1/4 mile radius of the well bore, an underground source of drinking water.

b. Other industrial and municipal disposal wells which inject fluids beneath the lowermost formation containing an underground source of drinking water within 1/4 mile radius of the well bore.

c. Radioactive waste disposal wells which inject fluids below the lowermost formation containing an underground source of drinking water within 1/4 mile of the well bore. This classification of radioactive waste disposal wells does not affect the disposal of naturally occurring radioactive material (NORM) in Class II wells as part of oil and gas exploration and production operations. The injection of wastes associated with oil and natural gas exploration and production, including such wastes containing NORM, are regulated under the appropriate Class II regulations.

2. Class II. Wells which inject fluids:

ADD-43

a. which are brought to the surface in connection with conventional oil or natural gas production and may be commingled with waste waters from gas plants which are an integral part of production operations, unless those waters are classified as a hazardous waste at the time of injection;

b. for enhanced recovery of oil and natural gas; and

c. for storage of hydrocarbons which are liquid at standard temperature and pressure.

3. Class III. Wells which inject for extraction of minerals or energy, including:

a. mining of sulfur by the Frasch process;

b. in situ production of uranium or other metals. This category includes only in situ production from ore bodies which have not been conventionally mined. Solution mining of conventional mines such as stopes leaching is included in Class V; and

c. solution mining of salts or potash.

4. Class IV

a. Wells used by generators of hazardous wastes or of radioactive wastes, by owners or operators of hazardous waste management facilities, or by owners or operators of radioactive waste disposal sites to dispose of hazardous wastes or radioactive wastes into a formation which within 1/4 mile of the well contains an underground source of drinking water. This includes the disposal of hazardous waste into what would otherwise be septic systems and cesspools, regardless of their capacity.

b. Wells used by generators of hazardous wastes or of radioactive wastes, by owners or operators of hazardous wastes management facilities, or by owners or operators of radioactive waste disposal sites to dispose of hazardous wastes or radioactive waste above a formation which within 1/4 mile of the well contains an underground source of drinking water. This includes the disposal of hazardous waste into what would otherwise be septic systems and cesspools, regardless of their capacity.

c. Wells used by generators of hazardous wastes or by owners or operators of hazardous waste management facilities, to dispose of hazardous wastes which cannot be classified under § 103.C.1.a or 103.C.4.a and b (e.g., wells used to dispose of hazardous wastes into or above a formation which contains an aquifer which has been exempted pursuant to § 103.H). This includes the disposal of hazardous waste into what would otherwise be septic systems and cesspools, regardless of their capacity.

5. Class V. Injection wells not included in Class I, II, III, or IV. Typically, Class V wells are shallow wells used to place a variety of fluids directly below the land surface. However, if the fluids placed in the ground qualify as a hazardous

ADD-44

waste under the Resource Conservation and Recovery Act (RCRA), the well is either a Class I or Class IV well. Class V wells include:

a. air conditioning return flow wells used to return to the supply aquifer the water used for heating or cooling in a heat pump;

b. large-capacity cesspools, including multiple dwelling, community or regional cesspools, or other devices that receive sanitary wastes, containing human excreta, which have an open bottom and sometimes have perforated sides (see § 109.D.2). The UIC requirements do not apply to single family residential cesspools or to nonresidential cesspools which receive solely sanitary waste and have the capacity to serve fewer than 20 persons a day;

c. cooling water return flow wells used to inject water previously used for cooling;

d. drainage wells used to drain surface fluid, primarily storm runoff, into a subsurface formation;

e. dry wells used for the injection of wastes into a subsurface formation;

f. recharge wells used to replenish the water in an aquifer;

g. salt water intrusion barrier wells used to inject water into a USDW to prevent the intrusion of salt water into the USDW;

h. sand backfill and other backfill wells used to inject a mixture of water and sand, mill tailings or other solids into mined out portions of subsurface mines, whether what is injected is radioactive or not;

i. septic system wells used to inject the waste or effluent from a multiple dwelling, business establishment, community or regional business establishment septic tank (see § 103.C.6). The UIC requirements do not apply to single family residential septic system wells, or to nonresidential septic system wells which are used solely for the disposal of sanitary waste and have the capacity to serve fewer than 20 persons a day;

j. subsidence control wells (not used for the purpose of oil or natural gas production) used to inject fluids into a non-oil or gas producing zone to reduce or eliminate subsidence associated with the overdraft of a USDW;

k. injection wells associated with the recovery of geothermal energy for heating, aquaculture and production of electric power;

l. wells used for solution mining of conventional mines such as stopes leaching;

m. injection wells used for in situ recovery of lignite, coal, tar, sands, and oil shale;

ADD-45

n. wells used to inject spent brine into the same formation from which it was withdrawn after extraction of halogens or their salts; and

o. injection wells used in experimental technologies;

p. motor vehicle waste disposal wells that receive or have received fluids from vehicular repair or maintenance activities, such as an auto body repair shop, automotive repair shop, new and used car dealership, specialty repair shop (e.g., transmission and muffler repair shop), or any facility that does any vehicular repair work. Fluids disposed in these wells may contain organic and inorganic chemicals in concentrations that exceed the maximum contaminant levels (MCLs) established by the primary drinking water regulations. These fluids also may include waste petroleum products and may contain contaminants, such as heavy metals and volatile organic compounds, which pose risks to human health.

6. Specific Exclusions. The following are not covered by these regulations:

a. individual or single family residential or nonresidential cesspools, septic systems or similar waste disposal systems, if such systems:

i. are used solely for the disposal of sanitary waste; and

ii. have the capacity to serve fewer than 20 persons a day;

b. injection wells located on a drilling platform or other site that is beyond the state's territorial waters; and

c. any dug hole, drilled hole, or bored shaft which is not used for emplacement of fluids underground.

D. Prohibition of Movement of Fluid into Underground Sources of Drinking Water

1. No authorization by permit or rule shall allow the movement of fluid containing any contaminant into underground sources of drinking water, if the presence of that contaminant may cause a violation of the Louisiana Drinking Water Regulations, Chapter VIII of the State Sanitary Code or may otherwise adversely affect the health of persons. The applicant for a permit shall have the burden of showing that the requirements of this Section are met.

2. For Class I and III wells, if any water quality monitoring of a USDW indicates the movement of any contaminant into the USDW, except as authorized under § 109, the commissioner shall prescribe such additional requirements for construction, corrective action, operation, monitoring, or reporting (including closure of the injection well) as are necessary to prevent such movement. In the case of wells authorized by permit, these additional requirements shall be imposed by modifying the permit in accordance with § 113.C, or the permit may be terminated under § 113.E if cause exists, or appropriate enforcement action may be taken if the permit has been violated. In the case of wells authorized by rule, see § 103.E.1.

ADD-46

3. If at any time the commissioner learns that a Class V well may cause a violation of the Louisiana Drinking Water Regulations, Chapter XII of the State Sanitary Code or may be otherwise adversely affecting the health of persons, he shall:

a. require the injector to obtain a permit;

b. order the injector to take such actions (including, where required, closure of the injection well) as may be necessary to prevent the violation or adverse effect; or

c. take enforcement action.

4. Notwithstanding any other provision of this Section, the commissioner may take emergency action upon receipt of information that a contaminant which is present in or likely to enter a public water system may present an imminent and substantial endangerment to the health or safety of persons.

E. Authorization of Underground Injection by Rule

1. The commissioner may authorize underground injection by rule as outlined in this Section.

a. Injection into existing Class I and III wells or Class III projects may be authorized by rule for up to five years from the effective date of the Louisiana UIC program. Except for commercial Class I wells in § 103.F, all such wells must apply for a permit within four years of the effective date and receive a permit within five years of the effective date. The commissioner will establish a schedule for repermitting prior to the effective date.

i. Rules under § 103.E.1 shall specify that the authorization to inject shall expire:

(a). upon the effective date of the permit or permit denial, if a permit application has been filed in a timely manner as specified in § 105.B;

(b). if a permit application has not been filed in a timely manner as specified in § 105.B; or

(c). unless a complete permit application is pending, not later than five years after the effective date.

ii. Notwithstanding the prohibition in § 103.B, rules which under § 103.E.1.a authorizing Class III wells or projects in existing fields or projects may allow them to continue normal operations until permitted, including construction, operation, and plugging and abandonment of wells provided the owner or operator maintains compliance with all applicable requirements.

iii. Rules under § 103.E.1 shall require compliance no later than one year after authorization with the following requirements applicable to permittee, except the terms permit and permittee shall be read to include rules and those authorized by rule:

ADD-47

(a). requirements for commercial wells injecting hazardous waste accompanied by a manifest: § 103.F;

(b). financial responsibility: § 107.C;

(c). notice of abandonment: § 107.L;

(d). 24-hour reporting on noncompliance: § 107.L.6;

(e). operating, monitoring, and reporting requirements (except mechanical integrity): § 109.A.6, 7, and 8 (Class I) and § 109.B.6, 7, and 8 (Class III);

(f). plugging and abandonment: § 109.A.10, § 109.B.10;

(g). record keeping requirements: § 109.A.11, § 109.B.12; and

(h). exemption from rule where authorized by temporary permit: § 115.B.

b. i. Injection into existing Class IV wells as defined in § 103.C.4.a may be authorized for a period not to exceed six months after approval or promulgation of the UIC program. Such rules shall apply the requirements of § 103.F.3.

ii. Injection into existing Class IV wells as defined in § 103.C.4.b and c may be authorized until six months after approval or promulgation of a UIC program incorporating criteria and standards under § 109.C applicable to Class IV injection wells. Such rules shall apply the requirements of § 103.F.3.

iii. notwithstanding the requirements of Clauses i and ii above, wells used to inject contaminated ground water that has been treated and is being injected into the same formation from which it was drawn are authorized by rule for the life of the well if such subsurface emplacement of fluids is approved by appropriate state or federal agencies pursuant to provisions for cleanup of releases under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) or pursuant to requirements and provisions under the Resource Conservation and Recovery Act (RCRA).

c. Injection into Class V wells may be authorized by rule until requirements under future regulations become applicable to the specific type of Class V well. However, the owner or operator of a Class V well authorized by rule shall provide an inventory of the Class V well(s) to the commissioner. At a minimum, the inventory shall include the following information for each Class V well:

i. well and/or facility name and location;

ii. name and address of legal contact;

iii. ownership of well and/or facility;

iv. date of well installation/completion;

v. nature and type of injection well(s);

vi. depth and operating status of injection well(s); and

vii. any additional information required by the commissioner.

d. Class V well authorization by rule shall expire upon the effective date of a permit issued pursuant to these rules or upon proper closure of the well.

e. An owner or operator of a Class V well which is authorized by rule is prohibited from injecting into the well:

i. upon the effective date of an applicable permit denial;

ii. upon failure to submit inventory information pursuant to § 103.E.1.c. above;

iii. upon failure to submit a permit application pursuant to § 103.E.2.b. below; or

iv. upon failure to comply with the commissioner's request for any additional information.

2. Requiring a Permit

a. The commissioner may require any Class I, III, or V injection well or project authorized by a rule to apply for and obtain a UIC permit. Cases where UIC permits may be required include:

i. the injection well is not in compliance with any requirements of the rule;

(Note: Any underground injection which violates any rule under this Section is subject to appropriate enforcement action.)

ii. the injection well is not or no longer is within the category of wells and types of wells operations authorized in the rule; and

iii. the protection of USDW requires that the injection operation be regulated by requirements, such as for corrective action, monitoring and reporting, or operation, which are not contained in the rule.

b. The commissioner may require the owner or operator authorized by a rule to apply for a UIC permit by sending the owner or operator a letter containing a brief statement of the reasons, an application form, a statement setting a time for the owner or operator to file the application, and a statement that upon the effective date of the UIC permit the rule no longer applies to the activities regulated under the UIC program.

ADD-49

c. Any owner or operator authorized by a rule may request to be excluded from the coverage of the rule by applying for a UIC permit. The owner or operator shall submit an application under § 105.B with reasons supporting the request, to the commissioner. The commissioner may grant any such request.

d. A Class V well satisfying any of the requirements of Clauses i through iv below is no longer authorized by rule; therefore, the owner or operator of the well shall apply for and obtain a UIC permit or permanently close the well:

i. the Class V well does not comply with the prohibition of fluid movement standard in § 103.D;

ii. the Class V well is an existing large-capacity cesspool (in which case, the well shall be permanently closed by April 5, 2005) or an existing Class V motor vehicle waste disposal well (in which case, the well shall be permanently closed by January 1, 2005). These rules prohibit the permitting and construction start-up of new motor vehicle waste disposal wells and new large-capacity cesspools on and after April 5, 2000;

iii. the commissioner specifically requires the Class V well be permitted (in which case, rule authorization expires upon the effective date of the permit, or you are prohibited from injecting into your well upon failure to submit a permit application in a timely manner as specified by the commissioner; or upon the effective date of permit denial);

iv. the owner or operator of the Class V well failed to submit inventory information as described in § 103.E.1.c (in which case, injection into the well is prohibited until the inventory requirements are met).

F. Requirements for Commercial Wells Injecting Hazardous Waste Accompanied by a Manifest

1. Applicability. The regulations in this Section apply to all generators of hazardous waste, and to owners or operators of all commercial hazardous waste management facilities, using any class of well to inject hazardous wastes accompanied by a manifest.

2. Authorization. The owner or operator of any commercial injection well that is used to inject hazardous wastes accompanied by a manifest or delivery document shall apply for authorization to inject as specified in § 105.B within six months after the effective date of the Louisiana UIC Program.

3. Requirements. In addition to requiring compliance with the applicable requirements of this Section and § 109, the commissioner shall, for each facility meeting the requirements of § 103.F.2, require that the owner or operator comply with the applicable requirements of the Louisiana Hazardous Waste Management program.

G. Prohibition of Class IV Wells. The following activities are prohibited:

1. the construction, operation, or maintenance of any Class IV well is prohibited except for wells used to inject contaminated ground water that has been treated and is being reinjected into the same formation from which it was drawn as part of a clean-up plan approved by appropriate state and federal agencies; however, this prohibition does not apply to the following:

a. wells used to inject hazardous waste into aquifers or portions thereof which have been exempted pursuant to § 103.H, provided the exempted aquifer into which waste is injected underlies the lowermost formation containing a USDW; and

b. wells used to inject hazardous waste where no USDW exists within 1/4 mile of the well bore in any underground formation, provided that a determination is made that such injection is into a formation sufficiently isolated to ensure that injected fluids do not migrate from the injection zone.

H. Identification of Underground Sources of Drinking Water and Exempted Aquifers

1. The commissioner may identify (by narrative description, illustrations, maps, or other means) and shall protect, except where exempted under § 103.H.2, as an underground source of drinking water, all aquifers or parts of aquifers which meet the definition of an underground source of drinking water. Even if an aquifer has not been specifically identified by the commissioner, it is an underground source of drinking water if it meets the definition.

2. After notice and opportunity for a public hearing the commissioner may identify (by narrative description, illustrations, maps, or other means) and describe in geographic and/or geometric terms (such as vertical and lateral limits and gradient) which are clear and definite, all aquifers or parts thereof which the commissioner proposes to designate as exempted aquifers if they meet the following criteria:

a. the aquifer does not currently serve as a source of drinking water; and

b. the aquifer cannot now and will not in the future serve as a source of drinking water because:

i. it is mineral, hydrocarbon or geothermal energy producing or can be demonstrated by a permit applicant as part of a permit application for a Class III operation to contain minerals or hydrocarbons that considering their quantity and location are expected to be commercially producible;

ii. it is situated at a depth or location which makes recovery of water for drinking water purposes economically or technologically impractical;

iii. it is so contaminated that it would be economically or technologically impractical to render that water fit for human consumption; or

iv. it is located over a Class III well mining area subject to subsidence or catastrophic collapse; or

c. the total dissolved solids content of the ground water is more than 3,000 and less than 10,000 mg/1 and it is not reasonably expected to supply a public water system.

ADD-51

3. For Class III wells, the commissioner shall require an applicant for a permit, which necessitates an aquifer exemption under § 103.H.2.b above, to furnish the data necessary to demonstrate that the aquifer is expected to be mineral or hydrocarbon producing. Information contained in the mining plan for the proposed project, such as a map and general description of the mining zone, general information on the mineralogy and geochemistry of the mining zone, analysis of the amenability of the mining zone to the proposed mining method, and a time-table of planned development of the mining zone shall be considered by the commissioner in addition to the information required in the well or area permit application.

**Credits**

AUTHORITY NOTE: Promulgated in accordance with R.S. 30:1D, 4C(16), and 4.1.

HISTORICAL NOTE: Promulgated by the Department of Natural Resources, Office of Conservation, LR 8:83 (February 1982), amended LR 11:640 (June 1985), LR 27:1698 (October 2001).

Current through rules published in Louisiana Register Vol. 50, No. 6, June 20, 2024. Some sections may be more current; see credits for details.

LAC 43:XVII.103, 43 LA ADC Pt XVII, § 103

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-52

Louisiana Administrative Code
  Title 43. Natural Resources
    Part XVII. Injection and Mining
      Subpart 2. Statewide Order NO. 29-N-2
        Chapter 2. Class I Hazardous Waste Injection Wells

La. Admin Code. tit. 43, Pt XVII, § 209

§ 209. Technical Criteria and Standards

Currentness

A. Applicability. This Section establishes technical criteria and standards for the regulation of Class I hazardous waste injection wells.

B. Area of Review

1. The area of review for each Class I hazardous waste injection well shall be a fixed radius of no less than 2 miles around the well or shall be determined by the calculated cone of influence of the well, whichever is greater.

2. All known unplugged, improperly plugged and abandoned, or improperly constructed wells in the area of review which penetrate the confining of injection zone are subject to the corrective action requirements of § 209.C.

C. Corrective Action

1. Coverage. Applicants for Class 1 hazardous waste injection well permits shall submit a plan outlining the protocol used to:

a. identify all wells which penetrate the confining or injection zone within the area of review; and

b. determine whether these wells are adequately completed or plugged.

2. Applicants for Class I hazardous waste injection well permits shall identify the location of all wells within the area of review that penetrate the injection or confining zone and shall submit as required in § 205.E.2, 3, and 4:

a. a tabulation of all wells within the area of review that penetrate the injection or the confining zone; and

b. a description of each well or type of well and any records of its plugging or completion.

ADD-53

3. For wells determined to be improperly plugged, completed, or abandoned, or for which plugging or completion information is unavailable, the applicant shall also submit a plan consisting of such steps or modifications as are necessary to prevent movement of fluids into or between underground sources of drinking water or outside of the injection zone. Where the plan is adequate, the commissioner shall incorporate it into the permit as a condition. Where the commissioner's review of the application indicates that the permittee's plan is inadequate (based at a minimum on the factors in § 209.C.5), the commissioner shall:

    a. require the applicant to revise the plan;

    b. prescribe a plan for the corrective action as a condition of the permit; or

    c. deny the application.

4. Requirements

    a. Existing Injection Wells. Any permit issued for an existing Class I hazardous waste injection well requiring corrective action other than pressure limitations shall include a compliance schedule requiring any corrective action accepted or prescribed under § 209.C.3. Any such compliance schedule shall provide for compliance as soon as possible but not later than two years following issuance of the permit. It shall also require observance of appropriate pressure limitations under § 209.C.4.c until all other corrective action measures have been implemented.

    b. New Injection Wells. No permit for any Class I hazardous waste injection well may authorize injection until all corrective actions required under this Section have been taken.

    c. Injection Pressure Limitations. The commissioner may require pressure limitations in lieu of plugging. If so, then the commissioner shall require as a permit condition that injection pressure be so limited that pressure in the injection zone at the site of any improperly completed or abandoned well within the area of review would not be sufficient to drive fluids into or between USDW's or outside of the injection zone. This pressure limitation shall satisfy the corrective action requirement. Alternatively, such injection pressure limitation can be made part of a compliance schedule and last until all other corrective actions have been implemented.

5. In determining the adequacy of corrective action proposed by the applicant under § 209.C.3 and in determining the additional steps needed to prevent fluid movement into and between USDW's or outside of the injection zone, the following criteria and factors shall be considered by the commissioner:

    a. nature and volume of the injected fluids;

    b. nature of native fluids or by-products of injection;

    c. geology;

ADD-54

d. hydrology;

e. potentially affected population;

f. history of the injection operation;

g. completion and plugging records;

h. closure procedures in effect at the time the well was closed;

i. hydraulic connections with USDW's or zones outside of the injection zone;

j. reliability of the procedures used to identify abandoned wells;

k. any other factors which might affect the movement of fluids into or between USDW's or outside of the injection zone.

D. Minimum Criteria for Siting

1. All Class I hazardous waste injection wells shall be sited such that they inject into a formation that is beneath the lowermost formation containing within 1/4 mile of the wellbore an underground source of drinking water (USDW).

2. The siting of Class I hazardous waste injection wells shall be limited to areas that are geologically suitable. The commissioner shall determine geologic suitability based upon:

a. an analysis of the structural and stratigraphic geology, the hydrogeology, and the seismicity of the region;

b. an analysis of the local geology and hydrogeology of the well site, including at a minimum, detailed information regarding stratigraphy, structure and rock properties, aquifer hydrodynamics and mineral resources; and

c. a determination that the geology of the area can be described confidently and that the limits of waste fate and transport can be accurately predicted through the use of models.

3. Class I hazardous waste injection wells shall be sited such that:

a. the injection zone has sufficient permeability, porosity, thickness, and a real extent to prevent migration of fluids into USDW's or outside of the injection zone;

b. the confining zone:

    i. is laterally continuous and free of transecting, transmissive faults or fractures over an area sufficient to prevent the movement of fluids into USDW or outside the injection zone; and

    ii. contains at least one formation of sufficient thickness and with lithologic and stress characteristics capable of preventing vertical propagation of fractures.

4. The owner or operator shall demonstrate to the satisfaction of the commissioner that:

a. the confining zone is separated from the base of the lower-most USDW by at least one sequence of permeable and less permeable strata that will provide an added layer of protection for the USDW in the event of fluid movement in an unlocated borehole or transmissive fault; or

b. within the area of review, the piezometric surface of the fluid in the injection zone is less than the piezometric surface of the lower-most USDW, considering density effects, injection pressures and any significant pumping in the overlying USDW; or

c. there is no USDW present;

d. the commissioner may approve a site which does not meet the requirements in § 209.D.4.a, b or c if the applicant can demonstrate to the commissioner that because of the geology, nature of the waste, or other considerations, abandoned boreholes or other conduits would not cause endangerment of USDW's.

E. Construction Requirements

1. General. All existing and new Class I hazardous waste injection wells shall be constructed and completed to:

a. prevent the movement of fluids into or between USDW's or into any unauthorized zones;

b. permit the use of appropriate testing devices and workover tools; and

c. permit continuous monitoring of injection tubing and long string casing as required pursuant to § 209.H.10.

2. Compatibility. All well materials must be compatible with fluids with which the materials may be expected to come into contact. A well shall be deemed to have compatibility as long as the materials used in the construction of the well meet or exceeds standards developed for such materials by the American Petroleum Institute, The American Society for Testing Materials, or comparable standards acceptable to the commissioner.

ADD-56

3. Casing and Cementing of New Wells

a. Casing and cement used in the construction of each newly drilled well shall be designed for the life expectancy of the well, including the post-closure care period. The casing and cementing program shall be designed to prevent the movement of fluids into or between USDW's, or outside the injection zone, and to prevent potential leaks of fluids from the well. In determining and specifying casing and cementing requirements, the commissioner shall consider the following information as required by § 205.E:

    i. depth to the injection zone;

    ii. injection pressure, external and internal pressure, and axial loading;

    iii. hole size;

    iv. size and grade of all casing strings (wall thickness, diameter, nominal weight, length, joint specification, and construction material);

    v. corrosiveness of injected fluid, formation fluids, and temperature;

    vi. lithology of injection and confining zones;

    vii. type or class of cement including slurry weight (lb/gal) and yield (cu. ft./sack); and

    viii. quantity and chemical composition of injected fluid.

b. One surface casing string shall, at a minimum, extend into the confining bed below the lowest formation that contains a USDW and be cemented by circulating cement from the base of the casing to the surface, using a minimum of 150 percent of the calculated annular volume. The commissioner may require more than 150 percent when it is warranted by the geology or by other circumstances.

c. At least one long string casing and/or intermediate casing string, using a sufficient number of centralizers, shall be utilized in the well. If either casing string is to be perforated, then the approved casing shall extend through the base of the injection zone. If an approved alternate construction method is used, such as the setting of a screen, the casing shall be set to the top of the injection interval. Regardless of the construction method utilized, the casing strings shall be cemented by circulating cement from the casing shoe to the surface in one or more stages:

    i. of sufficient quantity and quality to withstand the maximum operating pressure; and

ADD-57

ii. in a quantity no less than 120 percent of the calculated volume necessary to fill the annular space. The commissioner may require more than 120 percent when it is warranted by the geology or other circumstances.

d. Circulation of cement may be accomplished by staging. The commissioner may approve an alternative method of cementing in cases where the cement cannot be circulated to the surface, provided the owner or operator can demonstrate by using logs that the cement is continuous across and sufficiently above the injection zone so as to provide for zonal isolation and does not allow fluid movement behind the casing.

e. Casing, including any casing connections, must be rated to have sufficient structural strength to withstand, for the design life of the well, the maximum burst and collapse pressures and the maximum tensile stress which may be experienced during the construction, operation, and closure of the well.

f. At a minimum, cement and cement additives must be of sufficient quality and quantity to maintain integrity over the design life of the well.

4. Tubing and Packer

a. All Class I hazardous waste injection wells, except as in § 209.E.4.d below, shall inject fluids through tubing with a packer set at a depth specified by the commissioner. Where multiple injection intervals exist, the packer setting depth will be as close as practicable to the top of the primary injection interval. The commissioner shall have the authority to adjust the packer setting depth as required on a case-by-case basis.

b. In determining and specifying requirements for tubing and packer, the following factors shall be considered:

i. depth of setting;

ii. characteristics of injection fluid (chemical content, corrosiveness, temperature, and density);

iii. injection pressure;

iv. annular pressure;

v. rate (intermittent or continuous), temperature, and volume of injected fluids;

vi. size of casing; and

vii. tubing tensile, burst, and collapse strengths.

ADD-58

c. A corrosion resistant or noncorrosive fluid shall be placed under pressure into the tubing/long string casing annulus. The annulus pressure shall be monitored in accordance with § 209.H.9 and 10.

d. The commissioner may approve the use of a fluid seal system as an alternative to a mechanical packer if he determines that the following conditions are met:

i. the operator demonstrates that the seal will provide a level of protection comparable to a packer;

ii. the operators staff is, and will remain, adequately trained to operate and maintain the well and to identify and interpret variations in parameters of concern;

iii. the permit contains specific limitations on variations in annular pressure and loss of annular fluid;

iv. the design and construction of the well allows continuous monitoring of the annular pressure and mass balance of annular fluid; and

v. a secondary system is used to monitor the interface between the injection fluid and the annulus fluid and the permit contains requirements for testing the system every three months and recording the results with the submission of the appropriate quarterly report.

5. Disposal of Drill Material. The subsurface material (cuttings) such as sand, clay, shale, etc. removed from the wellbore during the drilling of a Class I hazardous waste injection well may be disposed at a properly permitted municipal landfill or a hazardous waste landfill provided the disposal of such material at such facilities complies with all applicable regulations.

F. Logging, Testing and Sampling Prior to New Well Operation

1. During the drilling and construction of a new Class I hazardous waste injection well, appropriate logs and tests shall be run to determine or verify the depth, thickness, porosity, permeability, and rock type of, and the salinity of any entrained fluids in all relevant geologic units to assure conformance with performance standards in § 209.E, and to establish accurate baseline data against which future measurements may be compared. A descriptive report interpreting results of such logs and tests shall be prepared by a knowledgeable log analyst and submitted to the commissioner as part of the completion report described in § 209.G.1. At a minimum, such logs and tests shall include:

a. deviation checks during drilling on all holes constructed by drilling a pilot hole which are enlarged by reaming or another method. Such checks shall be at sufficient frequent intervals to determine the location of the borehole and to assure that vertical avenues for fluid movement in the form of diverging holes are not created during drilling; and

b. such other logs and tests as may be needed after taking into account the availability of similar data in the area of the drilling site, the construction plan, and the need for additional information that may arise from time to time as the construction of the well progresses. At a minimum, the following logs shall be required in the following situations:

i. for surface casing:

(a) spontaneous potential, resistivity or gamma-resistivity, and caliper logs before casing is installed; and

(b) a cement bond and variable density log, and a temperature log after casing is set and cemented;

ii. for intermediate and long string casing:

(a) resistivity, spontaneous potential, gamma-ray, porosity, caliper and fracture finder logs before the casing is installed; and

(b) a cement bond and variable density log, and a temperature log after the casing is cemented;

iii. the commissioner may allow the use of an alternative to the above logs when an alternative will provide equivalent or better information, and:

(a) all casing strings shall be pressure tested at conditions specified by the commissioner and reported on the appropriate form; and

(b) a mechanical integrity test consisting of:

(i). a pressure test with liquid or gas;

(ii). a radioactive tracer survey;

(iii). a temperature or noise log;

(iv). a casing inspection log, if required by the commissioner; and

(v). any other test required by the commissioner.

2. Whole cores or sidewall cores of the confining and injection zones and formation fluid samples from the injection zone shall be taken. Cores from nearby wells may be accepted if the owner or operator can demonstrate that core retrieval is not possible and that such cores are representative of the conditions at the well. The commissioner may require coring of other formations in the borehole.

3. The fluid temperature, pH, conductivity, pressure, and the static fluid level of the injection zone must be recorded.

4. At a minimum, the following information concerning the injection and confining zones shall be determined or calculated for Class I hazardous waste injection wells:

ADD-60

    a. fracture pressure;

    b. other physical and chemical characteristics of the formation fluids in the injection zone; and

    c. physical and chemical characteristics of the confining and injection zones.

5. Upon completion, but prior to operation, the owner or operator shall conduct the following tests to verify hydrogeologic characteristics of the injection zone:

    a. a pump test; or

    b. injectivity tests.

6. The commissioner shall have the opportunity to witness all logging and testing required by § 209.F. The owner or operator shall submit a schedule of such activities to the commissioner 30 days prior to conducting the first test.

7. Construction Supervision. All phases of well construction and any well workover shall be supervised by a person who is knowledgeable and experienced in practical drilling engineering and who is familiar with the special conditions and requirements of injection well construction.

G. Pre-Operation Requirements. Prior to the commissioner granting final approval for the operation of a Class I hazardous waste injection well, the owner or operator shall submit the following information to the commissioner for review and approval.

1. A completion report containing at a minimum:

    a. the drilling and complete and accurate record of the depth, thickness, and character of the strata penetrated;

    b. casing and cement records;

    c. all available logs and testing program data on the well and a descriptive report interpreting the results of all logs and tests;

    d. measured bottomhole temperature and pressure;

    e. a demonstration of mechanical integrity pursuant to § 209.F.1.d;

    f. the results of the injection zone and confining zone testing program as required in § 205.E.3.c;

ADD-61

g. compatibility of the injected waste with fluids in the injection zone and minerals in both the injection zone and confining zone and with the materials used to construct the well;

h. core sample testing results;

i. injectivity test data;

j. the anticipated maximum pressure and flow rate under which the well will operate;

k. the actual injection procedure;

l. revised calculated area of review based on data obtained during logging and testing of the well and formation, and where necessary revisions to the information submitted under § 205.E.2.a.ii and E.3.a;

m. revised formation pressure build-up calculation, § 205.E.3.1;

n. revised waste front travel calculation, § 205.E.3.m;

o. revised maps and cross sections of the injection zone using pertinent data above;

p. the status of corrective action on wells identified under § 205.E.3.k;

q. as built diagram of the well with construction information;

r. submit a certified location plat indicating the surveyed surface and bottom-hole location of the well, the latitude and longitude as well as the Lambert (X-Y) coordinates of the surface and bottom-hole. Also include the directional survey and directional profile drawing of the well.

2. For all Class I injection wells, file one copy of the permit in the conveyance records of the parish courthouse where the well is located. Within 15 days from the date of filing, forward a certified copy of the permit with recording references to the division within the Office of Conservation that issued the permit.

3. For all Class I injection wells, written notification that a copy of the permit has been filed with the appropriate oil and gas regulatory division within the Office of Conservation.

4. Compliance with all pre-operating terms of the permit must occur and approval to commence operation must be received from the commissioner prior to beginning injection operations (see § 207.L).

ADD-62

5. The commissioner may give permission to commence injection for an interim period not to exceed 30 calendar days following the inspection required in § 207.L.2.b. Final permission to inject will be given only upon receipt and approval of the completion report required in § 209.G.1.

H. Operating Requirements

1. Except during well stimulation, the injection pressure at the wellhead shall not exceed the calculated maximum surface injection pressure (MSIP) so as to assure that the pressure in the injection zone during injection operations will not initiate new fractures or propagate existing fractures in the injection or confining zone nor cause the movement of injection or formation fluids into USDW or outside the injection zone. The MSIP shall be calculated by using the following formula.

MSIP = 0.85 (BHPF - H) + TF + SE

where:

BHPF = bottom-hole fracture pressure established by gradients for the area the well is located in or actual testing.

H = hydrostatic pressure.

TF = frictional loss in the tubing during maximum injection rate.

SE = skin effects as established by accepted engineering test procedures as described in "Pressure Buildup and Flow Tests in Wells", by C.S. Matthews and D G. Russell or approved alternate tests (optional variable).

2. Injection between the outermost casing protecting USDW's and the wellbore is prohibited.

3. The owner or operator shall maintain an annulus pressure that exceeds the operating injection pressure, unless the commissioner determines that such a requirement might harm the integrity of the well. The fluid in the annulus shall be noncorrosive or contain a corrosion inhibitor.

4. A protective barrier shall be maintained around the wellhead and related appurtenances during all normal in-service and out-of-service periods for protection against mechanical damage.

5. A sign shall be maintained on the protective barrier of each injection well identifying the well class and type, well name and number, Serial Number, section-township-range, and any other information required by the commissioner.

6. The owner or operator shall maintain mechanical integrity of the well at all times. Integrity shall be demonstrated and reported according to the procedures and at the frequency specified in § 209.I.

7. Approval by the commissioner must be obtained before conducting any workover operations on the well (see § 209.J.2). All fluids and materials (sand, etc.) removed from the well during workovers shall be contained and disposed of properly.

ADD-63

8. Permit requirements for owners or operators of hazardous waste wells which inject wastes that have the potential to react with the injection formation to generate gases shall include:

    a. conditions limiting the temperature, pH or acidity of the injected waste; and

    b. procedures necessary to assure that pressure imbalances which might cause a backflow or blowout do not occur.

9. Pressure gauges shall be installed at the wellhead and properly maintained which will indicate the pressure on the injection tubing and on the tubing-casing annulus.

10. The owner or operator shall install, use, and maintain in proper operating condition continuous recording devices to monitor injection pressure, flow rate, volume, and temperature of injected fluids; and the pressure on the annulus between the injection tubing and the long string casing, and any other specified data. The instruments shall be housed in weatherproof enclosures.

11. The owner or operator shall install, use, and maintain in proper operating condition:

    a. automatic alarm and automatic shut-off systems, designed to sound and shut-in the well when pressures and flow rates or other parameters approved by the commissioner exceed a range and/or gradient specified in the permit; or

    b. automatic alarms, designed to sound when the pressures and flow rates or other parameters approved by the commissioner exceed a rate and/or gradient specified in the permit, in cases where the owner or operator certifies that a trained operator will be on site at all times when the well is operating.

12. If an automatic alarm or shutdown is triggered, the owner or operator shall immediately investigate and identify as expeditiously as possible the cause of the alarm or shutoff. If upon such investigation the well appears to be lacking mechanical integrity or if the monitoring required under § 209.H.10 of this Section otherwise indicates that the well may be lacking mechanical integrity, the owner or operator shall:

    a. cease injection of waste fluids unless authorized by the commissioner to continue or resume injection;

    b. take all necessary steps to determine the presence or absence of a leak; and

    c. notify the commissioner within 24 hours after the alarm or shutdown in person or by telephone as required in § 207.L.6.

13. If a loss of mechanical integrity is discovered pursuant to Paragraph 12 of this Subsection or during periodic mechanical integrity testing, the owner or operator shall:

    a. immediately cease injection of waste fluids;

ADD-64

b. take all steps reasonably necessary to determine whether there may have been a release of hazardous waste constituents into any unauthorized zone;

c. notify the commissioner within 24 hours as in § 209.H.12.c after loss of mechanical integrity is discovered;

d. notify the commissioner when injection can be resumed; and

e. restore and demonstrate mechanical integrity to the satisfaction of the commissioner prior to resumption of injection operations.

14. Whenever the owner or operator obtains evidence that there may have been a release of injected waste into an unauthorized zone, immediately cease injection of waste fluids, and:

a. notify the commissioner within 24 hours of obtaining such evidence as in § 209.H.12.c;

b. take all necessary steps to identify and characterize the extent of any release;

c. comply with and implement any remediation plan specified and approved by the commissioner; and

d. where such release is into a USDW currently serving as a water supply, place a notice in the official parish journal where the facility is located and the official state journal; notify local governing authorities in the affected area, all water well users within 2 miles of the release, and the Secretary of the Department of Environmental Quality.

15. Where there is evidence that there may have been a release of injected waste into an unauthorized zone, the commissioner may allow the operator to resume injection prior to completing cleanup action if the owner or operator demonstrates that the injection operation will not endanger USDW's or allow the movement of fluids outside the injection zone.

I. Testing and Monitoring Requirements. Samples and measurements taken for the purposes of testing and monitoring shall be representative of the monitored activity and shall include at a minimum:

1. Monitoring of the Injected Waste

a. The owner or operator shall develop and follow an approved written waste analysis plan that describes the procedures to be carried out to obtain a detailed chemical and physical analysis of a representative sample of the waste, including the quality assurance procedures used. At a minimum the plan shall specify:

i. the parameters for which the waste will be analyzed and the rationale for the selection of these parameters;

ADD-65

ii. the test methods that will be used to test for these parameters;

iii. the sampling method that will be used to obtain a representative sample of the waste being analyzed;

iv. the date, exact place and time of sampling or measurement;

v. the individual(s) who performed the sampling or measurement;

vi. the date(s) analyses were performed;

vii. the individual(s) who performed the analyses; and

viii. the results of such analyses.

b. The analysis of the injected waste as described in the waste analysis plan shall be repeated at frequencies specified in the waste analysis plan and when process or operating changes occur that may significantly alter the characteristics of the waste stream.

c. The owner or operator shall conduct continuous or periodic monitoring of selected parameters as required by the commissioner.

d. The owner or operator shall assure that the plan remains accurate and the analysis remain representative.

2. Hydrogeologic Compatibility Determination. The owner or operator shall submit information demonstrating to the satisfaction of the commissioner that the waste stream and its anticipated reaction products will not alter the permeability, thickness or other relevant characteristics of the confining or injection zone such that they would no longer meet the requirements specified in § 209.D.

3. Compatibility of Well Materials

a. The owner or operator shall demonstrate that the waste stream will be compatible with the well materials with which the waste is expected to come into contact, and submit to the commissioner a description of the methodology used to make that determination. Compatibility for the purposes of this requirement is established if contact with injected fluids will not cause the well materials to fail to satisfy any design requirement imposed under § 209.E.2.

b. The commissioner shall require continuous corrosion monitoring of the construction materials used in the well for wells injection corrosive waste, and may require such monitoring for other waste by:

ADD-66

i. placing coupons of the well construction materials in contact with the waste stream; or

ii. routing the waste stream through a loop constructed with the material used in the well; or

iii. using an alternative method approved by the commissioner.

c. If a corrosion monitoring program is required:

i. the test shall use materials identical to those used in the construction of the well, and such materials must be continuously exposed to the operating pressures and temperatures (measured at the wellhead) and flow rates of the injection operation; and

ii. the owner or operator shall monitor the materials for loss of mass, thickness, cracking, pitting, and other signs of corrosion on a quarterly basis to ensure that the well components meet the minimum standards for material strength and performance set forth in § 209.E.2.

4. Periodic Mechanical Integrity Testing. The owner or operator of a Class I hazardous waste injection well shall conduct mechanical integrity testing as follows:

a. the long string casing, injecting tubing, and annular seal shall be tested by means of an approved pressure test with a liquid or gas annually and whenever there has been a well workover involving the unseating or disturbing of the injection tubing or annular seal system;

b. the bottom-hole cement shall be tested by means of an approved Radioactive Tracer Survey annually;

c. an approved temperature, noise, or other approved log shall be run at least once every five years to test for movement of fluid along the borehole. The commissioner may require such test whenever the well is worked over;

d. casing inspection logs shall be run once every five years unless the commissioner waives this requirement due to well construction or other factors which limit the test's reliability; and

e. any other test approved by the commissioner.

5. Mechanical Integrity Testing by Conservation Representative

a. One of the following tests shall be witnessed or reviewed onsite by a Louisiana Office of Conservation representative to verify mechanical integrity:

ADD-67

i. a fluid pressure test of the annular space; or

ii. review of the continuous monitoring records required in § 209.J.

b. Verification of mechanical integrity under this Paragraph may be performed on an alternating basis. The frequency of integrity verification shall be quarterly for commercial Class I hazardous waste injection wells and semi-annually for onsite Class I hazardous waste injection wells. The commissioner or his representative reserves the right to specifically require more frequent testing as well as the right to specify the method of testing in specific instances.

6. Mechanical Integrity during Periods of Non-Use. Except during workovers or routine maintenance, any well which is not operational shall conform to the mechanical integrity requirements of § 209.I.4 and 5 and shall sustain a positive pressure on the annulus during the period of non-use. When an operator takes a well out of operation, the operator shall assure the mechanical integrity of the well during non-use (see § 209.K). If a well cannot meet mechanical integrity requirements the operator shall submit a plan to the commissioner within 30 days of the integrity test, to properly bring the facility into compliance. If a plan is not submitted within 30 days or if the plan is considered inadequate, the owner or operator will be given six months to plug and abandon the well as required in § 209.L.

7. Ambient Monitoring. This Paragraph sets forth ambient monitoring criteria for all Class I injection wells. Based on a site-specific assessment of the potential for fluid movement from the well or injection zone, and on the potential value of monitoring wells to detect such movement, the commissioner shall:

a. require the owner or operator to develop a monitoring program. At a minimum, the commissioner shall require monitoring of the pressure buildup in the injection zone annually, including at a minimum, a shut down of the well for a time sufficient to conduct a valid observation of the pressure fall-off curve;

b. when prescribing a monitoring system the commissioner may also require:

i. continuous monitoring for pressure changes in the first aquifer overlying the confining zone. When such a well(s) is/are installed, the owner or operator shall, on a quarterly basis, sample the aquifer and analyze for constituents specified by the commissioner;

ii. the use of indirect geophysical techniques to determine the position of the waste front, the water quality in a formation designated by the commissioner, or to provide other site specific data;

iii. periodic monitoring of the groundwater, quality in the first aquifer overlying the injection zone;

iv. periodic monitoring of the groundwater quality in the lowermost USDW; or

v. any additional monitoring necessary to determine whether fluids are moving into or between USDW's or outside the injection zone.

ADD-68

8. The commissioner may require seismicity monitoring when he has reason to believe that the injection activity may have the capacity to cause seismic disturbances.

J. Reporting Requirements. Reporting requirements shall, at a minimum, include:

1. quarterly reports to the commissioner containing the following information. Quarterly reports are due no later than 30 days following the end of the quarter for which it is being submitted:

    a. the physical, chemical, and other relevant characteristics of the injection stream;

    b. monthly average, maximum and minimum values for injection pressure, flow rate and volume, cumulative volume of fluids, and annular pressure;

    c. any changes in the annular fluid volume;

    d. a description of any event which triggers an alarm or shutdown device required pursuant to § 209.H.10 and 11 and the response taken;

    e. a description of any event that exceeds operating parameters for annulus pressure or injection pressure as specified in the permit; and

    f. the results of monitoring prescribed under § 209.I;

    g. periodic test of mechanical integrity;

    h. any other test of the injection well conducted by the permittee if required by the commissioner; and

    i. any well workover performed during the quarter including minor well maintenance.

2. Workover Reporting

    a. The owner or operator shall notify the commissioner and obtain a work permit prior to commencing any workover operation on the well. Workovers include, but are not limited to, plug and abandon, deepen, perforate, squeeze, plugback, sidetrack, pull tubulars, unseat packer, backwash, change interval of completion (disposal) within the approved injection zone, etc.

    b. All work permits must be requested in writing by use of the appropriate form. If an unforseen situation arises which requires immediate attention, the permittee may request a verbal work permit by phoning the Office of Conservation.

ADD-69

The permittee must then submit to the commissioner a completed work permit application within five days of obtaining the verbal permit.

c. Within 20 days following the completion of the authorized work, the permittee must submit to the Office of Conservation, one original and two copies of the well history and work resume report.

d. With the first quarterly report after the conclusion of the workover submit, to the aforementioned office, a completion report which not only includes the reason for the workover but also a detailed description and analysis of the work performed.

K. Temporarily Cease Injection

1. The owner or operator of a Class I hazardous waste injection well who temporarily ceases injection, except for periods of workovers or routine maintenance, may keep the well open provided the well is kept in compliance with the technical requirements applicable to active injection wells such as maintaining mechanical integrity, positive annular pressure, monitoring, etc. This is to ensure that the waste will not migrate out of the injection zone or endanger USDW's during the period of temporary disuse.

2. If a well has been out-of-service for a period of one year or longer, the owner or operator must inform the commissioner of intentions for the continued use of the well.

3. The owner or operator of a well that has ceased injection operations for more than two years shall notify the commissioner 30 days prior to resuming operation of the well.

L. Closure (Plug and Abandon)

1. Closure Plan. The owner or operator of a Class I hazardous waste injection well shall prepare, maintain, and comply with a plan for closure of the well that meets the requirements of § 209.L.4 and is acceptable to the commissioner. The obligation to implement the closure plan survives the termination of a permit or the cessation of injection activities. The requirement to maintain and implement an approved plan is directly enforceable regardless of whether the requirement is a condition of the permit.

a. The owner or operator shall submit the plan as part of the permit application, and upon approval by the commissioner, shall be a condition of any permit issued.

b. Any proposed significant revision to the method of closure reflected in the plan shall be submitted for approval by the commissioner no later than the date on which notice of closure is required to be submitted under § 209.L.2.

c. The plan shall assure financial responsibility as required in § 209.O and also include the following information:

i. the type, number, and placement of each plug including the elevation of the top and bottom of each plug;

ADD-70

ii. the type, grade, and quantity of material to be used in plugging;

iii. the method of placement of the plugs as required in § 209.L.4.e;

iv. any proposed test or measurement to be made;

v. the amount, size, and location (by depth) of casing and any other materials to be left in the well;

vi. the method and location where casing is to be parted, if applicable; and

vii. the estimated cost of closure expressed in future dollars for a time period equal to the duration of a Class I injection well permit.

d. The commissioner may modify a closure plan where necessary.

2. Notice of Intent to Close. The owner or operator shall notify the commissioner by submission of an appropriate work permit at least 60 days before closure of a well. At the discretion of the commissioner, a shorter notice period may be allowed.

3. Closure Report. Within 60 days after closure or at the time of the next quarterly report (whichever is less) the owner or operator shall submit a closure report to the commissioner. If the quarterly report is due less than 15 days after completion of closure, then the closure report shall be submitted within 60 days of closure. The report shall be certified as accurate by the owner or operator and by the person who performed the closure operation (if other than the owner or operator). Such report shall consist of:

a. a statement that the well was closed in accordance with the closure plan previously submitted and approved by the commissioner; or

b. where actual closure differed from the plan previously submitted, a written statement specifying the differences between the previous plan and the actual closure.

4. Standards for Well Closure

a. Prior to closing the well, the owner or operator shall observe and record the pressure decay for an appropriate time period or a time specified by the commissioner. The commissioner shall review the pressure decay and transient pressure observations conducted pursuant to § 209.I.7.a and determine whether the injection activity has conformed with predicted values.

ADD-71

b. Prior to closure, appropriate mechanical integrity testing shall be conducted to ensure the integrity of that portion of the long string casing and cement that will be left in the ground after closure. Testing methods may include:

    i. pressure testing with liquid or gas;

    ii. radioactive tracer surveys;

    iii. noise, temperature, pipe evaluation, or cement bond logs; or

    iv. any other test required by the commissioner.

c. Prior to well closure, the well shall be flushed with a buffer fluid.

d. Upon closure, the well shall be plugged with cement in a manner that will not allow the movement of fluids into or between USDW's or outside the injection zone.

e. Placement of cement plugs shall be accomplished by one of the following:

    i. the Balance Method;

    ii. the Dump Bailer Method;

    iii. the Two-Plug Method; or

    iv. an alternate method approved by the commissioner that will reliably provide a comparable level of protection.

f. Each plug shall be appropriately tagged and tested for seal and stability before closure is completed.

g. The well to be closed is to be in a state of static equilibrium with the mud weight equalized top to bottom, either by circulating the mud in the well at least once or by a comparable method prescribed by the commissioner, prior to the placement of the cement plug(s).

h. Upon successful completion of the closure, the surface location of the abandoned well shall be identified with a permanent marker inscribed with the operator's name, well class, well name and number, serial number, section-township-range, parish, and date plugged and abandoned.

M. Post-Closure Care

1. The owner or operator of a Class I hazardous waste injection well shall prepare, maintain, and comply with a plan for post-closure care that meets the requirements of § 209.M.2 and is acceptable to the commissioner. The obligation to implement the post-closure plan survives the termination of a permit or the cessation of injection activities. The requirement to maintain an approved plan is directly enforceable regardless of whether the requirement is a condition of the permit.

a. The owner or operator shall submit the plan as part of the permit application and, upon approval by the commissioner, such plan will be a condition of any permit issued.

b. The owner or operator shall submit any proposed significant revision to the plan as appropriate over the life of the well, but no later than the date of the closure report required under § 209.L.3.

c. The plan shall assure financial responsibility as required in § 209.O.

d. The plan shall include the following information:

i. the pressure in the injection zone before injection began. Where a direct measurement of initial pressure is not available, then reasonable estimates may be used, provided they are acceptable to the commissioner;

ii. the anticipated pressure in the injection zone at the time of closure;

iii. the predicted time until pressure in the injection zone decays to the point that the well's cone of influence no longer intersects the base of the lowermost USDW;

iv. predicted position of the waste front at closure;

v. the status of any cleanups required under § 209.C; and

vi. the estimated cost of proposed post-closure care at a time equal to the duration of a Class I injection well permit expressed in terms of future dollars.

e. At the request of the owner or operator, or on his own initiative, the commissioner may modify the post-closure plan after submission of the closure report.

2. To provide for post-closure care, the owner or operator shall:

a. continue and complete any cleanup action required under § 209.C, if applicable;

b. continue to conduct any groundwater monitoring required under the permit until pressure in the injection zone decays to the point that the well's cone of influence no longer intersect the base of the lowermost USDW. The commissioner may extend the period of post-closure monitoring if he determines that the well may endanger a USDW;

c. submit a survey plat to the local zoning authority designated by the commissioner. The plat shall indicate the location of the well relative to permanently surveyed benchmarks. A copy of the plat shall be submitted to the appropriate Regional Administrator, Environmental Protection Agency;

d. provide appropriate notification and information to such state and local authorities as have cognizance over drilling activities to enable such state and local authorities to impose appropriate conditions on subsequent drilling activities that may penetrate the well's confining or injection zone.

3. Each owner of a Class I hazardous waste injection well and the owner of the surface or subsurface property on or in which a Class I hazardous waste injection well is located, must record a notation on the deed to the facility property or on some other instrument which is normally examined during title search that will in perpetuity provide any potential purchaser of the property the following information:

a. the fact that the land has been used to manage hazardous waste;

b. the name of the state agency or local authority with which the plat was filed, as well as the address of the Regional Environmental Protection Agency Office to which it was submitted;

c. the type and volume of waste injected, the injection interval(s) into which it was injected, and the period over which injection occurred.

N. Recordkeeping Requirements

1. The owner or operator shall keep complete and accurate records of all phases of the injection operation from application through post-closure. This includes, but is in no way limited to:

a. area of review and corrective action requirements;

b. construction and completion information including logging and testing;

c. complete data on all monitoring requirements specified in the permit and/or by the commissioner for the injection well(s) and any associated monitoring well(s);

d. all periodic measurements and well test such as injection fluid analyses, bottom-hole pressure data, mechanical integrity records, etc.;

ADD-74

e. records reflecting the nature, composition, and volume of all injected fluids; and

f. closure (plug and abandon) and post-closure information.

2. The owner or operator shall retain all records of the well's operation described in Paragraph 1 above for a period of three years following well closure. The commissioner may require the owner or operator to deliver the records to the Louisiana Office of Conservation at the conclusion of the retention period. If so, then the records shall thereafter be retained at a location designated by the commissioner for that purpose.

3. All records shall be made available for review upon request from a representative of the commissioner.

O. Financial Responsibility

1. The permit shall require the owner or operator to demonstrate and maintain financial responsibility for closure (plug and abandon) and post-closure care by using a trust fund, surety bond, letter of credit, financial statement, insurance, or corporate guarantee, or other materials acceptable to the commissioner. The amount of the funds available shall be no less than the amount identified in § 209.L.1.c.vii and § 209.M.1.d.vi.

2. The obligation to maintain financial responsibility for post-closure care survives the termination of a permit or the cessation of injection activities. The requirement to maintain financial responsibility is enforceable regardless of whether the requirement is a condition of the permit.

P. Waiver of Requirements

1. Where applicable on a case-by-case basis, the commissioner may alter requirements for a Class I hazardous waste injection well from those set forth in this Section provided any reduction in requirements will not result in an increased risk for movement of fluids into an underground source of drinking water or outside of the injection zone.

2. When reducing requirements under this Subsection, the commissioner shall issue an order either separately or as part of the permit explaining the reasons for the action.

Q. Additional Requirements. The commissioner may prescribe additional requirements for a Class I hazardous waste injection well than those described in these regulations in order to protect underground sources of drinking water or prevent the movement of fluids outside of the injection zone.

**Credits**
AUTHORITY NOTE: Promulgated in accordance with R.S. 30:1D and 4C(16), and 4.1.

HISTORICAL NOTE: Promulgated by the Department of Natural Resources, Office of Conservation, LR 15:978 (November 1989).

ADD-75

Current through rules published in Louisiana Register Vol. 50, No. 6, June 20, 2024. Some sections may be more current; see credits for details.

LAC 43:XVII.209, 43 LA ADC Pt XVII, § 209

**End of Document**                                                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADD-76